## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CYNTHIA WARMBIER, *et al.*, <br><br>　　　　　　Judgment Creditors<br><br>　　v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br><br>　　　　　　Judgment Debtor. | **<u>FILED UNDER SEAL</u>**<br><br><br>Case No. 1:21-MC-00021 (LEK/DJS) |

## MEMORANDUM OF LAW IN SUPPORT
## <u>OF THE ISSUANCE OF WRIT OF EXECUTION</u>

TABLE OF CONTENTS

<u>PAGE</u>

TABLE OF AUTHORITIES ............................................................................................................ iii

RELIEF REQUESTED.................................................................................................................. 1

PROCEDURAL BACKGROUND................................................................................................. 1

ATTACHMENT AND TURNOVER PURSUANT TO THE TERROISM RISK
INSURANCE ACT........................................................................................................................ 3

ENFORCING THE JUDGMENT ................................................................................................. 6

THE SUBJECT FUNDS............................................................................................................... 7

THE WRIT SHOULD BE ISSUED ............................................................................................. 10

CONCLUSION.............................................................................................................................. 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave.*,
    No. 08 CIV. 10934, 2013 WL 2451067 (S.D.N.Y. June 6, 2013)..........................................11

*Doe v. Ejercito De Liberacion Nacional et al.*,
    Case No. 15-mc-00023 ...........................................................................................................1

*Est. of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*,
    919 F. Supp. 2d 411 (S.D.N.Y. 2013)...............................................................................6, 7

*Est. of Heiser v. Islamic Republic of Iran*,
    807 F. Supp. 2d 9 (D.D.C. 2011) ......................................................................................3, 4

*Gates v. Syrian Arab Republic*,
    755 F.3d 568 (7th Cir. 2014) *overruled on other grounds by Rubin v. Islamic*
    *Republic of Iran*, 830 F.3d 470 (7th Cir. 2016..................................................................5

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002)..................................................................................................11

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*,
    830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic*
    *Republic of Iran*, 138 S. Ct. 816 (2018)............................................................................5

*Ladjevardian v. The Republic of Argentina*,
    No. 04-CV-2710 (TPG), 2016 WL 3039189 (S.D.N.Y. May 26, 2016), *aff'd*
    *sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*,
    663 F. App'x 77 (2d Cir. 2016)..........................................................................................6

*Levin v. Bank of New York*,
    No. 09 CV 5900 RPP, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) .......................................5

*In re: Sealed Case*,
    Nos. 19-5058, -5100, -5102, -5103, 2019 WL 2717193 (D.C. Cir. June 28,
    2019) .....................................................................................................................................9

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
    946 F.3d 120 (2d Cir. 2019), *cert. denied sub nom. Fuller v. Banco Bilbao*
    *Vizcaya Argentaria, S.A.*, 141 S. Ct. 364 (2020) ..........................................................3, 4

**Statutes**

22 U.S.C. § 9222(a)(10)............................................................................................8

28 U.S.C. § 1605A.........................................................................................1, 3, 4, 5

28 U.S.C. § 1610 *et seq*. (Foreign Sovereign Immunities Act of 1976)........................2

28 U.S.C. § 1610(c) ............................................................................................2, 5

28 U.S.C. § 1610 Note (Terrorism Risk Insurance Act of 2002) ...............................3

TRIA § 201(a)...........................................................................................3, 4, 10, 12

TRIA § 201(d)(4).....................................................................................................4

**Other Authorities**

31 C.F.R. 501.605 ...................................................................................................7

31 C.F.R. part 510 ..........................................................................................2, 7, 11

*Designation of an Entity Pursuant to Executive Order 13382*, 74 Fed. Reg.
   41782-02 (Aug. 18, 2009)...................................................................................7

Exec. Order No. 13382, 70 Fed. Reg. 38567 (June 28, 2005) ...................................7

F.R.C.P. 69(a) ...............................................................................................6, 10, 11

*Imposition of Special Measure Against Bank of Dandong as a Financial*
   *Institution of Primary Money Laundering Concern*, 82 Fed. Reg. 51758-01
   (Nov. 8, 2017)....................................................................................................9

N.Y.C.P.L.R. § 5230 ......................................................................................6, 10, 11

Pursuant to the Court's Text Order dated March 31, 2021 (Dkt. No. 6) (the "Text Order"), Judgment Creditors Cynthia Warmbier and Frederick Warmbier, individually, and as personal representatives of the Estate of Otto Warmbier (together, the "Judgment Creditors"), by their undersigned attorneys, hereby file this *Memorandum of Law in Support of the Issuance of Writ of Execution* under seal.

Judgment Creditors submit the Declaration of their counsel Jason H. Cowley (the "Cowley Declaration") as evidence in support of this memorandum and further state as follows:

## RELIEF REQUESTED

1.      Pursuant to the Text Order, Judgment Creditors hereby clarify that they are, in fact, seeking the issuance of a writ of execution relating to certain property and respectfully submit this memorandum of law in support of their request that the Court issue the proposed writ (the "Writ") previously submitted to the Court, a copy of which has been filed under seal on March 24, 2021 as Docket No. 4.  As set forth in more detail herein, the property at issue (the "Subject Funds") are certain funds currently in the possession of the State of New York, Office of the State Comptroller, Thomas P. Dinapoli (the "Comptroller).  Upon issuance of the Writ, the Judgment Creditors will cause the Writ to be served on the Comptroller.  Once the Writ has been served, the Judgment Creditors will initiate a turnover proceeding with respect to the Subject Funds in order to seek partial satisfaction of a judgment against the Democratic People's Republic of Korea ("North Korea" or the "Judgment Debtor").  *See e.g.*, *Doe v. Ejercito De Liberacion Nacional et al.*, Case No. 15-mc-00023 (MAD/CFH) (N.D.N.Y.).

## PROCEDURAL BACKGROUND

2.      On December 24, 2018, the U.S. District Court for the District of Columbia (the "D.C. District Court") entered a judgment against North Korea under section 1605A(c) of the

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1610 *et seq.* ("FSIA") in the amount of $501,134,683.80 (the "Judgment") for the torture, hostage taking and extrajudicial killing of Judgment Creditors' son, Otto Warmbier. *See* Cowley Decl., Exs. A and B. Judgment Creditors hold the Judgment in their individual capacities as well as their capacities as personal representatives of the Estate of Otto Warmbier.

3.       On April 9, 2019, the D.C. District Court entered an order pursuant to 28 U.S.C. § 1610(c), authorizing the Judgment Creditors to seek attachment and execution to satisfy the Judgment. *See* Cowley Decl., Ex. C.

4.       Subsequently, Judgment Creditors engaged in discovery and issued subpoenas to the Comptroller in efforts to identify attachable assets. The Comptroller agreed to provide responsive information pursuant to a protective order. *See* Dkt. No. 5, Ex. 3. Specifically, the Comptroller agreed to provide detailed information with respect to certain funds in its possession that were blocked by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") pursuant to North Korea Sanctions Regulations, 31 C.F.R. part 510.

5.       On March 17, 2021, the Judgment was duly registered in this District. *See* Dkt. No. 1 (Registration of Foreign Judgment).

6.       On March 23, 2021, after consultation with the Clerk's Office in this District, counsel for the Judgment Creditors sent three copies of the proposed Writ with original signatures of counsel to the Clerk's Office for issuance of the requested Writ.[1]

---

[1] Although Judgment Creditors were unable to locate any specific guidance on the Court's website relating to the issuance of writs of execution, at least one other federal court in New York provides guidance on how to obtain a writ of execution from the clerk of court. *See, e.g.*, U.S. District Court of Southern District of New York website, https://www.nysd.uscourts.gov/forms/writ-execution-against-property (providing link to form for a writ of execution and directing: "A WRIT OF EXECUTION must be submitted to the Clerk's Office in paper form and include an original signature from the attorney. The Writ may be mailed to the Orders and Judgments Clerk with a stamped, self-addressed return envelope, or hand delivered.").

7.    On March 26, 2021, counsel for the Judgment Creditors received copies of the Writ from the Clerk's office, stamped with the date of receipt.  However, these copies were not signed by Court personnel.  Upon conferring with the Clerk's office, counsel was informed that the proposed Writ had been relayed to Your Honor for consideration and was advised to file a motion to seal the proposed Writ to the extent counsel sought to prevent a public filing of the Writ.  Accordingly, on March 26, 2021, Judgment Creditors filed a motion to seal the proposed Writ and any Writ issued by the Court (the "Motion to Seal").  *See* Dkt. No. 5.

8.    On March 31, 2021, pursuant to the Text Order, Judgment Creditors were directed to "to file a memorandum of law under seal establishing their entitlement to a writ of execution under § 201(a) of the Terrorism Risk Insurance Act and any other applicable federal or state substantive requirements."  *See* Dkt. No. 6.

## ATTACHMENT AND TURNOVER PURSUANT TO THE TERROISM RISK INSURANCE ACT

9.    Generally, property of a foreign sovereign is ordinarily immune from attachment. *Est. of Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9, 13 (D.D.C. 2011) (explaining that the Foreign Sovereign Immunities Act "broadly designates all foreign-owned property as immune, and then articulates limited exceptions to that immunity.").  However, judgments entered under FSIA's terrorism exception, codified at 28 U.S.C. § 1605A,[2] entitles judgment creditors to enforce such judgments in accordance with section 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297; 116 Stat. 2337, codified at 28 U.S.C. § 1610 Note ("TRIA").  *Vera v. Banco*

---

Counsel for the Judgment Creditors attempted to follow a similar procedure in seeking to obtain the Writ, and apologizes for causing any confusion in doing so.

[2] "From 1996 through 2008, the state-sponsored terrorism exception to sovereign immunity was codified at 28 U.S.C. § 1605(a)(7).   In 2008, section 1605(a)(7) was modified and then recodified as section 1605A." *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 129 (2d Cir. 2019), *cert. denied sub nom. Fuller v. Banco Bilbao Vizcaya Argentaria, S.A.*, 141 S. Ct. 364 (2020), n. 6.

*Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019), *cert. denied sub nom. Fuller v. Banco Bilbao Vizcaya Argentaria, S.A.*, 141 S. Ct. 364 (2020) (Section 201(a) of TRIA "grants courts subject-matter jurisdiction over post-judgment execution and attachment proceedings involving blocked assets "in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A…").

10.     Section 201(a) of TRIA provides as follows:

Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism, or for which a terrorist party is not immune under 28 U.S.C. § 1605(a)(7) of title 28, United States Code, ***the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable***.

TRIA § 201(a) (emphasis added).

11.     Congress enacted TRIA "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." *Heiser*, 807 F. Supp. 2d at 15 (quoting H.R. Conf. Rep. 107-779, at 27 (2002)).

12.     For purposes of TRIA, "terrorist party" is defined to include "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4). The U.S. Department of State designated North Korea as such in November 2017. *See* Cowley Decl., Ex. D.

13.     With respect to the definition of "agency or instrumentality" as used in TRIA, plaintiffs must show the entity in question "(1) was a means through which a material function of

-4-

the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of

the terrorist party, or (3) was owned, controlled, or directed by the terrorist party."  *See*

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 134–36 (2d Cir. 2016),

*abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

14.     At least some courts have held that judgment creditors must obtain a court order

under section 1610(c) of FSIA prior to attachment or execution of assets, including the issuance

of any valid writ of execution, in order to satisfy judgments awarded under section 1605A of FSIA,

even when the attachment is being pursued under TRIA.  *See, e.g., Levin v. Bank of New York*, No.

09 CV 5900 RPP, 2011 WL 812032, at \*9-10 (S.D.N.Y. Mar. 4, 2011) (Section 1605A judgment

creditors must "obtain court orders under 1610(c) prior to attachment or execution" even if

attachment is being pursued under TRIA as "[such judgment creditors] remain subject to the

requirements of 1610(c)" in order for writs to be valid).  The Judgment Creditors have obtained

such an order from the D.C. District Court.  *See* Cowley Decl., Ex. C; *see also Gates v. Syrian*

*Arab Republic*, 755 F.3d 568, 577 (7th Cir. 2014) *overruled on other grounds by Rubin v. Islamic*

*Republic of Iran*, 830 F.3d 470 (7th Cir. 2016) (holding that judgment creditors "complied with §

1610(c) in the District of Columbia before they sought attachment of the Syrian assets in the

Northern District of Illinois," and that:  "Where such a determination is required, one suffices for

attachment efforts throughout the United States. There is no reason for later courts to revisit an

earlier determination that sufficient time has passed to allow attachment. Time's arrow always

moves in the same direction.").

## ENFORCING THE JUDGMENT

15.     Pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 69(a)(1), "a money judgment is enforced through a writ of execution, unless the court directs otherwise" and the procedure on execution is governed by applicable state law.

16.     Article 52 of the New York Civil Practice Law and Rules ("N.Y.C.P.L.R.") provides various mechanisms to enforce money judgments in New York, including section 5230 thereof, "one of the most common enforcement devices…[which] is available against any non-exempt property in which the [judgment debtor] has an interest." N.Y.C.P.L.R. Commentaries 5230:1. Section 5230 "allows courts to authorize 'an execution' on property to satisfy a judgment. An execution is an instrument 'delivered to the court's enforcement officer, usually the sheriff, directing the sheriff to levy against any nonexempt property that can be found belonging to the judgment debtor'… § 5230 requires a creditor to show that the debtor 'has an interest' in the property." *See Ladjevardian v. The Republic of Argentina*, No. 04-CV-2710 (TPG), 2016 WL 3039189, at *5 (S.D.N.Y. May 26, 2016), *aff'd sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77 (2d Cir. 2016) (denying writ of execution where debtors did not have interest in property at issue); *see also Est. of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 414 (S.D.N.Y. 2013) (allowing for turnover of funds based on writ of execution served and issued pursuant to F.R.C.P. 69(a) and N.Y.C.P.L.R. § 5230 prior to commencement of turnover action).

17.     In addition, if the blocked assets are subject to attachment under TRIA, the funds can be executed on (and ultimately turned over) without a license from OFAC. *Est. of Heiser v.*

*Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d at 422 (citing *Weininger v. Castro*, 462 F. Supp. 2d. 457, 499 (S.D.N.Y. 2006)).[3]

## THE SUBJECT FUNDS

18.     The Subject Funds consist of approximately $240,336.41, held by the Comptroller, which have been blocked by OFAC pursuant to North Korea Sanctions Regulations, 31 C.F.R. part 510.  *See* Cowley Decl., Exs. E, F, and G.

19.     Based on documents provided by the Comptroller, the Subject Funds came into the Comptroller's possession when a financial institution reported that one of the accounts it maintained was blocked by OFAC (the "Blocked Account") and submitted a check constituting all funds in the Blocked Account, in the amount of $240,336.41, to the Comptroller.  The Blocked Account was in the name of Korea Kwangson Banking Corporation ("KKBC"), with an address of Jungson-dong, Sungri Street, Central District, Pyongyang, North Korea.  *See id.*

20.     According to a 2009 OFAC press release, KKBC has been designated (and its assets accordingly blocked) by the U.S. Department of Treasury under Executive Order (E.O.) 13382[4] for having provided financial services in support of three other North Korean entities that were identified by the President as weapons of mass destruction proliferators and designated by the United Nations to have participated in North Korea's weapons of mass destruction and missile programs.  *See* Cowley Decl., Ex. H; *see also Designation of an Entity Pursuant to Executive Order 13382*, 74 Fed. Reg. 41782-02 (Aug. 18, 2009) (notice blocking property and interests in property of KKBC pursuant to Executive Order 13382).  As the press release notes, "North Korea's

---

[3] The Judgment Creditors are mindful of their litigation reporting requirements to OFAC under 31 C.F.R. 501.605.

[4] Executive Order 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supports") was issued pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and Section 301 of Title 3, United States Code.  *See* Exec. Order No. 13382, 70 Fed. Reg. 38567 (June 28, 2005).

use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities" and KKBC has been utilized "to facilitate funds transfers likely amounting to millions of dollars."  *See* Cowley Decl., Ex. H.

21.     Other bodies have also imposed sanctions against KKBC for its role in furthering North Korea's weapons of mass destruction proliferation efforts.  On March 2, 2016, the United Nations Security Council adopted Resolution 2270, which expanded an asset freeze mandated under prior Resolution 1718, dated October 14, 2006, to include KKBC's assets.  Specifically, pursuant to Paragraph 10 of Resolution 2270 and Paragraph 8(d) of Resolution 1718, all member states of the United Nations were directed to (i) "freeze immediately the funds, other financial assets and economic resources which are on their territories…that are owned or controlled, directly or indirectly, by [KKBC]" and (ii) "ensure that any [such] funds, financial assets and economic resources [were] prevented from being made available by their nationals or by any persons or entities within their territories, to or for the benefit of persons of entities [acting on behalf of or at the direction of KKBC]"  based on the Security Council's designation that KKBC was "engaged in or providing support for, including through other illicit means, [North Korea's] nuclear-related, other weapons of mass destruction-related and ballistic missile-related programmes[.]"  *See* Cowley Decl., Exs. I and J.  Shortly after the adoption of Resolution 2270, on March 4, 2016, the Council of the European Union adopted its own Council Decision (CFSP) 2016/319, adding KKBC to the European Union's list of sanctioned North Korean entities.  *See* Cowley Decl., Ex. K.

22.     Congress has taken note of OFAC's findings, as well as the European Union's, with respect to KKBC specifically.  *See* 22 U.S.C. § 9222(a)(10) (congressional finding that KKBC

was "designated by the Secretary of the Treasury and the European Union as having materially contributed to the proliferation of weapons of mass destruction"). Similarly, the Financial Crimes Enforcement Network (FinCEN), another component of the U.S. Department of Treasury, has described KKBC as "a U.S.- and UN-designated North Korean bank that has provided financial services in support of [weapons of mass destruction] proliferators." *See Imposition of Special Measure Against Bank of Dandong as a Financial Institution of Primary Money Laundering Concern*, 82 Fed. Reg. 51758-01 (Nov. 8, 2017).

23.     Additionally, the U.S. Department of Justice has described KKBC as a "sanctioned North Korea state bank[.]" *See* Appellate Br. of U.S. Dep't of Justice in *In re: Sealed Case*, Nos. 19-5058, -5100, -5102, -5103, 2019 WL 2717193 at *39 (D.C. Cir. June 28, 2019). In a forfeiture complaint filed by the Department in the D.C. District Court, and verified by Special Agent Benjamin Whitley of the Federal Bureau of Investigation (the "Verified Complaint"), KKBC is described as a "North Korean bank that was previously designated by OFAC and the U.N. for providing financial services for North Korea's weapons of mass destruction proliferators." *See* Cowley Decl., Ex. L at ¶ 29. The Verified Complaint further identifies KKBC as a subsidiary of a North Korean state-run bank, the Foreign Trade Bank, which North Korea has used "to work with a host of front companies in order to access the U.S. financial system and evade the U.S. sanctions imposed on [Foreign Trade Bank] and its sanctioned affiliates." *Id*. at ¶¶ 1, 29.

24.     The Judgment Creditors also provide the expert declaration of Professor Sung-Yoon Lee, the Kim Koo-Korea Foundation Professor in Korean Studies and Assistant Professor at the Fletcher School of Law and Diplomacy at Tufts University. *See* Cowley Decl., Ex. M. Based on public information, including the information set forth above, as well as his own academic and professional knowledge, Professor Lee states: "I readily conclude that KKBC not only constitutes

an agency or instrumentality of the North Korean state but is an essential state enterprise that facilitates North Korea's manifold sanctions evasion and illicit activities around the world[.]" *Id.* at ¶ 9.  He explains that:  "KKBC is a means through which a material function of North Korea is carried out, to wit, the illicit movement of funds though the global financial system to support the funding of North Korea's weapons programs.  Relatedly, KKBC provided material services to, on behalf of, or in support of North Korea in furtherance of these ends…Based on my own knowledge and familiarity with the government and economy of North Korea, I know that financial institutions such as KKBC based in North Korea, a totalitarian state, are, in fact, owned, controlled, and directed by the Government of North Korea[,]" and thus, he is "readily able to conclude that KKBC is owned, controlled, and directed by the Government of North Korea." *Id.* at ¶¶ 14, 15. As a result, Professor Lee concludes that "KKBC functions as an organ of the state of North Korea, and it constitutes an 'agency or instrumentality' of North Korea as those terms are used in TRIA." *Id.* at ¶ 16.

25.    Accordingly, there is ample basis to conclude that KKBC constitutes an agency or instrumentality of North Korea for purposes of TRIA.

## THE WRIT SHOULD BE ISSUED

26.    As established herein, the Subject Funds are subject to turnover in partial satisfaction of the Judgment, as all requirements under section 201(a) of TRIA are satisfied.  As such, the Writ should be issued under F.R.C.P. 69(a), N.Y.C.P.L.R. § 5230 and applicable case law.

27.    First, as set forth above, North Korea meets the definition of "terrorist party" under TRIA. *See* Cowley Decl., Ex. D.

28.     Second, the Subject Funds constitute "blocked assets," as they have been, and remain, blocked by OFAC pursuant to the North Korea Sanctions Regulations, 31 C.F.R. part 510. *See* Cowley Decl., Ex. G (identifying the Blocked Account as an "OFAC Blocked Account").

29.     Third, the Subject Funds constitute funds of KKBC because the Subject Funds were held in the Blocked Account, which was titled to KKBC. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows.").

30.     Fourth, as set forth above, KKBC constitutes an agency or instrumentality of North Korea under TRIA.  Based on the information and evidence set forth herein, including but not limited to, OFAC's factual findings and the expert conclusions of Professor Lee, there can be no serious disagreement that KKBC (i) was a means through which a material function of North Korea was accomplished, (ii) provided material services to, on behalf of, or in support of North Korea, or (iii) was owned, controlled, or directed by North Korea.  Any one of these three prongs would satisfy the requisite definition.  Here, all three prongs are satisfied.  *See* Cowley Decl., Ex. M; *see also In re 650 Fifth Ave.*, No. 08 CIV. 10934, 2013 WL 2451067, at *6 (S.D.N.Y. June 6, 2013) (in conducting TRIA analysis, explaining that OFAC's factual findings are afforded great deference "[g]iven OFAC's unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes its determinations").

31.     Accordingly, the Judgment Creditors have established that North Korea, or an agency or instrumentality thereof, has an interest in the Subject Funds, which entitles the Judgment Creditors to a writ of execution under F.R.C.P. 69(a),  N.Y.C.P.L.R. § 5230 and applicable case law.

## **CONCLUSION**

32.     Because the Subject Funds constitute the blocked assets of an agency or instrumentality of the relevant terrorist party, North Korea, the Judgment Creditors may pursue a turnover action with respect to the Subject Funds pursuant to section 201(a) of TRIA, and are accordingly entitled to the issuance of a writ of execution as a first step in that process.

WHEREFORE, Judgment Creditors respectfully request that the Court enter an order in the form attached hereto as **Exhibit A** which:

(A)     Finds that KKBC is an agent and/or instrumentality of North Korea, and that its blocked assets are therefore subject to execution pursuant to TRIA, based on the information set forth herein;

(B)     Directs the Clerk of the Court to issue the writ of execution previously submitted to the Court and docketed as Docket No. 4, a copy of which is attached hereto as **Exhibit B**;

(C)     Grants the Judgment Creditors' Motion to Seal (Dkt. No. 5) and directs the Clerk of the Court to (i) maintain the proposed writ of execution (Dkt. No. 4) under seal and (ii) file any resulting court-issued writ of execution under seal for a period of 30 days, subject to additional extensions as necessary;

(D)     For the same reasons set forth in the Motion to Seal, directs that this memorandum of law and all exhibits attached hereto, and all accompanying documents, including the Cowley Declaration and all exhibits attached thereto, be maintained under seal;

(E)     Notwithstanding the foregoing, allows the Judgment Creditors to (1) receive a copy of the court-issued writ of execution, (2) cause service thereof upon the Comptroller and (3) take other actions necessary to satisfy any reporting obligations to the U.S. Government; and

(F)     Grants such further relief as the Court deems just and proper.

Dated: April 2, 2021

         Respectfully submitted,


          s/ Jason H. Cowley
         Jason H. Cowley
         NDNY Bar No. 70260
         McGuireWoods LLP
         1251 Avenue of the Americas, 20th Floor.
         New York, NY 10020
         Telephone: (212) 548-2138
         Facsimile: (212) 715-2311
         Email: jcowley@mcguirewoods.com

         *Attorney for Judgment Creditors*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CYNTHIA WARMBIER, *et al.*,<br><br>          Judgment Creditors<br><br>     v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br><br>          Judgment Debtor. | **FILED UNDER SEAL**<br><br>Case No. 1:21-MC-00021 (LEK/DJS) |

**ORDER GRANTING ISSUANCE OF WRIT OF EXECUTION AND MOTION TO**
**FILE REQUESTED AND RESULTING WRIT OF EXECUTION UNDER SEAL**

Upon due and careful consideration of Judgment Creditors' Motion to File Requested and Resulting Writ of Execution under Seal (Dkt. No. 5) (the "Motion to Seal") and the Memorandum of Law in Support of the Issuance of Writ of Execution (Dkt. No. __) (the "Memorandum of Law"), and all legal and factual authorities cited therein, including section 201(a) of the Terrorism Risk Insurance Act of 2002 (Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297; 116 Stat. 2337, codified at 28 U.S.C. § 1610 Note ("TRIA"), Federal Rule of Civil Procedure 69(a) and section 5230 of the New York Civil Practice Law and Rules, and Judgment Creditors' supporting declarations of their counsel and expert witness, including all exhibits attached thereto, it is

**HEREBY ORDERED AND ADJUDGED** as follows:

1.      Based on the information set forth in the Judgment Creditors' Memorandum of Law and accompanying documents and exhibits thereto, including but not limited to U.S. Department of Treasury, Office of Foreign Assets Control's factual findings with respect to Korea Kwangson Banking Corporation and the expert declaration of Professor Sung-Yoon Lee, the Court finds that

Korea Kwangson Banking Corporation is an agent and/or instrumentality of the Democratic People's Republic of Korea, and its blocked assets are therefore subject to execution pursuant to TRIA.

2.      The Clerk of the Court is hereby directed to (i) issue the writ of execution in the form filed under seal as Docket No. 4 and deliver a copy to the Judgment Creditors to cause service and levy on garnishee by the U.S. Marshal and (ii) file the issued writ of execution under seal for a period of 30 days, subject to additional extensions as necessary;

3.      Judgment Creditors' Motion to Seal (Dkt. No. 5) is hereby granted;

4.      The Clerk of the Court is further directed to maintain the proposed writ of execution (Dkt. No. 4) under seal pending any court order directing otherwise;

5.      The Clerk of the Court is further directed to maintain the Memorandum of Law, all exhibits attached thereto, and all accompanying documents, including the declarations of Judgment Creditors' counsel and expert witness and all exhibits attached thereto, as well as this Order, under seal, pending any court order directing otherwise;

6.      Notwithstanding the sealing provisions contained herein, the Judgment Creditors are authorized to take actions necessary to satisfy any legal reporting obligations to the U.S. Department of Treasury, Office of Foreign Assets Control.

**SO ORDERED**.

Dated: April __, 2021

_____
United States District Judge
For the Northern District of New York

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK



Docket No. 21-MC-00021

**THE PRESIDENT OF THE UNITED STATES OF AMERICA**
*To the Marshal of the Northern District of New York, GREETING*:

YOU ARE COMMANDED, that of the goods and chattels of the Democratic People's Republic of North Korea and its agencies and instrumentalities in your district, including, but not limited to, specifically $240,336.41 in funds of Korea Kwangson Banking Corporation, an agency or instrumentality of the Democratic People's Republic of North Korea, currently held by the State of New York, Office of the State Comptroller, you cause to be made in the sum of <u>Five Hundred and One Million One Hundred Thirty-Four Thousand Six Hundred and Eighty-Three dollars and Eighty cents ($501,134,683.80)</u>, which lately in the United States District Court for the District of Columbia, in the District of Columbia Circuit, Frederick Warmbier, individually and as a personal representative of the Estate of Otto Warmbier, and Cynthia Warmbier, individually and as a personal representative of the Estate of Otto Warmbier, recovered against said Democratic People's Republic of North Korea in an action between Frederick Warmbier, individually and as a personal representative of the Estate of Otto Warmbier, and Cynthia Warmbier, individually and as a personal representative of the Estate of Otto Warmbier, PLAINTIFFS, and the Democratic People's Republic of North Korea, DEFENDANT, in favor of said PLAINTIFFS and which judgment the said PLAINTIFFS thereafter duly registered and docketed in the United States District Court for the Northern District of New York as appears by the record filed in the Clerk's Office of said District Court for the Northern District of New York on the 17th day of March, in the year 2021.

and if sufficient personal property of the said Democratic People's Republic of North Korea cannot be found in your District, then you cause the same to be made out of the real property belonging

to such judgment debtor, the Democratic People's Republic of North Korea, on the above-mentioned day, or at any time thereafter, in whose hands soever the same may be, and return this execution within sixty days after its receipt by you, to the Clerk of said District Court.

WITNESS, the Honorable Glenn T. Suddaby, Chief Judge of the United States District Court for the Northern District of New York on the _____ day of March in the year of our Lord two thousand and twenty-one, and of the Independence of the United States the two hundred forty fifth year.


_____
CLERK

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Cynthia Warmbier, et al.

v.

Democratic People's Republic of North Korea

EXECUTION AGAINST PROPERTY

Jason Cowley
McGuireWoods LLP
1251 6th Avenue, 20th Floor
New York, NY 10020
212-548-2100

Attorney for

Frederick Warmbier, individually and as a personal representative of the Estate of Otto
Warmbier, and Cynthia Warmbier, individually and as a personal representative of the Estate of
Otto Warmbier

State of New York
County of Albany

To the Marshal:

You will levy and collect Five Hundred and One Million One Hundred Thirty-Four Thousand Six
Hundred and Eighty-Three dollars and Eighty cents ($501,134,683.80), including, but not limited
to, specifically $240,336.41 in funds of Korea Kwangson Banking Corporation, an agency or
instrumentality of the Democratic People's Republic of North Korea, currently held by the State
of New York, Office of the State Comptroller, from the Democratic People's Republic of North
Korea and its agencies and instrumentalities, with interest from 24th day of December 2018,
besides your fees etc.

Jason Cowley
McGuireWoods, LLP

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CYNTHIA WARMBIER, *et al.*,<br><br>         Judgment Creditors<br><br>   v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br><br>         Judgment Debtor. | **FILED UNDER SEAL**<br><br>Case No. 1:21-MC-00021 (LEK/DJS) |

## DECLARATION OF JASON H. COWLEY

I, Jason H. Cowley, declare pursuant to 28 U.S.C. 1746 under penalty of perjury as follows:

1.     I am a partner with the law firm of McGuireWoods LLP ("McGuireWoods"), counsel for Judgment Creditors Cynthia Warmbier and Frederick Warmbier, and am admitted to practice in New York and before this Court. I submit this declaration in relation to the Judgment Creditors' Memorandum of Law in Support of the Issuance of a Writ of Execution.

2.     Attached hereto as **Exhibit A** is a true and correct certified copy of the memorandum opinion issued by the U.S. District Court for the District of Columbia ("D.C. District Court") on December 24, 2018, relating to the judgment entered against North Korea under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1610 *et seq.* ("FSIA") in the amount of $501,134,683.80 (the "Judgment") for the torture, hostage taking and extrajudicial killing of Plaintiffs' son, Otto Warmbier.

3.     Attached hereto as **Exhibit B** is a true and correct certified copy of the Judgment itself entered by the D.C. District Court on December 24, 2018.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the order entered by the D.C. District Court under 28 U.S.C. § 1610(c) on April 9, 2019.

5.      Attached hereto as **Exhibit D** is a true and correct copy of 82 Fed. Reg. 56100-01, which designates the Democratic People's Republic of Korea ("North Korea") as a state sponsor of terrorism as of November 17, 2017.

6.      Attached hereto as **Exhibits E, F, and G** are documents McGuireWoods received from State of New York, Office of the State Comptroller, Thomas P. Dinapoli (the "Comptroller") regarding certain funds in its possession in the sum of $240,336.41 (the "Subject Funds"). Exhibit E is a true and correct copy of what appears to be a screenshot showing the name of the holder of the account containing the Subject Funds. Exhibit F is a true and correct copy of what appears to be a screenshot showing the nature and origin of the Subject Funds. Exhibit G is a true and correct copy of a document relating to the Subject Funds, which describes in detail how the Subject Funds came into the Comptroller's possession.

7.      Attached hereto as **Exhibit H** is a true and correct copy of a press release from the U.S. Department of Treasury dated August 11, 2009.

8.      Attached hereto as **Exhibit I** is a true and correct copy of Resolution 2270, which was adopted by the United Nations Security Council on March 2, 2016.

9.      Attached hereto as **Exhibit J** is a true and correct copy of Resolution 1718, which was adopted by the United Nations Security Council on October 14, 2006.

10.     Attached hereto as **Exhibit K** is a true and correct copy of Council Decision (CFSP) 2016/319, which was adopted by the Council of the European Union on March 4, 2016.

11.     Attached hereto as **Exhibit L** is a true and correct copy of a verified forfeiture complaint in Civil Action No. 17-cv-01166 in the U.S. District Court for the District of Columbia,

filed by the U.S. Department of Justice and verified by Special Agent Benjamin Whitley of the Federal Bureau of Investigation.

12.      Attached hereto as **Exhibit M** is a true and correct copy of the Expert Declaration of Professor Sung-Yoon Lee, the Kim Koo-Korea Foundation Professor in Korean Studies and Assistant Professor at the Fletcher School of Law and Diplomacy at Tufts University.

I declare under penalty of perjury under the laws of the United States that the foregoing information is true and correct.

Executed on ___April 2___, 2021 in ___Charlotte, NC___.

Signed: _____
Jason H. Cowley
NDNY Bar No. 70260
McGuireWoods LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020
Telephone: (212) 548-2138
Facsimile: (212) 715-2311
Email: jcowley@mcguirewoods.com

*Attorney for Judgment Creditors*

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WARMBIER, *et al.*,

      Plaintiffs,

      v.

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,

      Defendant.

Civil Action No. 18-977 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

"What the heck did you do to my kid?"[1]  This is the anguished question voiced by the mother of Otto Warmbier when, after detaining the young man for over 17 months, the Democratic People's Republic of Korea ("North Korea") returned Otto's comatose body to the United States.[2]  Before Otto traveled with a tour group on a five-day trip to North Korea, he was a healthy, athletic student of economics and business in his junior year at the University of Virginia, with "big dreams" and both the smarts and people skills to make him his high school class salutatorian, homecoming king, and prom king.  Decl. of Cynthia Warmbier ("C. W. Decl.") ¶¶ 11–16, ECF No. 16-2; H'rg Tr. (Rough) at 50–51 (Austin Warmbier ("A. W.")); *id.* at 58 (C. W.).  He was blind, deaf, and brain dead when North Korea turned him over to U.S. government officials for his final trip home.  H'rg Tr. (Rough) at 31, 36 (Frederick Warmbier

---

[1]    Rough Transcript of Hearing (Dec. 19, 2018) ("H'rg Tr. (Rough)") at 82 (Cynthia Warmbier ("C. W.")).  Citations to the December 19, 2018 hearing are to a rough draft of the transcript, since no final transcript is yet available.  The final transcript will be posted on this case's docket when available.  Discrepancies in page numbers between the rough and final transcripts may exist.

[2]    The Warmbier family members will be referenced in the text by their first names to simplify their identification in this Memorandum Opinion, and by their initials in citations to the hearing transcript.

("F. W.")). Otto died within a week of his return. Decl. of Dr. Daniel Kanter ("Kanter Decl.") ¶ 20, ECF No. 16-4.

A deeply knowledgeable expert from the Fletcher School of Law and Diplomacy at Tufts University describes North Korea as "unique" in the world today: North Korea is the "most advanced, most perfected totalitarian state in world history," H'rg Tr. (Rough) at 105, 110 (Expert Prof. Sung-Yoon Lee), and has "perfected its means of terrorizing" both its own people and others, *id.* at 111. The dictator who leads North Korea, and his cronies, "show[] no regard for human life," *id.* at 127, creating, for example, a "manmade . . . famine" in the late 1990s that killed "upwards of 2 million people," *id.*, and maintaining "political prisoner concentration camps," *id.* at 110, such that "North Korean escapees" tell "a consistent story" of "a life of extreme deprivation and repression," *id.* at 111. Moreover, North Korea is "unprecedented" in its state sponsorship of "elicit activities, like proliferation of weapons of mass destruction, counterfeiting U.S. dollars, [and] the production and sale of drugs like opium, heroin, and meth[amphetamines]." *Id.* at 106. Indeed, North Korea is the world's "leading" and "best qualified candidate for indictment" at the International Criminal Court for crimes against humanity. *Id.* at 122. An American family, the Warmbiers, experienced North Korea's brutality first-hand when North Korea seized their son to use as a pawn in that totalitarian state's global shenanigans and face-off with the United States. As Otto's mother said, "there's evil in this world," *id.* at 82 (C. W.), and "[i]t's North Korea," *id.*

Having been compelled to keep silent during Otto's detention in North Korea in an effort to protect his safety, Otto's parents have since promised to "stand up" and hold North Korea accountable for its "evil" actions against their son. *Id.* at 58–60 (C. W.). To that end, Otto's parents, Cynthia ("Cindy") and Frederick ("Fred") Warmbier, initiated this action individually

and as personal representatives of Otto's estate, seeking damages under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, against North Korea for its torture, hostage taking, and extrajudicial killing of Otto.  Compl. ¶¶ 1–5, ECF No. 1.  North Korea never entered an appearance in, or defended against, this action, and the plaintiffs now move for default judgment for the damage caused by North Korea to Otto and his parents.  For the reasons discussed below, default judgment is granted and Otto and his parents are awarded damages totaling $501,134,683.80.

## I.    BACKGROUND

The factual background surrounding Otto's detention in North Korea is summarized below, followed by an overview of the procedural history of this case.  The factual background is based upon the detailed declarations submitted by the plaintiffs in support of their motion for default judgment, as well as exhibits and testimony presented at an evidentiary hearing held on December 19, 2018.[3]

### A.    Otto Warmbier's Detention in North Korea

Otto Warmbier, a 21-year-old University of Virginia student, with a curiosity to learn more about the world through travel, took a five-day trip to North Korea, between December 29, 2015 and January 2, 2016, in advance of a study abroad program in China.  H'rg Tr. (Rough) at 13–15 (F. W.); *id.* at 59 (C. W.); C. W. Decl. ¶¶ 15–16.  Otto had an "open mind" and "wanted to explore," and he viewed the trip to North Korea as an opportunity to experience a different culture and way of life.  H'rg Tr. (Rough) at 59, 64–65 (C. W.); C. W. Decl. ¶ 15.  Although Otto's parents were "nervous" about Otto's trip, a University of Virginia professor advised Otto

---

[3]    Six witnesses testified at the evidentiary hearing:  Otto's parents, Fred and Cindy Warmbier, his younger siblings, Austin and Greta Warmbier, and two experts on North Korea, David Hawk and Professor Sung-Yoon Lee.

3

that travel to North Korea was safe with certain tour groups, and the website for the operator of Otto's tour group, Young Pioneer Tours, attested to the safety of their guided trips into North Korea. Decl. of Frederick Warmbier ¶ 5 ("F. W. Decl."), ECF No. 16-1; H'rg Tr. (Rough) at 14 (F. W.).

On January 2, 2016, Otto's scheduled departure date from North Korea, Fred and Cindy expected Otto to call them when he arrived in China, but that call never came. H'rg Tr. (Rough) at 14–15 (F. W.); F. W. Decl. ¶ 5. The next morning, the tour company explained that Otto missed his flight because North Korean officials took him out of the security line at the Pyongyang Sunan International Airport, and he could not leave North Korea with the rest of his tour group. H'rg Tr. (Rough) at 15 (F. W.); F. W. Decl. ¶ 5; C.W Decl. ¶ 16. The tour company reassured Otto's parents that "everything was fine," adding that the president of the tour company stayed with Otto and he would be "on the next flight out." H'rg Tr. (Rough) at 15–16 (F. W.); F. W. Decl. ¶ 5. Over "the next day or two," the tour company again reassured Otto's parents that "everything was fine," and Otto's inability to leave North Korea "was just a misunderstanding." F. W. Decl. ¶ 6; H'rg Tr. (Rough) at 15 (F. W.). Shortly thereafter, however, the tour company said that Otto was sick and had been taken to a hospital, and the president of the tour company left North Korea for China, leaving Otto unaccompanied in North Korea. H'rg Tr. (Rough) at 15–16 (F. W.); F. W. Decl. ¶ 6.

When Otto was detained, the U.S. State Department advised Fred and Cindy that Otto's detention was part of North Korea's "normal routine" when "they want something," and assured them that, "based on history," Otto would "be home in six months." H'rg Tr. (Rough) at 17–18 (F. W.). The State Department cautioned the Warmbiers against speaking to media outlets or publicly about Otto's detention because North Korea was "going to want something for Otto,"

and the more the family spoke publicly, "the more it's going to cost." *Id.* at 17, 22–24 (F. W.); *id.* at 65 (C. W.). Otto's parents were also told that, at some point, North Korea would permit Otto to call home, usually late at night, and in a statement dictated by North Korea through Otto would provide a clue as to what North Korea wanted as a condition of his release. *Id.* at 67 (C. W.).

Given the repeated cautions against speaking publicly, Otto's parents were "[t]errified," "afraid to . . . speak out or discuss" Otto "with anyone," including their neighbors and friends. *Id.* at 16, 23 (F. W.); *id.* at 72 (C. W.). They had a "sixth sense" that "things were bad for Otto," but what transpired was worse than they "could have imagined." F. W. Decl. ¶ 27. Even Otto's two younger siblings, Austin and Greta Warmbier, and Otto's friends were fearful about speaking publicly due to the possibility that North Korea would punish Otto. H'rg Tr. (Rough) at 45 (Greta Warmbier ("G. W.")); *id.* at 59–60 (C. W.); F. W. Decl. ¶ 7. "[S]peaking out against North Korea would antagonize the country and prolong or worsen Otto's detention." F. W. Decl. ¶ 16. In this way, over the duration of Otto's detention, North Korea "controlled" the "dialogue the whole time." H'rg Tr. (Rough) at 82–83 (C. W.).

Otto's parents remained in the dark about the reason for Otto's detention in North Korea until three weeks later, on January 22, 2016, F. W. Decl. ¶ 7, when the Korean Central News Agency ("KCNA"), North Korea's state media outlet, Expert Decl. of David Hawk ("Hawk Expert Decl.") ¶ 11, ECF No. 16-9, released an article stating Otto was "under investigation," Decl. of Benjamin L. Hatch ("Hatch Decl."), Ex. A (KCNA Article titled, "American Arrested for His Hostile Act Against DPRK"), ECF No. 16-1. The article reported that Otto had been "arrested while perpetrating a hostile act against the DPRK," having entered the country "under

the guise of tourist [*sic*] for the purpose of bringing down the foundation of its single-minded

unity at the tacit connivance of the U.S. government and under its manipulation." *Id.*

Then, on February 29, 2016, North Korea televised Otto reciting a prepared "confession"

to "severe crimes against" the DPRK, that amounted to Otto allegedly taking down a poster with

a political slogan supporting North Korea's dictator, Kim Jong-Il, from a hotel's staff-only area,

at the behest of a church in Ohio and the CIA. Hatch Decl., Ex. B (Tr. of Otto's "Confession");

Hatch Decl., Ex. C (Video of Otto's "Confession"); *see also* Expert Decl. of Robert M. Collins

("Collins Expert Decl.") ¶ 21, ECF No. 16-10. The preposterous "confession" was riddled with

"totally bizarre," "completely false" statements, F. W. Decl. ¶ 8, and malapropisms tied to North

Korean cultural references that would not be used by an American, H'rg Tr. at 123–26 (Expert

Prof. Sung-Yoon Lee). In short, the "confession" was plainly coerced and "completely

manipulated." *Id.* at 18 (F. W.).

Examples of the many untruths in the purported "confession" include: (1) Otto called his

father's company "Finishing Cincinnati Black Oxide," but that company, in fact, is called

"Finishing Technology," F. W. Decl. ¶ 8; (2) Otto said he practiced for his alleged crime by

stealing street signs at the University of Virginia and storing the stolen signs under his bed, H'rg

Tr. (Rough) at 19 (F. W.); F. W. Decl. ¶ 8, yet his father never found any such stolen signs, let

alone under Otto's bed at Otto's apartment, H'rg Tr. (Rough) at 19 (F. W.); F. W. Decl. ¶ 8; (3)

Otto said he conspired with the Friendship United Methodist Church, which had assets of $42

million, even though Otto had no relationship with that church, was not Methodist, and the

church has no such extensive assets, H'rg Tr. (Rough) at 19 (F. W.); F. W. Decl. ¶ 8; (4) Otto

said he agreed to take the poster because he "'desperately' needed a car" and $200,000 to fund

his two siblings' college tuition, when Otto "had his own car and was never expected or asked to

pay for his siblings' tuition," F. W. Decl. ¶ 8; and (5) Otto said he conspired with "the Z
Society," but had no connection to any such organization, *id.*

In addition to these false statements in his "confession," Otto spoke with "unnatural"
language that sounded as if he had "been forced to memorize" the words. *Id.* ¶¶ 8, 9. Otto, for
instance, said "I came to commit this crime task," "[t]he United States administration already
knows about my act through the CIA, which is closely linked to the Z Society and connived at
my crime," "[t]his was a very foolish aim," "[t]his made an innocent-minded, adventurous young
man, like myself, want to show my bravery to improve my reputation and show a Western
victory of the DPR Korea," and "I intentionally packed my quietest boots, the best for sneaking.
I knew that I would wear them during my crime commitment." *Id.* ¶ 9.

Otto's "strange phrases," such as the references to the "U.S. administration," "DPR
Korea instead of DPRK," and his "quietest boots for sneaking" were "clumsy" North Korean
"stock phrase[s]" that provide "no doubt . . . that this was a coerced confession under great
duress." H'rg Tr. (Rough) at 123–25 (Expert Prof. Sung-Yoon Lee). Moreover, Otto's reference
to "hostile U.S. policy" three times, and the notion that Otto, as the oldest child, would need to
subsidize his younger siblings' college tuition—an expectation of the eldest son in Korean
culture—are reflective of "Korean connotation," further indicating North Korea "imposed" this
material in Otto's confession. *Id.* at 124–25 (Expert Prof. Sung-Yoon Lee).

Shortly after Otto's purported "confession," the U.S. State Department assured Otto's
parents that Otto's detention was nearing a "mature phase," and North Korea would "finally
call." F. W. Decl. ¶ 10. Fred and Cindy learned nothing, however, until KCNA reported on
North Korea's "trial" of Otto, on March 16, 2016, where North Korea convicted Otto on a charge
of state subversion and sentenced him to fifteen years of hard labor, based on his purported

"confession" to the crime. Hatch Decl., Ex. E (KCNA Article on Otto's "Trial," titled

"American Student Sentenced to 15 Years of Hard Labor in DPRK"). KCNA stated Otto

committed the crime "pursuant to the U.S. government's hostile policy" towards North Korea.

*Id.* Short video excerpts of Otto's "trial" were released, but no public court records have ever

been made available. *See* Hatch Decl., Ex. F (ABC Good Morning America News Broadcast

Containing Clips of Otto's "Trial") ("Video of 'Trial'"); Hatch Decl. ¶ 7. In the excerpts, Otto's

hands are "curled in," and he is "completely distressed" and "visibly upset." *See* Hatch Decl.,

Ex. F (Video of "Trial"); F. W. Decl. ¶ 11.

   North Korea continued to detain Otto for an additional 15 months after this "trial," for a

total detention period of approximately 17.5 months. *See* F. W. Decl. ¶ 21. During Otto's

detention, Otto's family received "almost no information about [Otto's] condition," F. W. Decl. ¶

15, and Otto's parents ultimately had no way to communicate with him, H'rg Tr. (Rough) at 21–

22 (F. W.); C. W. Decl. ¶ 17. Although Otto's parents initially were told they could send Otto

emails through the State Department, which forwarded them to Swedish intermediaries in North

Korea for delivery to Otto, Otto's parents never heard anything directly from Otto and have no

idea if he received any of this correspondence. H'rg Tr. (Rough) at 21–22 (F. W.); C. W. Decl. ¶

17; F. W. Decl. ¶ 12. By June 2016, the State Department told Otto's parents that they could no

longer email Otto because North Korea considered him a "Prisoner of War" and a "War

Criminal." F. W. Decl. ¶ 14.

   Over the course of Otto's detention, Otto's parents spoke regularly with State Department

and other senior officials, and were told "on several occasions" that Otto was being imprisoned

because "North Korea wanted something from the United States," and he "would not be released

until they obtained that." *Id.* ¶ 15; H'rg Tr. (Rough) at 67 (C. W.). Then-Secretary of State John

8

Kerry told Otto's family at a meeting that "Otto is being held hostage by North Korea," F. W. Decl. ¶ 15, and "they want something for Otto," H'rg Tr. (Rough) at 26 (F. W.). Otto's parents "knew he was a hostage, a pawn, a political prisoner," "left alone" and "abandoned," *id.* at 28 (F. W.). They lived "in fear" of talking about Otto because of the "threat" of what North Korea would do to Otto as a result. *Id.* at 23, 25 (F. W.).

In June 2017, Joseph Yun, the former U.S. Special Representative for North Korea Policy at the State Department, and the Deputy Secretary of State informed Fred that Otto had been in a coma for over a year since April 2016. *Id.* at 29 (F. W.); F. W. Decl. ¶ 18; C. W. Decl. ¶ 23. Once again, however, Otto's parents were advised not to speak about Otto's condition publicly because if they mentioned Otto in the media, North Korea would not release him and there was "no guarantee" about his safety. H'rg Tr. (Rough) at 29, 31 (F. W.); F. W. Decl. ¶ 18.

Otto's family remained silent after that call, H'rg Tr. (Rough) at 31 (F. W.), and ultimately, North Korea agreed to release Otto, after pardoning Otto for his purported crime, F. W. Decl. ¶ 20. Representative Yun traveled to North Korea to bring Otto back. *Id.* Cindy "held out hope" that "Otto could be brought back" as the "young man" she once knew. C. W. Decl. ¶ 23. Having been told Otto was in a coma, she pictured him asleep and thought he would be able to recover with medical care. *Id.* These hopes were "shattered" on June 13, 2017, when Otto landed at the Cincinnati Municipal Lunken Airport. *Id.* ¶¶ 23–24; F. W. Decl. ¶ 21.

Fred, Cindy, and Otto's younger siblings climbed the steps of the plane and immediately heard "loud inhuman sounds." H'rg Tr. (Rough) at 33 (F. W.). When Otto's family saw him, Otto's condition was "horrible and unrecognizable." C. W. Decl. ¶ 24. Otto was "jerking violently" and "howling." F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 33 (F. W.). He wore a diaper and had a "feeding tube" and a "shaved head," "his arms . . . curled and mangled," "his eyes . . .

9

bulging out," and it "almost appeared that he had chewed a hole through his bottom lip." F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 33 (F. W.); *id.* at 47 (G. W.); *id.* at 54 (A. W.). His once "perfectly straight" teeth were misaligned, H'rg Tr. (Rough) at 61 (C. W.), and Otto was blind and deaf, with severe brain damage, unable to perceive anything around him, *id.* at 36 (F. W.).

The entire family was "shocked" upon seeing Otto. *Id.* at 35 (F. W.); *id.* at 46, 47 (G. W.); *id.* at 54 (A. W.). Greta "ran off the plane screaming" because Otto looked like a "monster," and "not Otto"; she was scared of him. C. W. Decl. ¶ 24; H'rg Tr. (Rough) at 47 (G. W.). Otto's mother, too, "almost passed out" upon seeing Otto, and ran off the plane with Greta. C. W. Decl. ¶ 24; F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 47 (G. W.). Fred and Austin remained on the plane with Otto until he was transported to an ambulance, an experience that was "traumatic" and "tragic." F. W. Decl. ¶ 22; H'rg Tr. (Rough) at 33–34 (F. W.).

Otto's mother, although distraught by the sight of her son in such a state, rode in the ambulance with Otto from the airport to the hospital because she did not want Otto "to be alone anymore." C. W. Decl. ¶ 24. Over the next couple of days at the hospital, Otto's family was advised by medical personnel about the severity of Otto's brain damage: he was a "vegetable," completely unresponsive to his family, blind, deaf and without "any signs of consciousness." F. W. Decl. ¶ 25; H'rg Tr. (Rough) at 33, 36 (F. W.). In addition to these horrendous signs of his torture, Otto also had "a large scar on his left foot," a wound not present before he left for North Korea, and his once "perfectly straight" teeth were "noticeably misaligned." F. W. Decl. ¶ 24; H'rg Tr. (Rough) at 36 (F. W.); *id*. at 61 (C. W.). Seeing Otto in that state "was horrible." H'rg Tr. (Rough) at 36 (F. W.).

Otto's lead neurologist, Dr. Daniel Kanter, concluded Otto's brain damage most likely resulted from the loss of blood flow to the brain for a period of five to twenty minutes. Kanter

Decl. ¶ 15. Otto was in an unrecoverable state of non-responsiveness. *Id.* ¶ 16. After Otto's physicians concluded that his condition would never improve, Otto's family transitioned him to palliative care and ultimately ceased feeding and breathing assistance. *Id.* ¶ 20; F. W. Decl. ¶ 25. Otto died quickly on June 19, 2017, less than a week after his release from North Korea. Kanter Decl. ¶ 20.

Since Otto's death, North Korea has denied any responsibility, calling his death a mystery and blaming it on "botulism" and the United States government. F. W. Decl. ¶ 24; Hatch Decl., Ex. G (KCNA Article titled, "DPRK FM Spokesman Accuses U.S. of Slandering Humanitarian Measure").

## B. Procedural History

Plaintiffs Fred and Cindy Warmbier, individually and as personal representatives of the estate of Otto Warmbier, filed this lawsuit against North Korea, on April 26, 2018. *See* Compl. They served North Korea in accordance with the FSIA, which provides the procedure for completing service upon a foreign state or political subdivision of a foreign state. Decl. Supp. Default, ECF No. 13; *see also infra* Part III.B for further discussion. After the plaintiffs sought entry of default, *see* Decl. Supp. Default, the Clerk entered default against North Korea on September 7, 2018, *see* Entry of Default, ECF No. 14; *see also* FED. R. CIV. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."). The plaintiffs subsequently filed the instant motion for default judgment, *see* Pls.' Mot. Default J., ECF No. 16 ("Pls.' Mot."), supported by eleven declarations, as well as testimony and exhibits presented at an evidentiary hearing on December 19, 2018, pursuant to

11

Federal Rule of Civil Procedure 55(b)(2).[4]  The plaintiffs' motion for default judgment is now

ripe for review.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default

judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  "[S]trong policies

favor resolution of disputes on their merits," and therefore, "'[t]he default judgment must

normally be viewed as available only when the adversary process has been halted because of an

essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting

*H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir.

1970)).

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment

is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  Thus,

the procedural posture of a default does not relieve a federal court of its "affirmative obligation"

to determine whether it has subject matter jurisdiction over the action.  *James Madison Ltd. by*

*Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy

itself that it has personal jurisdiction before entering judgment against an absent defendant."

*Mwani*, 417 F.3d at 6.  The "plaintiffs retain 'the burden of proving personal jurisdiction, [and]

they can satisfy that burden with a *prima facie* showing.'"  *Id.* (quoting *Edmond v. U.S. Postal*

*Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may rest their

---

[4]       The plaintiffs have submitted eleven declarations, with exhibits, that detail evidence about (1) Otto's
detention in North Korea, *see* Hatch Decl.; C. W. Decl.; F. W. Decl.; (2) Otto's medical and dental history, *see*
Kanter Decl., Decl. of Dr. Murray Dock, ECF No. 16-5; Decl. of Dr. Todd Williams, ECF No. 16-6; Decl. of Dr.
Barbara J. Walker, ECF No. 18 (sealed); (3) expert declarations on North Korean torture, hostage taking, and
extrajudicial killing, *see* Expert Decl. of Professor Sung-Yoon Lee ("Lee Expert Decl."), ECF No. 16-8; Hawk
Expert Decl.; Collins Expert Decl.; and (4) an expert report on lost wages, *see* Report of James V. Koch ("Koch
Report"), ECF No. 16-11.  The plaintiffs also filed post-hearing evidence regarding Otto's medical expenses.  *See*
Decl. of Benjamin L. Hatch ("Hatch Medical Expenses Decl."), ECF No. 23 (sealed).

argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* at 7.

When default judgment is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55(e)," which has been renumbered by the 2007 amendment to Rule 55(d). *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P."). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).

With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Id.* at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (alteration adopted). Courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual

13

allegations that are supported by affidavits." (citing *Rimkus v. Islamic Republic of Iran*, 750 F.

Supp. 2d 163, 171 (D.D.C. 2010))); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63

(D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011) (quoting *Estate of Botvin v. Islamic Republic

of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)); *accord* FED. R. CIV. P. 56(e)(2) (authorizing

court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to

properly address another party's assertion of fact").  Section 1608(e), thus, "does not require a

court to step into the shoes of the defaulting party and pursue every possible evidentiary

challenge."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).  "This is part of

the risk a sovereign runs when it does not appear and alert the court to evidentiary problems."

*Id.* at 786.

      In a FSIA default proceeding, a district court can find that the evidence presented is

satisfactory "when the plaintiff shows 'her claim has some factual basis,'. . . even if she might

not have prevailed in a contested proceeding."  *Id.* at 785 (citations omitted).  "This lenient

standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and

eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile

sovereign."  *Id.*  Thus, courts are accorded "an unusual degree of discretion over evidentiary

rulings in a FSIA case against a defaulting state sponsor of terrorism."  *Id.*  This "broad

discretion extends to the admission of expert testimony, which, even in the ordinary case, 'does

not constitute an abuse of discretion merely because the factual bases for an expert's opinion are

weak.'"  *Id.* (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993)).

Indeed, "[t]he testimony of expert witnesses is of crucial importance in terrorism cases . . .

because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain,"

"[v]ictims of terrorist attacks, if not dead, are often incapacitated and unable to testify about their

14

experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go

to great lengths to avoid detection." *Id.* at 787 (citations omitted). "Eyewitnesses in a state that

sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of

retaliation," and "[t]he sovereigns themselves often fail to appear and to participate in

discovery." *Id.* Accordingly, "[w]ith a dearth of firsthand evidence, reliance upon secondary

materials and the opinions of experts is often critical in order to establish the factual basis of a

claim under the FSIA terrorism exception." *Id.*

## III.  DISCUSSION

In a FSIA case, "[a] default judgment may be entered when (1) the Court has subject

matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the

defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims

against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to

the monetary damages they seek." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75

(D.D.C. 2017); *accord Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 32 (D.D.C. 2018).

Each of these requirements is addressed *seriatim* below.

### A.  Subject Matter Jurisdiction

This Court may exercise "original jurisdiction" over a foreign state "without regard to

amount in controversy" in "nonjury civil action[s]" seeking "relief in personam with respect to

which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or

under any applicable international agreement." 28 U.S.C. § 1330(a). As the plaintiffs have not

demanded a jury trial, *see* Civil Cover Sheet at 2, ECF No. 1-1, and they seek *in personam* relief,

*see* Compl. at 21, the remaining question is whether North Korea is entitled to immunity under

the FSIA or another international agreement.

15

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies. *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). The plaintiffs invoke jurisdiction under the FSIA's terrorism exception, codified at 28 U.S.C. § 1605A, *see* Pls.' Mot. at 9, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ," 28 U.S.C. § 1605A(a)(1). Subject matter jurisdiction under this terrorism exception may be exercised when the plaintiff establishes the following four elements: (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act, and . . . remains so designated when the claim is filed," *id.* § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time [of] the act . . . a national of the United States," *id.* § 1605A(a)(2)(A)(ii); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," *id.* § 1605A(a)(2)(A)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' if 'engaged in by an official, employee, or agent' of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)). These four elements, which are discussed below, have been satisfactorily proven here.

16

### 1.      First Element: North Korea Was Timely Designated a State Sponsor of Terrorism

With respect to the first element, North Korea was designated a state sponsor of terrorism, in part due to Otto's detention and abusive treatment resulting in his death. North Korea was first designated as a state sponsor of terrorism by the State Department in 1988. *See* Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477–01 (Feb. 5, 1988). The State Department, however, rescinded that determination in 2008. Notice, Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540–01 (Oct. 24, 2008). The State Department re-designated North Korea as a state sponsor of terrorism in November 2017, and that designation has not been rescinded. *See* Notice, Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56100–01 (Nov. 27, 2017). North Korea thus "remain[ed] so designated when" the plaintiffs filed their claims in April 2018. 28 U.S.C. § 1605A(a)(2)(A)(i)(I); *see also* Compl. at 1, 21.

Notwithstanding that North Korea was not designated as a state sponsor of terrorism "at the time" of Otto's detention in January 2016 or by the time of his subsequent release in June 2017, *see* 28 U.S.C. § 1605A(a)(2)(A)(i)(I), subject matter jurisdiction is established if the foreign state was designated as a state sponsor of terrorism "as a result of such act," *id.* Here, the State Department's designation of North Korea as a state sponsor of terrorism was, at least in part, a result of North Korea's detention and mistreatment of Otto, which is sufficient to meet the state-sponsor-of-terrorism requirement. *See Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 74 (D.D.C. 2008) ("North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the [USS] Pueblo," an act upon which the FSIA claim was based); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 65

(D.D.C. 2010) (concluding that 28 U.S.C. § 1605A(a)(2)(A)(i) was satisfied where Iran was

designated as a state sponsor of terrorism "in partial response to the Beirut bombing," the act

which gave rise to the FSIA claim).

       After Otto's death, Fred and Cindy recounted Otto's story "to various government

officials"—including members of Congress, State Department and Executive Branch officials—

"in support of re-adding North Korea to the list of state sponsors of terrorism."  F. W. Decl. ¶ 26;

*see also* H'rg Tr. (Rough) at 38–39 (F. W.).  On October 20, 2017, sixteen Congressmen wrote a

letter to the Secretary of State stating, "We write to urge you to exercise your authority to relist

North Korea as a State Sponsor of Terrorism," and noting that "[s]ince North Korea was

removed from the State Sponsors of Terrorism list in 2008, the Kim regime has repeatedly

perpetrated or supported heinous acts, the most recent example of which was the illegitimate

detention, murderous mistreatment, and tragic death of Otto Warmbier."  Hatch Decl., Ex. K

(Letter from Congressmen to Secretary of State).  Ultimately, President Trump announced that

the United States would be re-designating North Korea as a state sponsor of terrorism on

November 20, 2017, the same date that the State Department lists as the designation date for

North Korea.  Hatch Decl., Ex. H (CNN Video titled "Trump: N. Korea Is a State Sponsor of

Terror"); Hatch Decl., Ex. I (CNN Article titled, "Trump Names North Korea a State Sponsor of

Terrorism"); *see also* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/j/

ct/list/c14151.htm (last visited Dec. 24, 2018).  In his announcement, President Trump stated,

"As we take this action today our thoughts turn to Otto Warmbier, a wonderful young man."

Hatch Decl., Ex. H; *see also* Hatch Decl., Ex. I.  This evidence plainly establishes that the

plaintiffs meet the first element for the exercise of subject matter jurisdiction because, under 28

U.S.C. § 1605A(a)(2)(A)(i)(I), because the lawsuit was filed after North Korea was designated as a state sponsor of terrorism, in part, "as a result of" its barbaric treatment of Otto.

### 2.    Second Element: The Plaintiffs Are U.S. Citizens

As to the second element, the plaintiffs have averred in sworn declarations that they, as well as their son, Otto, have been United States citizens for their entire lives, including at the time of Otto's seizure and detention in North Korea and of his death.  F. W. Decl. ¶ 1; C. W. Decl. ¶ 1.  Thus, the second element is firmly established.

### 3.    Third Element: Plaintiffs' Offer to Arbitrate with North Korea

For the third element, the FSIA "does not require any particular form of offer to arbitrate, simply the extension of a 'reasonable opportunity.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003).  The plaintiffs filed a Notice of Offer to Arbitrate on the same day they filed their Complaint.  *See* Offer to Arbitrate at 1, ECF No. 3. The Notice offered "to submit the above-captioned matter to arbitration in accordance with accepted international rules of arbitration," and stated that North Korea could accept such offer "by filing with the Clerk . . . an acceptance in lieu of filing an answer or other responsive pleading."  *Id.*  A translated copy of the Notice was served on North Korea on June 19, 2018, *see* Return of Service, ECF No. 12, and North Korea has failed to file an acceptance or contact Plaintiffs regarding their offer to arbitrate, Hatch Decl. ¶ 18.  The plaintiffs have thus satisfied the arbitration offer requirement, under 28 U.S.C. § 1605A(a)(2)(A)(iii).  *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 158 (D.D.C. 2017) ("[A]n offer of arbitration was included with the documents served on Iran . . . , which is sufficient to satisfy the FSIA's requirement."); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 66 (D.D.C. 2015)

(including an offer of arbitration in the documents served on the foreign state satisfied the FSIA's requirement).

### 4. Fourth Element: Actions of North Korea Qualify for the Terrorism Exception

Finally, as detailed below, the plaintiffs have provided ample evidence to establish the fourth element: that their damages arise from North Korea's barbaric mistreatment of Otto, including "torture," "hostage taking," and "extrajudicial killing." 28 U.S.C. § 1605A(a)(1).

#### a. Torture

"[T]orture," for purposes of the FSIA's terrorism exception, is defined by "the meaning given" to that term in the Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA, drawing from the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention"), defines torture as follows:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 (note)); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002) (explaining that the TVPA's definition of torture "borrows extensively from the [Torture Convention]").

To establish torture, the plaintiffs must show that the conduct was sufficiently severe and purposeful. *See Price*, 294 F.3d at 92–93. As the D.C. Circuit has explained, "suffering alone is

insufficient to establish a claim under the FSIA's terrorism exception. To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim, for instance, to punish him for his religious or political beliefs." *Kim*, 774 F.3d at 1050. Severity "is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 294 F.3d at 92. "The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim," and [t]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.* at 93. Thus, "torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault," as "[n]ot *all* police brutality, not *every* instance of excessive force used against prisoners, is torture under the FSIA." *Id.* (emphases in original).

The TPVA lists certain purposes for which extreme and outrageous measures might be torturous, such as "obtaining from that individual or a third person information or a confession," 28 U.S.C. § 1350 (note), although the list of purposes in the TVPA "was not meant to be exhaustive," *Price*, 294 F.3d 82 at 93. In sum, "[i]n order to lose its sovereign immunity, a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Id.*

Here, ascertaining precisely what North Korea did to Otto to cut off the blood flow to his brain, rendering him blind, deaf and brain dead, is not forensically doable, but also is unnecessary. Certainly, Otto, who was returned by North Korea to the United States with severe brain damage that eventually killed him, *see* Kanter Decl. ¶ 21, was "incapacitated" and "unable to testify about [his] experiences," *Owens*, 864 F.3d at 787. Further, North Korea has not appeared in this case and, not surprisingly, no witnesses are available to provide any eyewitness

21

or even hearsay evidence on this point.  Indeed, North Korea "is known to intimidate defectors

and potential witnesses." *Kim*, 774 F.3d at 1048; *see also, e.g.*, Hawk Expert Decl. ¶ 28 ("North

Korea is known to intimidate potential witnesses to its human rights abuses to prevent

information about such abuses from reaching the outside world.").  Accordingly, "[w]ith a dearth

of firsthand evidence, reliance upon secondary materials and the opinions of experts is often

critical in order to establish the factual basis of a claim under the FSIA terrorism exception."

*Owens*, 864 F.3d at 787; *see also Kim*, 774 F.3d at 1049 ("[W]here a plaintiff has produced

compelling, admissible evidence that the regime abducted the victim and that it routinely tortures

and kills the people it abducts, the courts can assume that the defendant probably tortured and

killed the victim.").  "In these circumstances, requiring that the [plaintiffs] prove exactly what

happened to the [victim] and when would defeat the Act's very purpose" of "punish[ing] foreign

states who have committed or sponsored such acts and deter them from doing so in the future."

*Kim*, 774 F.3d at 1048.

The plaintiffs have satisfactorily established that North Korea more likely than not

barbarically tortured Otto to extract a false confession and then, after a proceeding characterized

by North Korea as a "trial," used Otto's lengthy sentence as leverage against the United States to

further North Korea's own foreign policy objectives.  Here, as in similar cases, reliance on expert

testimony is sufficient and appropriate.  *See, e.g.*, *Owens*, 864 F.3d at 787; *Kim*, 774 F. 3d at

1049 (finding sufficient evidence of torture where experts "reported that victims of forced

disappearance in North Korea usually suffer torture" and that the victim was an "especially likely

target").  Three separate experts on North Korea confirm that Otto was tortured during different

stages of his detention in North Korea.

22

First, Otto was likely tortured while interrogated to obtain a false confession.  David

Hawk, an expert on human rights in North Korea who has interviewed many North Korean

refugees, *see* Hawk Expert Decl. ¶¶ 1–4, and whose testimony the D.C. Circuit has previously

credited, *see Kim*, 774 F.3d at 1050, opined that Otto "was almost certainly subject to harsh

interrogation methods, including torture and/or other cruel, inhuman or degrading treatment or

punishment," Hawk Expert Decl. ¶ 37.  North Korea ultimately obtained a false confession from

Otto, and "the initial or pretrial interrogation stage, when interrogators are attempting to extract a

confession, is when torture most commonly occurs in North Korea; indeed, it would be unusual

if torture did not occur in this phase." *Id.*

Similarly, Bob Collins, an expert having extensive familiarity with North Korean

interrogation methods, *see* Collins Expert Decl. ¶¶ 1–7, noted that Otto's purported "confession,"

which was full of patently false statements and unnatural language, *see id.* ¶ 27, indicates the

confession was "most likely dictated to [Otto] in advance and the product of torture," *id.* ¶¶ 27–

28.  Professor Sung-Yoon Lee, who specializes in Korean Studies at the Fletcher School of Law

and Diplomacy at Tufts University, *see* Lee Expert Decl. ¶ 1, similarly concluded that "Otto was

likely tortured by North Korean agents while detained in order to obtain a confession from him,"

because it is a "routinized way through which North Korea obtains confessions from individuals

in its custody," *id.* ¶ 24.

Second, Otto was likely tortured based on the nature of the North Korean crime to which

he was forced to confess and for which he was convicted:  removing a poster that said, "Let's

arm ourselves strongly with Kim Jong-il patriotism!"  Collins Expert Decl. ¶ 21.  According to

Mr. Hawk, "North Korea almost certainly tortured Otto" because this crime would carry a

penalty of "particularly brutal treatment" in North Korea, Hawk Expert Decl. ¶ 38, or even the

23

penalty of "execution," H'rg Tr. (Rough) at 97 (Expert David Hawk).  Mr. Collins confirms that,

"[a] crime of the nature of which Otto was accused is in fact the ultimate crime in North Korea;"

and North Koreans suspected of similar political offenses "are seized and deported without

judicial process to political prison camps . . . where they are routinely tortured and mistreated."

Collins Expert Decl. ¶ 22.

       Third, North Korea "most likely further tortured" Otto after his trial and sentencing "for

their own intelligence and foreign relations purposes." *Id.* ¶ 30.  Indeed, North Korea probably

"both seized and maintained custody of Otto" and then "systematically tortured" him to "further

certain policy goals: namely, in order to deter the United States from responding either with

military action or sanctions in the face of North Korea's increased nuclear and conventional

weapons testing." Lee Expert Decl. ¶¶ 20, 25.

       Fourth, the general fact of Otto's detention in North Korea suggests he was tortured.  For

example, Mr. Hawk opined that in all North Korean detention facilities, prisoners "are uniformly

treated with brutality and disregard for human rights."  Hawk Expert Decl. ¶ 13.  The "practice

of torture permeates the North Korean prison and detention system," *id.* ¶ 20, and "is particularly

common . . .  during interrogations," *id.* ¶ 23.  Likewise, Mr. Collins explained that he is "aware

of hundreds of North Koreans . . . who have been subject to" torture, Collins Expert Decl. ¶ 27,

and concluded Otto was likely tortured based on that "routine" practice, *id.* ¶¶ 18, 28.  According

to Professor Lee, given the expected and routinized nature of torture in North Korean facilities,

North Korean interrogators "would have found it unpatriotic not to use torture to get what they

want."  H'rg Tr. (Rough) at 126 (Expert Prof. Sung-Yoon Lee).

       Fifth, notably, several torture methods regularly employed by North Korea are

"consistent with Otto's condition when he returned." Collins Expert Decl. ¶ 31.  Dr. Daniel

Kanter, the neurologist who cared for Otto when he returned to the United States, concluded

Otto's brain damage resulted from the cessation or significant reduction of blood flow to the

brain for five to twenty minutes, which can be caused by "cessation of breathing."  Kanter Decl.

¶¶ 1, 14, 15.  "[N]ormal North Korean torture methods," which include "[w]ater-boarding,"

"manipulating teeth with pliers," and "application of electric shock," "can lead to a cessation of

breathing," and if Otto began "to resist," "interrogators would have become infuriated . . . and

suffocated him or otherwise caused him to stop breathing, only to be forced to revive him."

Collins Expert Decl. ¶ 31.  Even more, Otto "had a large scar on his foot and . . . certain of his

bottom teeth appeared repositioned," further evidence supporting that his physical condition

resulted from "[t]he application of electric shocks" to Otto's foot and the use of pliers to

rearrange Otto's teeth.  *Id.* ¶ 30.

Although "there were not any apparent visible wounds on Otto [in the video footage

available of him while in North Korean detention]," "bruises, wounds or other injury on the body

anywhere other than his hands, head and neck would not have been visible" from the "methods

of torture commonly applied to North Korean detainees in order to extract [a] confession."

Collins Expert Decl. ¶ 28.  For instance, "water-boarding, being forced to squat for several hours,

and being placed in a box too small to either stand or lie down in for long periods of time," all

"cause severe pain and suffering without leaving obvious physical evidence."  *Id.*; *see also* H'rg

Tr. (Rough) at 92–93 (Expert David Hawk) (explaining "common methods of torture and pain

infliction during the initial detention and interrogation periods," such as "string[ing] prisoners up

by their wrists from the bars in the cells just with their toes off the floor," forced kneeling or

squatting with an "iron ore wooden bar" behind the legs, putting people in a "very, very small

box so that they can't stand up or lie down," and beatings, would not leave scars).  Moreover,

United States officials have publicly confirmed that North Korea tortured Otto. Hatch Decl. ¶ 17.

The plaintiffs, therefore, have "produced compelling, admissible evidence" that North Korea detained Otto and "routinely tortures" its detainees. *Kim*, 774 F.3d at 1049.

### b.    Hostage Taking

The plaintiffs have also satisfactorily shown that North Korea took Otto hostage. "[H]ostage taking" is defined under Section 1605A(h)(2) as having "the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages," which in turn provides:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridicial person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

United Nations, International Convention Against the Taking of Hostages, No. 21931, Article I (Dec. 17, 1979). "Courts thus have found 'hostage taking' in cases involving physical capture and confinement." *Mohammadi*, 782 F.3d at 16. "The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention." *Simpson v. Socialist People's Libyan Arab Jamahiriya ("Simpson II")*, 470 F.3d 356, 359 (D.C. Cir. 2006) (quoting *Simpson*, 326 F.3d at 234–35). This requires "some '*quid pro quo*' arrangement whereby the hostage would have been released 'upon performance or non-performance of any action by that third party,'" and the plaintiff must identify a "nexus between what happened to [the hostage] in [the foreign state] and any concrete concession that [the foreign sovereign] *may* have hoped to extract from the outside

26

world.'" *Id.* at 360 (quoting *Price*, 294 F.3d at 94).  A plaintiff, however, "need not allege that the hostage taker had communicated its intended purpose to the outside world." *Id.*

Here, ample evidence has been presented that North Korea detained Otto and persisted in detaining him for political leverage with the United States.  For instance, Fred and Cindy spoke "regularly with representatives from the Department of State as well as other senior United States officials, and were told on several occasions that Otto was being imprisoned in North Korea because North Korea wanted something from the United States, and that he would not be released until they had obtained that." F. W. Decl. ¶ 15.  Then-Secretary of State John Kerry, in particular, told Otto's family in a meeting, after Otto's trial and sentencing in North Korea, that "Otto is being held hostage by North Korea," and "they will want something in exchange for releasing him." *Id.*; *see also* H'rg Tr. (Rough) at 26 (F. W. ); C. W. Decl. ¶ 19 ("Several United States officials also told us that Otto was continuing to be held because North Korea wanted something from the United States and would not let him go until they got something in return.").

The expert David Hawk, who has authored multiple reports on North Korean prison facilities for international organizations, explained that, "North Korea imprisoned and continued to imprison Otto in order to use his fifteen-year sentence of imprisonment to compel the United States to send a high level official to North Korea to increase its stature and to open a dialogue with North Korea during a time when the two countries were not communicating . . . ." Hawk Expert Decl. ¶ 39; *see also* H'rg Tr. (Rough) at 102–03 (Expert David Hawk) (explaining Otto's detention fit North Korea's "pattern" of holding Americans hostage to serve its goal of "opening dialogue" with the United States).  This view is corroborated by the expert Bob Collins, who confirmed that, "North Korea would view" Otto's detention "as giving it leverage in its foreign policy goals, such as the ongoing development of its nuclear program during the time of Otto's

27

imprisonment."  Collins Expert Decl. ¶ 33; *id.* ¶ 34 ("[North Korea] would have believed the

nature of [Otto's] crime as giving them a particularly strong ability to leverage their custody of

him into achieving foreign policy goals with the United States as they could attribute the United

States with a heinous affront to North Korean sovereignty.").  Quite transparently, North Korea

made the political leverage purpose of Otto's detention clear when a spokesman for the North

Korean Foreign Ministry stated after Otto's death, "Warmbier is a victim of policy of 'strategic

patience' of Obama who was engrossed in utmost hostility and negation against the DPRK and

refused to have dialogue with the DPRK."  Hatch Decl., Ex. G (KCNA Article titled, "DPRK

FM Spokesman Accuses U.S. of Slandering Humanitarian Measure").

      According to Professor Lee, for North Korea, hostage taking is "a very well-honed craft"

and "a tool of North Korea's diplomacy," designed "to compel the United States to negotiate

from a position of weakness."  H'rg Tr. (Rough) at 121.  "North Korea carefully plans the timing

of events that it knows will have a substantial geopolitical impact."  Lee Expert Decl. ¶ 11.

Otto's case is no exception, as North Korea detained Otto "to deter the United States from

responding either with military action or sanctions in the face of North Korea's increased nuclear

and conventional weapons testing."  *Id.* ¶ 20.  Thus, "[i]t was not an accident that Otto's arrest

occurred in early January 2016," because at that time, North Korea "was then pursuing the rapid

and highly public expansion of its nuclear weapons program."  *Id.* ¶ 21.  On January 6, 2016, just

four days after North Korea seized Otto at the Pyongyang International Airport, "North Korea

claimed to have tested the nation's first hydrogen bomb," and "[o]n September 9, 2016, North

Korea announced that it successfully tested a nuclear warhead that could be mounted onto

ballistic missiles."  *Id.*  Even if North Korea "may have gone ahead with these weapons tests

whether or not it had Otto in its custody," North Korea "would have believed that having Otto

gave it an extra level of security that would deter the United States from being aggressive in response." *Id.*

Additionally, legislation to sanction North Korea had been pending in the U.S. Congress in 2015, which "North Korea would . . . have been aware and apprehensive of . . . before it seized Otto." *Id.* ¶ 22. Less than two weeks after enactment in the United States of the North Korea Sanctions and Policy Enhancement Act of 2016 (H.R. 757, Pub. L. 114–122), North Korea made public Otto's purported "confession." *Id.* Then, Otto's trial and sentencing occurred on March 16, 2016, the day after "President Obama had signed an Executive Order imposing a variety of sanctions on North Korea," with Otto's trial held on the actual day this Executive Order became effective. *Id.* ¶ 23.

Just as in *Massie*, where North Korea took hostage the USS Pueblo crew to "extract a public apology" from the United States, in violation of the FSIA, here, too, North Korea detained, convicted and imposed a lengthy prison term on Otto in order to gain leverage as North Korea engaged in highly publicized nuclear and long-range missile tests and the United States developed its North Korea sanctions policy. *See Massie*, 592 F. Supp. 2d at 65, 67; *see also Hekmati*, 278 F. Supp. 3d at 162 (finding sufficient proof of hostage taking under the FSIA when "Iran detained Hekmati on false espionage charges and, for four-and-a-half years, continuously threatened to kill, injure, and detain him, in an effort to compel the United States to release Iranians imprisoned in the United States or make other political or financial concessions to Iran."). This is sufficient evidence for hostage taking.

Another pernicious purpose of North Korea's hostage taking must be highlighted. North Korea, as a totalitarian state, exercises tight control on its own media and citizenry, and by seizing an American hostage, seeks to extend this control outside its borders by muting criticism

of its actions in the United States and the international community through the explicit and implicit threat to the safety and well-being of the hostage. *See* H'rg Tr. (Rough) at 121 (Expert Prof. Sung-Yoon Lee) (explaining that North Korea publicly portrays itself as a "high-functioning" nation "based on the . . . rule of law" to maintain "the semblance of normalcy"); *id.* at 104 (Expert David Hawk) (stating that North Korea "care[s] about its international reputation with respect to human rights").  As Otto's case illustrates, fear that public criticism of North Korea will result in reprisal against the hostage worked as North Korea intended to keep the Warmbiers and their family and friends silent about Otto's detention.

U.S. government officials repeatedly cautioned the Warmbiers that North Korea threatened to injure Otto if they spoke out publicly about Otto's confinement and questioned or criticized publicly the North Korean story about the circumstances of Otto's detention.  Otto's mother stated that, "we were told by all the government officials we met with that we should stay quiet and not speak out against North Korea because doing so would probably mean that Otto would be punished for what we said."  C. W. Decl. ¶ 19.  In June 2017, Joseph Yun, the former U.S. Special Representative for North Korea Policy at the State Department, told Fred Warmbier that North Korean representatives "won't release Otto" if the Warmbiers spoke to the media about Otto's detention. F. W. Decl. ¶ 18.  In sum, North Korea used Otto's detention to "control" the "dialogue the whole time," H'rg Tr. (Rough) at 82–83 (C. W.), and Otto's parents were "[t]errified," "afraid to . . . speak out or discuss" Otto "with anyone," *id.* at 16, 23 (F. W.). This same fear was shared by Otto's siblings, *id.* at 45 (G. W.); F. W. Decl. ¶ 7, and Otto's friends, who also declined to speak to the media about North Korea's detention of Otto, H'rg Tr. (Rough) at 59–60 (C. W.).

30

### c. Extrajudicial Killing

Next, North Korea's treatment of Otto amounted to an extrajudicial killing. Under Section 1605A(h)(7), "extrajudicial killing" has the meaning given to it in the TVPA, which defines an extrajudicial killing as:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 (note). "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

As to the first element, the plaintiffs acknowledge that "the precise cause of the condition that caused Otto's death is unknowable," Pls.' Mot. at 29, but there is overwhelming evidence that North Korea's barbaric acts were a substantial factor in causing Otto's death. As the D.C. Circuit has explained, "jurisdictional causation" is evaluated under a "proximate cause" standard, which requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," such that the act was a "substantial factor," and the victim's injury was "reasonably foreseeable or anticipated as a natural consequence" of the defendant's act. *Owens*, 864 F.3d at 794.

Here, North Korea released Otto from his detention with such irrevocable, extensive brain damage that this resulted in Otto's death. Kanter Decl. ¶¶ 9, 16, 21. Dr. Kanter opined, "based on a reasonable degree of medical certainty," that Otto "died because of his brain injury," which "was caused by the sustained cessation of blood flow to the brain, an injury occurring in North Korea after the last video that was released of him from his trial and sentencing." *Id.* ¶ 21. After reviewing brain scans taken when Otto returned and brain scans from North Korea, Dr.

51

Kanter opined that "the brain injury occurred in the weeks prior to" an April 2016 brain scan taken in North Korea. *Id.* ¶ 17. Dr. Kanter "diagnosed [Otto's] brain injury as severe and unrecoverable," concluding Otto "could have continued indefinitely with artificial" life support, "but he could not have lived without that assistance." *Id.* ¶ 20. As to North Korea's alternative public claim that Otto died from botulism, F. W. Decl. ¶ 24, Dr. Kanter's team conducted on Otto an "electromyography study," which tests for "neuromuscular junction dysfunction," "an important feature of botulism," Kanter Decl. ¶ 13. The test "was normal, indicating that [Otto] had not contracted botulism while in North Korea that would have caused respiratory failure." *Id.* ¶ 18. That Otto would die from this brain injury was also reasonably foreseeable. According to Mr. Hawk, North Korea released Otto "just before he would have died in detention," H'rg Tr. (Rough) at 98 (Expert David Hawk), deciding it "needed to get him out of the country before he [died] in detention, which would be harder for [North Korea] to explain," *id.* at 104.

With respect to the second element, North Korea deliberately caused Otto's brain damage, which resulted in his death. North Korea's torture methods "pose a substantial danger to human life," and North Korea "routinely withholds medical care from those in its custody, with such frequency that it amounts to an intentional act." Hawk Expert Decl. ¶ 40; *see also id.* ¶ 25 (explaining denial of food rations and imposition of hard labor are also "common" intentional acts resulting in death); Kanter Decl. ¶ 15 ("Because the [brain] injury was so extensive, it was unlikely that [Otto] was with medical personnel who were willing and able to intervene to resuscitate him when the injury occurred."). The expert's conclusions are "more than sufficient" evidence that North Korea deliberately caused Otto's death. *Kim*, 774 F.3d at 1050; *see also id.* at 1051. Moreover, the fact that North Korea continued to detain Otto in this severely compromised condition for over a year, rather than send him home earlier to obtain

32

medical care, compounds the deliberate nature of that totalitarian state's brutal treatment of Otto. *See* F.W. Decl. ¶ 12.

Finally, as for the third element, Otto's death was not authorized by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 (note). The North Korean criminal judgment against Otto was illegitimate because North Korea does not have an independent judiciary, fabricated Otto's "confession," and put on a "show trial." H'rg Tr. (Rough) at 100–01 (Expert David Hawk); Collins Expert Decl. ¶ 14 ("[T]he judiciary and prosecutors are thus highly controlled by the same entity that controls all other party and state apparatuses."); *id.* ¶ 27 (concluding Otto's "speech at the press conference purporting to confess to the alleged crime was most likely dictated to him in advance and the product of torture"). Further, even if North Korea's judiciary were legitimate, Otto's sentence authorized 15 years of hard labor, not death. Hatch. Decl., Ex. E (KCNA Article on Otto's "Trial," titled "American Student Sentenced to 15 Years of Hard Labor in DPRK").

### B. Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, this Court must have personal jurisdiction. Personal jurisdiction over North Korea, as a foreign state, depends on whether "service has been made under section 1608 of this title." 28 U.S.C. § 1330(b) (defining limits of personal jurisdiction over foreign states). Service may be effected under 28 U.S.C. § 1608 in one of four ways: (1) by "special arrangement for service between the plaintiff and the foreign state," (2) "in accordance with an applicable international convention on service of judicial documents," or, if the first two options are not applicable, (3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the

foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by

the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned,"

or, if service cannot be made under the third option, (4) by requesting the Clerk of the Court to

send the aforementioned package to "the Secretary of State in Washington, District of Columbia,

to the attention of the Director of Special Consular Services—and the Secretary shall transmit

one copy of the papers through diplomatic channels to the foreign state and shall send to the

clerk of the court a certified copy of the diplomatic note indicating when the papers were

transmitted."  28 U.S.C. § 1608(a).

North Korea has neither made a special arrangement for service with the plaintiffs, Hatch

Decl. ¶ 19, nor entered into any international convention governing service, *see* ATTORNEY

MANUAL FOR SERVICE OF PROCESS ON A FOREIGN DEFENDANT, UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA 6 (July 2018) ("North Korea is not a party to the [Hague]

Convention . . . .").  Instead, North Korea was served here under the third option: the necessary

papers were mailed through DHL and delivered to North Korea on June 19, 2018, *see* Return of

Service, ECF No. 12.  Accordingly, the plaintiffs have established that service was properly

effected against the defendants and, thus, personal jurisdiction is properly exercised.

### C.     North Korea's Liability

Section 1605A not only "provides federal courts with jurisdiction over, and withdraws

sovereign immunity from" certain suits, *see* 28 U.S.C. § 1605A(a)(1), but "also creates a federal

cause of action directly against foreign governments,"  *Fraenkel v. Islamic Republic of Iran*,

*Ministry of Foreign Affairs*, 892 F.3d 348, 352–53 (D.C. Cir. 2018).  "Under § 1605A(c),

'national[s] of the United States' may sue certain foreign governments—those designated by the

U.S. government as state sponsors of terrorism—for the acts described in § 1605A(a)(1)," *id.* at

353 (alteration in original) (quoting § 1605A(c)), such as torture, hostage taking and extrajudicial

killing, "causing 'personal injury or death,'" *id.* at 352–53 (quoting § 1605A(c)).  The statute

specifies that, "[i]n any such action, damages may include economic damages, solatium, pain

and suffering, and punitive damages."  *Id.* (alteration in original) (internal quotation marks

omitted) (quoting § 1605A(c)).

Here, the plaintiffs, who are all citizens of the United States, have established their first

claim for relief, which seeks to hold North Korea liable under § 1605A(c), the FSIA terrorism

exception's private right of action.  *See* Compl. ¶¶ 57–66 (First Claim for Relief Action for

Damages Under 28 U.S.C. § 1605A(c)); Pls.' Mot. at 35–36, 38.[5]  To determine liability under

Section 1605A(c), "the elements of immunity and liability . . . are essentially the same," *Kilburn

v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010), and liability under section

1605A(c) will, in most cases, "exist whenever the jurisdictional requirements of section 1605A

are met," *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 153 (D.D.C. 2011) (citing *Kilburn*,

699 F. Supp. 2d at 155); *see also Hekmati*, 278 F. Supp. 3d at 163 ("In concluding that there is

jurisdiction over Hekmati's claims . . . the Court has already determined all of the essential

elements for imposing liability under 1605A(c) have been established . . . ."); *Kaplan v. Cent.

Bank of Islamic Republic of Iran*, 55 F. Supp. 3d 189, 198 (D.D.C. 2014) ("[P]laintiffs' claims

against North Korea meet [the FSIA terrorism exception's] requirements for purposes of subject-

---

[5]     The plaintiffs bring three other claims based on common law torts.  *See* Compl. ¶¶ 67–70 (Second Claim
for Relief based on wrongful death and survival); *id.* ¶¶ 71–74 (Third Claim for Relief based on intentional infliction
of emotional distress); *id.* ¶¶ 75–77 (Fourth Claim for Relief based on assault and battery).  The D.C. Circuit has
explained that while a plaintiff may rely on "alternative sources of substantive law," including "state tort law," to
bring a claim against a foreign state after establishing a waiver of sovereign immunity through the FSIA's terrorism
exception, such reliance is not needed.  *See Owens*, 864 F.3d at 808–09 ("[I]n most cases brought under the new
terrorism exception, the plaintiff need not rely upon state tort law.").  Accordingly, discussion of the plaintiffs' tort-
based claims for relief is unnecessary, since those claims would give rise to no more damages than those available
under the FSIA's private right of action, *see* 28 U.S.C. § 1605A(c), and are therefore "subsumed in the FSIA
claims." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 508 (D.C. Cir. 2018).

matter jurisdiction and liability.").  Accordingly, for the reasons discussed in Part III.A, *supra*,

the plaintiffs have established North Korea's liability to them under 28 U.S.C. § 1605A(c),

leaving only the amount of damages allowable to the plaintiffs to resolve.

### D.     Damages

Otto's estate seeks to recover economic, pain and suffering, and punitive damages, and

Fred and Cindy Warmbier seek solatium and punitive damages.  *See* Pls.' Mot at 2–3.  The

damages to which each plaintiff is entitled are described below.

### 1.     Legal Standard for Damages Under Section 1605A(c)

Congress, in creating a private right of action in Section 1605A(c) for victims of state-

sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for

money damages, including "economic damages, solatium, pain and suffering, and punitive

damages."  28 U.S.C. § 1605A(c).  "Upon obtaining a default judgment, successful plaintiffs

may recover damages by proving 'that the projected consequences are reasonably certain (i.e.,

more likely than not) to occur, and must prove the amount of damages by a reasonable

estimate.'"  *Fraenkel*, 892 F.3d at 353 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C.

Cir. 2003)); *see also Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289

(D.D.C. 2015); *Roth*, 78 F. Supp. 3d at 402; *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d

105, 115–16 (D.D.C. 2005).  In determining the "reasonable estimate," courts may look to expert

testimony and prior awards for comparable injury.  *Reed v. Islamic Republic of Iran*, 845 F.

Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29

(D.D.C. 2008).

For the reasons detailed *supra*, in Part III.A, the plaintiffs have satisfactorily shown that North Korea's torture, hostage taking and extrajudicial killing of Otto was likely, and reasonably certain, to result in injury and death to Otto and to devastate his family.

### 2. Economic Losses and Medical Expenses (Otto's Estate)

Otto's estate seeks to recover for Otto's "lost earning capacity, or the likely wages that he would have earned had his life not been cut short." Pl.'s Mot. at 40; *see also* Compl. at 21. "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse [a plaintiff's] failure to support the claim for lost earnings with competent evidence." *Moradi*, 77 F. Supp. 3d at 71. A plaintiff, however, may prove lost earnings based on reasoned analysis of an expert economist, *see Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016), as the plaintiffs have done here.

In support of Otto's lost wages, the plaintiffs submitted evidence in the form of a report from Professor James V. Koch, a Board of Visitors Professor of Economics Emeritus and President Emeritus at Old Dominion University, with a Ph.D. from Northwestern University. Koch Report at 12. Mr. Koch accounted for Otto's life expectancy and work life expectancy, as well as Otto's "exceptional[] talent[]," "academic success at UVA," "his attendance at the London School of Economics," and his "signal selection" as a "highly compensated summer intern" at Millstein, a New York City investment firm. *Id.* at 2–3. Mr. Koch then ran three models. *Id.* at 3. The first assumed Otto would reject the "possibility of Wall Street" and instead earn the income of a "typical University of Virginia graduate," and the second assumed Otto would work at Millstein or a "comparable Wall Street firm and do[] good work, but . . . not [be] a star." *Id.* The third model assumed Otto would work at Millstein or a "comparable Wall Street firm," and "advance[] to [the] position of Director after twenty years." *Id.* Relying on his own

"education, training and experience, and accounting for the realities of the marketplace," Mr. Koch concluded, after reviewing Otto's case, that the third model provided the "most credible" estimate of "losses suffered by [Otto's] estate," at $6,038,308. *Id.* at 4. Despite the obvious assumptions underlying this model, Otto excelled at all that he set out to do in his young life, and his "driven" nature, H'rg Tr. (Rough) at 58 (C. W.), makes highly plausible that this success would have continued. Accordingly, Otto's estate is awarded $6,038,308 for his estimated economic losses as a result of North Korea's heinous treatment of him.

The plaintiffs also seek to recover Otto's medical expenses, Compl. at 21, and have submitted satisfactory evidence of those expenses, reflected in itemized medical bills totaling $96,375.80, *see* Hatch Medical Expenses Decl. ¶ 6; *see also id.*, Ex. A (UC Health Itemization of Otto's Hospital Services); *id.*, Ex. B (UC Health Itemization for Physician Providers); *id.*, Ex. C (UC Health Email Summary of Ex. B). *See Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 20 (D.D.C. 2007) ("[P]laintiffs, through their own testimony, have reasonably proven the costs incurred as a result of past medical expenses."); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 275 (D.D.C. 2003) ("[Plaintiff] has also requested damages for his past medical expenses and has 'reasonably proven' these expenses through the testimony of his mother.").

Although plaintiffs' counsel represented at the evidentiary hearing that insurance "covered part of" these expenses, H'rg Tr. (Rough) at 134, Otto's medical expenses are still recoverable in full. "[A] district court may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353. The Restatement (Second) of Torts provides that "[p]ayments made or benefits conferred by" collateral sources "do not have the effect of reducing the recovery against the defendant." RESTATEMENT (SECOND) OF TORTS §

38

920A cmt. b (1979). Therefore, Otto's estate is awarded $96,375.80 for Otto's medical expenses.

### 3. Pain and Suffering (Otto's Estate)

"[W]hen assessing damages for surviving victims of terrorist hostilities," the "baseline assumption" is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline may be moderated either upward or downward. An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, including partially lost vision and hearing, or were mistaken for dead,' or downward in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 35–36 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)) (citation omitted and alteration adopted).

An award of "$9 to $10 million in compensatory damages" has been appropriate "in cases where the victims were held as hostages and tortured for extensive periods of time," *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 103 (D.D.C. 2017) (collecting cases), and $10 million has been awarded to an estate when a victim was "subjected to mental and physical torture before being murdered by means involving the application of 'significant force' to his jaw," *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017).

Similar to these cases, North Korea detained Otto for approximately 17.5 months, and North Korea is known to use extreme methods of torture to extract confessions from those it detains, including "water-boarding, being forced to squat for several hours, . . . being placed in a box too small to either stand or lie down in for long periods of time," Collins Expert Decl. ¶ 28,

"string[ing] prisoners up by their wrists from the bars in the cells just with their toes off the floor," forced kneeling or squatting with an "iron ore wooden bar" behind the legs, and beatings, H'rg Tr. (Rough) at 92–93 (Expert David Hawk).  North Korea also returned Otto to the United States with such severe brain injury that he was blind, deaf and completely unresponsive.  F. W. Decl. ¶ 25; H'rg Tr. (Rough) at 33, 36 (F. W.).  While the precise torture applied to Otto for this resulting injury is unknown, the blood flow to his brain was cut off for from five to twenty minutes, Kanter Decl. ¶ 15, which could have been caused by "[w]ater-boarding," "manipulating teeth with pliers," "application of electric shock," or suffocation.  Collins Expert Decl. ¶ 31. Furthermore, Otto's perfectly straight teeth had been rearranged to be misaligned, further indicative of the use of pliers or other tools to inflict that painful damage, plus the scar on his foot may have been caused by multiple applications of electrical shocks.  *Id.* ¶ 30.  Due to the duration of Otto's detention, the public humiliation to which he was subjected with a publicized coerced "confession" and trial, and the severity of the torture to which he was subjected over such a long period of time, Otto's estate is awarded $15 million in compensatory damages for pain and suffering.

### 4.      Solatium (Fred and Cindy Warmbier)

Fred and Cindy Warmbier, in their individual capacities, seek solatium damages to compensate for the emotional distress they experienced as family members of victims of the attack.  "District Court judges have discretion under 28 U.S.C. § 1608(e) to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning."  *Fraenkel*, 892 F.3d at 351. Citing Judge Lamberth's "seminal opinion explaining the origins and particulars of solatium damages" in *Flatow v. Islamic Republic of Iran*, the D.C. Circuit has explained that "'[s]olatium

is traditionally a compensatory damage which belongs to the individual heir personally for injury

to the feelings and loss of decedent's comfort and society,'" and was an award that "began as a

remedy for the loss of a spouse or a parent," but is now understood to include the loss of a child

or a sibling, as well. *Id.* at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29

(D.D.C. 1998)).

      "Mental anguish, bereavement and grief resulting from" an immediate family member's

death or injury "constitutes the preponderant element of a claim for solatium." *Id.* at 356–57

(quoting *Flatow*, 999 F. Supp. at 30) (alteration adopted); *see also Baker v. Socialist People's*

*Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) ("A claim of solatium seeks

compensation for the 'mental anguish, bereavement and grief that those with a close personal

relationship to a decedent experience as a result of the decedent's death, as well as the harm

caused by the loss of the decedent, society and comfort.'" (quoting *Belkin v. Islamic Republic of*

*Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009))).  In determining the appropriate amount to

compensate victims' family members for emotional distress, "the Court may look to prior

decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

      Solatium damages, by their nature, are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72,

and, therefore, this Court has developed a commonly accepted standardized framework, known

as the *Heiser* damages framework, for solatium damages, *Estate of Heiser v. Islamic Republic of*

*Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *see also Roth*, 78 F. Supp. 3d at 403 (noting the

"framework has been adopted by other courts as an appropriate measure of solatium damages for

the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)).

Though use of the *Heiser* framework is not mandatory, *Fraenkel*, 892 F.3d at 351 ("District

Court judges invariably must exercise discretion in determining damages awards under the FSIA.

41

There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted." (emphasis in original)), this Court adopts this framework here in the interest of consistency.  As a baseline, under the *Heiser* framework, parents "received $5 million."  *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). As noted, "families of victims who have died are typically awarded greater damages than families of victims who remain alive."  *Estate of Heiser*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)).

These numbers serve only as a baseline from which the Court may deviate to compensate for specific circumstances.  *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)).  Factors militating in favor of an award enhancement generally fall into one of three categories: "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing."  *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011).  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ."  *Id.* at 26.

In Fred and Cindy's case, an upward enhancement is warranted.  "While it is difficult to quantify the grief that" Fred and Cindy "have experienced, and continue to experience, as a result of North Korea's violent actions, these plaintiffs are entitled to compensation for their loss,

pain, mental anguish, and suffering." *Kim*, 87 F. Supp. 3d at 290.  There is no question, based on

their moving live testimony, that Fred and Cindy were close with Otto and miss him greatly.

The circumstances surrounding Otto's detention made North Korea's acts particularly agonizing

for his parents.  While North Korea detained Otto, this totalitarian state permitted almost no facts

regarding his condition to be known, and Fred and Cindy constantly worried about their son,

unsure of what was happening to him. *See Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320,

347 (D.D.C. 2016) (spouse received award of $12 million where "[t]he pain and suffering she

has experienced were magnified by the initial lack of information surrounding [victim's] death"

and where she had to spend years learning "exactly what happened").

Moreover, families of torture and hostage-taking victims "are typically awarded greater

damages than are the families of victims of a single attack," because in the former cases, "the

afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the

time of the event—was also forced to endure unending anxiety and an extended period of

extreme distress over the health and safety of their captive family member." *Oveissi*, 768 F.

Supp. 2d at 27.  Finally, North Korea returned Otto with such extensive brain damage that Otto's

parents witnessed his discomfort, monstrous condition and, finally, his death shortly after his

return.

Having examined closely the facts of this particular case, Fred and Cindy Warmbier are

entitled to $15 million each, to account for their "first-hand observations and acute memories of

[their] child's death," *Braun*, 228 F. Supp. 3d at 86, and their agonizing wait for him to return

home, *see Kim*, 87 F. Supp. 3d at 290 (awarding $15 million each to brother and son of victim

kidnapped and killed by North Korea).

### 5. Punitive Damages (All Plaintiffs)

The plaintiffs also seek punitive damages, which are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim*, 87 F. Supp. 3d at 290 (internal quotation marks omitted) (quoting *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012)); *see also* RESTATEMENT (SECOND) OF TORTS § 908(1) (1979). Punitive damages are warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others." *Baker*, 775 F. Supp. 2d at 85. North Korea's conduct toward Otto justifies the imposition of significant punitive damages here. *See, e.g.*, *Hekmati*, 278 F. Supp. 3d at 166 (punitive damages awarded where plaintiff was held in solitary confinement, beaten, threatened, and psychologically battered for years in Iran).

In determining the appropriate amount of punitive damages, courts consider "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 41 (D.D.C. 2012) (quoting *Acosta*, 574 F. Supp. 2d at 30). Taking these factors into account, several approaches have been articulated for calculation of the appropriate amount of punitive damages in state-sponsored terrorism cases. One approach is to multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five. *See Baker*, 775 F. Supp. 2d at 85 (citing *Valore*, 700 F. Supp. 2d at 88–90; *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30–31; *Acosta*, 574 F. Supp. 2d at 31); *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26 (D.D.C. 2011). This approach, which may result in awards in the billions of dollars, has been

used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine

barracks in Beirut, which killed 241 American military servicemen. *See Baker*, 775 F. Supp. 2d

at 85. A second approach bases punitive damages on "the ratio of punitive to compensatory

damages set forth in earlier cases," if similar conduct has been previously litigated. *See Spencer

v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014); *Goldberg–Botvin v. Islamic

Republic of Iran*, 938 F. Supp. 2d 1, 11–12 (D.D.C. 2013). A third approach awards a fixed

amount of $150,000,000 per affected family. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp.

2d 216, 233 (awarding $300,000,000 in total to two victims and their families); *Baker*, 775 F.

Supp. 2d at 86 (awarding $150,000,000 each to families of three deceased victims); *Gates*, 580

F. Supp. 2d at 75 (awarding $150,000,000 each to the estates of two victims).

In this case, although egregious, Otto's detention in North Korea is not on the scale of an

exceptionally deadly attack against many Americans, making the first method, which might

result in an award in the billions of dollars, as the plaintiffs request, *see* Pls.' Mot. at 44, out-of-

line with analogous circumstances. In addition, the first method requires knowing how much

North Korea spends on terrorist activities, and that information is not available. *See Kim*, 87 F.

Supp. 3d at 291 (explaining that "[n]o such information for North Korea is readily accessible, . . .

if it is accessible at all"). The second method, likewise, is not appropriate since Otto's case is

unique.

The third approach, thus, is the most appropriate, but recognizing that North Korea has

committed acts that are "awful and worthy of the gravest condemnation," *id.* (quoting *Roth*, 78 F.

Supp. 3d at 405), and that North Korea is "keenly aware" of the "political environment" in the

United States, including judgments issued by United States courts, H'rg Tr. (Rough) at 131–32

(Expert Prof. Sung-Yoon Lee), a larger award is appropriate to punish and deter North Korea.

45

Accordingly, punitive damages are awarded to each of the three plaintiffs in the amount of $150 million, for a total of $450 million in punitive damages. *See Kim*, 87 F. Supp. 3d at 291 (awarding $300 million in punitive damages in 2015, based on North Korea's "presumed torture" of a missionary in North Korea, which was insufficient to deter North Korea in 2016 in Otto's case).

## IV.    CONCLUSION

For the reasons outlined above, the plaintiffs' motion for default judgment is granted. North Korea is liable for the torture, hostage taking, and extrajudicial killing of Otto Warmbier, and the injuries to his mother and father, Fred and Cindy Warmbier. The plaintiffs are awarded monetary damages in the following amounts: Otto Warmbier's estate is entitled to $6,038,308 in economic losses, $96,375.80 in medical expenses, $15,000,000 in pain and suffering, and $150,000,000 in punitive damages. Fred and Cindy Warmbier are each entitled to $15,000,000 in solatium damages and a total of $300,000,000 in punitive damages. Thus, the total damage award is $501,134,683.80.

Date: December 24, 2018

BERYL A. HOWELL
Chief Judge

*Julson P. Brown*

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CYNTHIA WARMBIER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, <br><br> Defendant. | Civil Action No. 18-977 (BAH) <br><br> Chief Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of the plaintiffs' Motion for Default Judgment and, If Necessary, Motion for Evidentiary Hearing, ECF No. 16, the related legal memorandum in support thereof, the exhibits and declarations attached thereto, the evidentiary hearing conducted on December 19, 2018, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion issued contemporaneously with this Order, the Court finds that the plaintiffs have established their "claim[s] or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), and it is hereby

**ORDERED** that the plaintiffs' Motion for Default Judgment is **GRANTED**; and it is further

**ORDERED** that the defendant Democratic People's Republic of Korea ("North Korea") shall be liable for damages in the amount of $501,134,683.80, which shall be allocated in the following manner:

1

- The estate of Otto Warmbier is entitled to the sum of $21,134,683.80 in compensatory damages and $150,000,000.00 in punitive damages; and

- Otto Warmbier's parents Frederick Warmbier and Cynthia Warmbier are each entitled to the sum of $15,000,000 in compensatory damages and $150,000,000 in punitive damages; and it is further

ORDERED that the plaintiffs shall, at their own cost and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Order to the defendant North Korea; and it is further

ORDERED that the Clerk of the Court close this case.

SO ORDERED

Date: December 24, 2018

*This is a final and appealable Order.*

_____
BERYL A. HOWELL
Chief Judge

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WARMBIER, *et al.*,

           Plaintiffs,

           v.

DEMOCRATIC PEOPLE'S REPUBLIC OF
KOREA,

           Defendant.

Civil Action No. 18-977 (BAH)

Chief Judge Beryl A. Howell

## <u>ORDER</u>

Otto Warmbier's parents, Frederick and Cynthia Warmbier, filed this action individually

and as personal representatives of Otto's estate, under the Foreign Sovereign Immunities Act

("FSIA"), 28 U.S.C. § 1602, *et seq.*, against the Democratic People's Republic of Korea ("North

Korea") for its torture, hostage taking, and extrajudicial killing of Otto.  The plaintiffs obtained a

default judgment against North Korea over three months ago, on December 24, 2018, pursuant to

the FSIA's terrorism exception to foreign sovereign immunity, section 1605A.  *See Warmbier v.*

*Democratic People's Republic of Korea*, 356 F. Supp. 3d 30 (D.D.C. 2018) ("Default J. Mem.

Op."); Order Granting Mot. for Default J., ECF No. 24.  The plaintiffs now seek an order

authorizing enforcement of that judgment, pursuant to the FSIA's section 1610(c).  *See* Pls.'

Mot. for Order Under 28 U.S.C. § 1610(c) & Mem. Supp. Mot. ("Pls.' Mot.") at 1, ECF No. 31.

The FSIA bars any "attachment or execution" against certain foreign property "until the

court has ordered such attachment and execution after having determined that a reasonable

period of time has elapsed following the entry of judgment and the giving of any notice required

under section 1608(e)."  28 U.S.C. § 1610(c).  In accordance with this statutory direction, the

plaintiffs request that this Court find that (1) "notice was properly given under 28 U.S.C. §

1

1608(e)," and (2) "a reasonable period of time has elapsed following entry of judgment and service of the judgment." Pls.' Mot. at 2. For the reasons discussed below, the plaintiffs' Motion is granted.

At the outset, the plaintiffs have not described the property against which attachment or execution is sought, but "[s]uch a description is not required." *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 101 (D.D.C. 2011). "A § 1610(c) order in this case serves only to determine (1) that a reasonable period of time has elapsed following entry of judgment, and (2) that any notice required under § 1608(e) has been given. Execution of the judgment with respect to any particular property requires a separate judicial determination that the property at issue falls within one of the exceptions to immunity." *Id.* at 101–02 (citing *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 798 F. Supp. 2d 260, 270–71 (D.D.C. 2011)); *accord BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 34 (D.D.C. 2017); *see also Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825 (2018) ("[I]ndividuals with § 1605A judgments against a foreign state must primarily invoke other provisions revoking the grant of immunity for property related to commercial activity . . . unless the property is expressly carved out in an exception . . . .").

The plaintiffs have satisfied the statutory prerequisites for issuance of a section 1610(c) order. First, North Korea has properly been given notice pursuant to section 1608(e), which requires that a copy of the default judgment entered against a foreign state under the FSIA "be sent to the foreign state . . . in the manner prescribed for service" of the summons and complaint, which, in this case, was pursuant to section 1608(a)(3). *See* Default J. Mem. Op. at 54. Section 1608(a)(3) directs sending the relevant documents "together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be

addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."

Here, the Clerk of the Court mailed the necessary documents, via DHL to the head of the Ministry of Foreign Affairs in North Korea on January 16, 2019.  *See* Clerk's Certificate of Mailing, ECF No. 28.  Service of the judgment was effective when North Korea received and signed for the documents approximately one month later, on February 14, 2019.  *See* Pls.' Mot., Ex. A, DHL Tracking for Clerk's Mailing with Waybill Number 1972256204 ("DHL Tracking for Clerk's Mailing"), ECF No. 31-1 (showing package was "[d]elivered" and "[s]igned for"); *see also Republic of Sudan v. Harrison*, No. 16-1094, 2019 WL 1333259, at *5 (U.S. Mar. 26, 2019) ("We assume that certified mail sent to a foreign minister will generally be signed for by a subordinate, but the person who signs for the minister's certified mail in the foreign ministry itself presumably has authority to receive mail on the minister's behalf . . . .").

Although the package was subsequently returned to the Court and docketed as "[u]ndeliverable," *see* Notice of Returned Mail, ECF No. 30, the plaintiffs have shown that, in fact, North Korea received and signed for the package, *see* Pls.' Mot. at 3 n.1 (citing DHL Tracking for Clerk's Mailing).  Then, eleven days after receipt, North Korea "created a new DHL Waybill and mailed the package back."  *Id.* (citing Pls.' Mot., Ex. B, DHL Tracking for North Korea's Return Mail with New Waybill Number 8643645323, ECF No. 31-2; Notice of Returned Mail (showing a "new DHL envelope," evidenced by a new Waybill number, which envelope apparently contained "the original DHL envelope," opened)).  As the plaintiffs correctly note, "North Korea's deliberate action to create a new mailing and send the documents to the Court . . . after accepting them only confirms its notice of the documents."  *Id.*

Second, approximately three and one-half months have elapsed since the December 24, 2018 Order granting the plaintiffs' Motion for Default Judgment, and approximately two months have passed since North Korea received notice on February 14, 2019.  This is a "reasonable period of time" under section 1610(c).  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 16-cv-661 (RC), 2017 WL 6349729, at *1 (D.D.C. June 9, 2017) (finding two months reasonable and collecting cases); *Owens v. Republic of Sudan*, 141 F. Supp. 3d 1, 8 (D.D.C. 2015) ("[C]ourts have found periods of three months and less reasonable." (collecting cases)); *Baker*, 810 F. Supp. 2d at 101 (finding a "period of a few months" reasonable).  This time period is particularly reasonable where North Korea has made no efforts to satisfy the judgment.  *See Crystallex Int'l Corp.*, 2017 WL 6349729, at *1.  To the contrary, North Korea mailed the judgment back, demonstrating its intention "to evade its obligation."  *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (finding 1.5 months reasonable, in part because there was "no evidence that the defendant ha[d] taken any steps towards the payment of its debt," and "at least some evidence that the defendant is actually attempting to evade its obligation").  Thus, "a reasonable period of time has elapsed" under section 1610(c).

For the foregoing reasons, upon consideration of the plaintiffs' Motion for Order Under 28 U.S.C. § 1610(c), ECF No. 31, the related legal memorandum in support thereof, the exhibits attached thereto, and the entire record herein, for the reasons stated in this Order, it is hereby

**ORDERED** that the plaintiffs' Motion, ECF No. 31, is **GRANTED**; and it is further

**ORDERED** that, based on the Court's findings that North Korea was properly given notice on February 14, 2019 of the December 24, 2018 Order entering final judgment, ECF No. 24, in accordance with 28 U.S.C. § 1608(e), and "that a reasonable period of time has elapsed

following the entry of judgment and the giving of . . . notice," *id.* § 1610(c), the plaintiffs may

now seek attachment or execution, pursuant to *id.* §§ 1610(a)–(b), to satisfy this Court's

judgment.

     **SO ORDERED**.

     Date: April 9, 2019

                                            _____
                                            BERYL A. HOWELL
                                            Chief Judge

# EXHIBIT D

• Names and dates of birth for all current and former spouses, or civil or domestic partners;

• Social media platforms and identifiers, also known as handles, used during the last five years; and

• Phone numbers and email addresses used during the last five years.

Regarding travel history, applicants may be requested to provide details of their international or domestic (within their country of nationality) travel, if it appears to the consular officer that the applicant has been in an area while the area was under the operational control of a terrorist organization as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(3)(B)(vi). Applicants may be asked to recount or explain the details of their travel, and when possible, providing supporting documentation.

This information collection continues implementation of the directive of the President, in the *Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security* of March 6, 2017, to implement additional protocols and procedures focused on "ensur[ing] the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits." In substance, this proposed collection is the same as the collection that was requested through the emergency procedures in May 2017. The emergency approval limited the collection to a temporary six month approval, and these materials seek to extend that approval for three years. Consular posts worldwide regularly engage with U.S. law enforcement and partners in the U.S. intelligence community to identify characteristics of applicant populations warranting increased scrutiny. The additional information collected will facilitate consular officer efforts to apply more rigorous evaluation of these applicants for visa ineligibilities. In accordance with existing authorities, visas may not be denied on the basis of race, religion, ethnicity, national origin, political views, gender, or sexual orientation.

Based upon the data since this collection began implementation in May 2017, the Department estimates that 70,500 applicants annually will be requested to respond to this collection. The Department bases this estimate on the fact that consular officers worldwide asked an approximately 25,000 applicants questions contained in this information collection between May 2017 and October 2, 2017.

Failure to provide requested information will not necessarily result in visa denial, if the consular officer determines the applicant has provided a credible explanation why he or she cannot answer a question or provide requested supporting documentation, such that the consular officer is able to conclude that the applicant has provided adequate information to determine the applicant's eligibility to receive the visa. The collection of social media platforms and identifiers will not be used to deny visas based on applicants' race, religion, ethnicity, national origin, political views, gender, or sexual orientation.

**Methodology**

Department of State consular officers at visa-adjudicating posts worldwide will ask the proposed additional questions to resolve questions about an applicant's identity or to vet for terrorism, national security-related, or other visa ineligibilities when the consular officer determines that the circumstances of a visa applicant, a review of a visa application, or responses in a visa interview indicate a need for greater scrutiny. The additional questions may be sent electronically to the applicant or be presented orally or in writing at the time of the interview. Consular officers will be mindful that, unlike some other forms of personal information required from visa applicants, social media identifiers may afford the user anonymity. Posts will assess their respective operating environments and collect the social media identifier information from applicants in a manner that best safeguards its transmission from applicant to post. In furtherance of this collection, consular officers are directed not to request user passwords; engage or interact with individual visa applicants on or through social media when conducting assessments of visa eligibility; not to violate or attempt to violate individual privacy settings or controls; and not to use social media or assess an individual's social media presence beyond established Department guidance. Consular staff are also directed in connection with this collection to take particular care to avoid collection of third-party information when conducting any social media reviews.

**Edward Ramotowski,**

*Deputy Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2017–25490 Filed 11–24–17; 8:45 am]

**BILLING CODE 4710–06–P**

## DEPARTMENT OF STATE

[Public Notice: 10211]

## Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST)

In accordance with section 6(j)(1) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), and as continued in effect by Executive Order 13222 of August 17, 2001, section 620A(a) of the Foreign Assistance Act of 1961, Public Law 87–195, as amended (22 U.S.C. 2371(c)), and section 40(f) of the Arms Export Control Act, Public Law 90–629, as amended (22 U.S.C. 2780(f)), I hereby determine that the Democratic People's Republic of Korea (DPRK) has repeatedly provided support for acts of international terrorism.

This notice shall be published in the **Federal Register**.

Dated: November 17, 2017.

**Rex W. Tillerson,**

*Secretary of State.*

[FR Doc. 2017–25547 Filed 11–24–17; 8:45 am]

**BILLING CODE 4710–AD–P**

## STATE JUSTICE INSTITUTE

## SJI Board of Directors Meeting, Notice

**AGENCY:** State Justice Institute.

**ACTION:** Notice of meeting.

**SUMMARY:** The SJI Board of Directors will be meeting on Monday, December 4, 2017 at 1:00 p.m. The meeting will be held at SJI Headquarters in Reston, Virginia. The purpose of this meeting is to consider grant applications for the 1st quarter of FY 2018, and other business. All portions of this meeting are open to the public.

**ADDRESSES:** State Justice Institute Headquarters, 11951 Freedom Drive, Suite 1020, Reston, Virginia 20190.

**FOR FURTHER INFORMATION CONTACT:** Jonathan Mattiello, Executive Director, State Justice Institute, 11951 Freedom Drive, Suite 1020, Reston, VA 20190, 571–313–8843, *contact@sji.gov.*

**Jonathan D. Mattiello,**

*Executive Director.*

[FR Doc. 2017–25534 Filed 11–24–17; 8:45 am]

**BILLING CODE P**

# EXHIBIT E

Functions   Options   Help

## Owner Maintenance

Claims Database
Record Exists in Claims Only

| | | | |
|---|---|---|---|
| Owner | 058784799 | Account | ████4121 |
| Report | 000367724 | Report Year/Class | 2017  09 | PIMS Owner Number |
| Reporter | 000068744 | Reporter FEIN | ████████ |
| Reporter Name | CHINA CONSTRUCTION BANK NY | | |

Account Title
KOREA KWANGSON BANKING CORP

Company Name  KOREA KWANGSON BANKING CORP

TIN                         Type                                    Prefix   [        ⌄ ]

First Name                                           Middle Name

Last Name   KOREA KWANGSON BANKING CORP            Suffix   [ ENT  ⌄ ]

Address 1   JUNGSON-DONG SUNTRI STREET

Address 2   CENTRAL DISTRICT

Address 3

City   PYONGYANG                           State   [ ]   Zip

Province

Foreign Zip                 Country Code  KN  [ ]   Country  NORTH KOREA

Account Removal          Removal          Deceased Owner Flag  N          DOB

OK

Exit

Audit Trails

# EXHIBIT F



Functions  Options  Help

**Property Maintenance**

OK
Exit
Audit List Inquiry

Claims Database
Record Exists in Claims Only

Reporter 00068744        FEIN ▮▮▮▮▮        Area/Div
Name CHINA CONSTRUCTION BANK NY
Report 00367724        Report Due 11/10/2017        Report Class 09
Account ▮▮▮4121        Report Ref# 000001        Report Year 2017

Property 68761597        Property Status/Date OPEN 07/11/2017
Property Type 1C        Document Number 00000675250000001160
Transfer Method        Property Nature CASH
CUSIP Number        Property Class 1
Property Description
OFAC

|  | Initial Amount Reported | Escheated Amounts Reported | Unpaid Amounts |
|---|---|---|---|
| Cash | $238,607.77 | $240,336.41 | $240,336.41 |
| Shares |  |  | .00000 |

Account Removal        Removal

# EXHIBIT G

AC2709 (Rev 10/13)

New York State Comptroller
**OFFICE OF UNCLAIMED FUNDS**
110 State Street, 8TH Floor
Albany, NY 12236-0001

2410
$240,336.41

7374922

**NYS OSC
REMITTANCE**

**VERIFICATION AND CHECKLIST FOR UNCLAIMED PROPERTY**

JUN 27 2017

**Reporting Organization:**

China Construction Bank NY Branch
(name of business)

(area or department, e g , Corp Trust Division)

1095 Avenue of the Americas
(street address)

33 floor
(street address)

New York   NY   10036
(city, state, zip code)

(service bureau, if used)

(service bureau contact name)

(service bureau contact phone)

| | |
|---|---|
| **Verification for Period Ended** | June 30, __ , 20 16 |
| **State of Incorporation** | NY Branch of Foreign Bank |
| **Date of Incorporation** | |
| **Are You Authorized To Do Business in NYS?** | Yes |
| **FEDERAL EMPL ID NO·** | |

| | |
|---|---|
| Contact Person | Loren Lampros |
| Contact Title | CFO |
| Contact Phone | ( 646) 781- |
| Contact Fax | ( 212) 207- |
| Address | 1095 Ave of the Americas |
| | 33 floor |
| | New York, NY 10036 |
| Email Address | |

I certify that I am a duly authorized officer of the above named organization   To the best of my knowledge and belief this report is a true and complete statement of all abandoned property held by, or owing by, this organization as of the report period end date

_Loren Lampros_
(signature)

| **Payment Type.** | Electronic | ☐ | **Totals:** Cash | 240,336.41 |
|---|---|---|---|---|
| | Check | ☒ | Issues | |
| | Securities | ☐ | Shares | |

**RESERVED FOR USE OF STATE COMPTROLLER**

| Amount Received | Date Received | Ack  Number | Media Type | Class | Report Sequence | Year |
|---|---|---|---|---|---|---|
| $ 240336.41 | 6/29/17 | | 1 | 09 | 367724 | 17 |

Comments

Compliance
OFAC

Be sure to complete the "checklist" sheet, indicating types and amounts of property being reported.  Also, please verify that the property type(s) used on this form are the same as the ones used in your detailed Report of Abandoned Property  Detailed instructions for completing this form are in the Handbook for Reporters of Unclaimed Funds

## 1  ACCOUNT BALANCES

| | | Dormancy Period | | Cash | Shares |
|---|---|---|---|---|---|
| A | Demand Deposit Account(s) | 3 yrs | 1A | $ _____ | |
| B | Savings Accounts (includes Club Accounts, Security Deposits & Retirement Accounts) | 3 yrs | 1B | $ _____ | |
| C | Time Deposit Accounts | 3 yrs | 1C | $ 240,336.41 | |
| D | Money on Deposits to Security Funds (if separate from A & B) | 3 yrs | 1D | $ _____ | |
| E | Unidentified Deposits (if separate from A & B) & Suspense Accounts | 3 yrs | 1E | $ _____ | |
| F | Escrow Funds (Mortgages, Performance Guarantee, Surety Bonds, etc ) | 3 yrs | 1F | $ _____ | |
| G | Credit Balances Arising from Loans (includes Liquidated Mortgages, Consumer Loans, Remainder of Collateral Amounts, etc ) | 3 yrs | 1G | $ _____ | |
| H | Credit Balances, Consumer Credit Accounts | 3 yrs | 1H | $ _____ | |
| I | Credit Balances in Trading & Investment Accounts with Trusts, Brokers, Investment Firms, etc  (Including O/S checks issued to customers) | 3 yrs | 1I | $ _____ | |
| J | Credit Balances or Cash Due Renters of Safe Deposit Boxes | 3 yrs | 1J | $ _____ | |

## 2.  NEGOTIABLE INSTRUMENTS

| | | | | | |
|---|---|---|---|---|---|
| A | Certified Checks | 3 yrs | 2A | $ _____ | |
| B | Cashier, Teller Checks | 3 yrs | 2B | $ _____ | |
| C | Bank Money Orders | 3 yrs | 2C | $ _____ | |
| D | Treasurer & Registered Checks | 3 yrs | 2D | $ _____ | |
| E | Drafts & Bank Traveler's Checks | 3 yrs | 2E | $ _____ | |
| F | Warrants | 3 yrs | 2F | $ _____ | |
| G | Outstanding Checks Issued to Vendors (Accounts Payable) | 3 yrs | 2G | $ _____ | |
| H | Travelers Checks (non-bank) | 15 yrs | 2H | $ _____ | |
| I | Licensed Money Transmitter Receipts & Money Orders (non-bank) | 5 yrs | 2I | $ _____ | |
| J | State Checks | 1 yr | 2J | $ _____ | |

## 3  PAYING AGENTS, FIDUCIARY, MUTUAL FUNDS, AMERICAN DEPOSITORY RECEIPT ACCOUNTS AND CORPORATION DISBURSING DIRECTLY TO THEIR OWN SHAREHOLDERS

| | | | | Cash | Shares |
|---|---|---|---|---|---|
| A | Cash Dividends (other than ADR) | 3 yrs | 3A | $ _____ | |
| B | Bond Interest (other than ADR) | 3 yrs | 3B | $ _____ | |
| C | Stock Dividends (other than ADR) | 3 yrs | 3C | $ _____ | 3P _____ |
| D | Distributions from Ownership of Interest (other than ADR), includes \ Redemption Values, Warrants, Underlying & Unexchanged Shares & Accrued Dividends | 3 yrs | 3D | $ _____ | 3Q _____ |
| E | Cash Dividends (ADR) | 3 yrs | 3E | $ _____ | |
| F | Stock Dividends (ADR) | 3 yrs | 3F | $ _____ | 3R _____ |
| G | Other Distributions Resulting From Ownership of Interest (ADR) | 3 yrs | 3G | $ _____ | 3S _____ |
| H | Bond Redemption | 3 yrs | 3H | $ _____ | 3T _____ |
| I | Mutual Fund & Dividend Reinvestment) | 3 yrs | 3I | $ _____ | 3U _____ |

## 4  INVESTMENTS, TRADING (BROKER/DEALER) AND BANK TRUST DEPARTMENT ACCOUNTS REPRESENTING DISTRIBUTIONS RECEIVED FOR KNOWN AND UNKNOWN OWNERS

| | | | | Cash | Shares |
|---|---|---|---|---|---|
| A | Cash Over Receipts (Dividends & Other) | 3 yrs | 4A | $ _____ | |
| B | Bond Interest Over Receipts | 3 yrs | 4B | $ _____ | |
| C | Stock Over Receipts (Dividends & Other) | 3 yrs | 4C | $ _____ | 4P _____ |
| D | Other Over Receipts | 3 yrs | 4D | $ _____ | 4Q _____ |
| E | Unidentified Overages | 3 yrs | 4E | $ _____ | 4R _____ |
| F | Other Distributions Resulting from Ownership Interest or Debt Obligation | 3 yrs | 4F | $ _____ | 4S _____ |

## 5  REFUNDS

| | | | | | |
|---|---|---|---|---|---|
| A | Utility Service Deposit | 2 yrs | 5A | $ _____ | |
| B | Advance Payments for Utility Services Not Furnished | 2 yrs | 5B | $ _____ | |
| C | Refunds Due on Overcharges by Utility Companies | 2 yrs | 5C | $ _____ | |
| D | Refunds Due by Insurance Companies | 3 yrs | 5D | $ _____ | |
| E | Amounts Due for Undelivered Goods and/or Services | 3 yrs | 5E | $ _____ | |
| F | Rebates | 3 yrs | 5F | $ _____ | |

## 6  INSURANCE PROCEEDS

| | | | | | |
|---|---|---|---|---|---|
| A | Limiting Age (Superannuated) Contracts | N/A | 6A | $ _____ | |
| B | Matured Endowments | 3 yrs | 6B | $ _____ | |
| C | Death Claims | 3 yrs | 6C | $ _____ | |
| D | Amounts Due Under Policies of Insurance Other than Life | 3 yrs | 6D | $ _____ | |
| E | Refunds & Other Amounts Due Under Policy Terms | 3 yrs | 6E | $ _____ | |
| F | Annuities | 3 yrs | 6F | $ _____ | |
| G | Retained Asset Accounts, Benefits Access Accounts or similar distribution Accounts | 3 yrs | 6G | $ _____ | |

## 7.  FUNDS OWING BY COURTS AND GOVERNMENTAL UNITS

| | | | | | |
|---|---|---|---|---|---|
| A | Trust Funds | 3 yrs | 7A | $ _____ | |
| B | Bail Funds | 3 yrs | 7B | $ _____ | |
| C | Funds for Support of Spouse or Child | 3 yrs | 7C | $ _____ | |
| D | Condemnation Awards | 3 yrs | 7D | $ _____ | |
| X | Other | 3 yrs | 7X | $ _____ | |

## 8.  OTHER AMOUNTS AND SECURITIES

| | | | | Cash | Shares |
|---|---|---|---|---|---|
| A | Wages, Payroll, Salaries, Commissions, Pension Payments | 3 yrs | 8A | $ _____ | |
| B | Unredeemed Gift Cards (5 yrs), merch. credits, lay-away deposits, AR and AP credits on cards (3 yrs) | 3/5 yrs | 8B | $ _____ | |
| C | Amounts Owed by Sales & Insurance Finance Companies | 3 yrs | 8C | $ _____ | |
| D | Surplus from Sale of Pledged Property | 1 yr | 8D | $ _____ | |
| E | Lost Property | 3 yrs | 8E | $ _____ | |
| F | Securities Long in Customers' Trading, Investment, Trust Accounts | 3 yrs | 8F | $ _____ | 8P _____ |
| G | Securities Held As Transfer Agent | 3 yrs | 8G | $ _____ | 8Q _____ |
| H | Securities Held in a Vault or Storage Area of a Bank | 3 yrs | 8H | $ _____ | 8R _____ |
| I | Securities Lost & held by a Safe Deposit Company or Bank | 3 yrs | 8I | $ _____ | 8S _____ |
| J | Securities Found in a Safe Deposit Box | 3 yrs | 8J | $ _____ | 8T _____ |
| K | Other Securities Owed | 3 yrs | 8K | $ _____ | 8U _____ |
| X | Late Filing Interest | | 8X | $ _____ | |
| Y | Other Miscellaneous Property | 3 yrs | 8Y | $ _____ | 8Z _____ |



中国建设银行
China Construction Bank
纽约分行
New York Branch

June 21, 2017

**New York State Office of the State Comptroller**
**Office of Unclaimed Funds**
**Remittance Control, 2nd Floor**
**110 State Street**
**Albany, New York  12236**

Dear Sir or Madam,

Pursuant to the Comptroller's instruction under the Voluntary Compliance Program and the Voluntary Compliance Agreement (copy enclosed) we hereby submit a check in the amount of $240,336.41.

Our Bank understands that the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC) has granted the New York State Comptroller's Office of Unclaimed Funds an amended license authorizing New York State to take custody of assets that are deemed abandoned under the NYS Abandoned Property Law.

If you have any questions, please feel free to contact me at (646)781-█████

Sincerely,

Loren Lampros
SVP and Chief Financial Officer

## VOLUNTARY COMPLIANCE AGREEMENT

*CHINA CONSTRUCTION BANK, NY BRANCH* (Company Name) (hereinafter "Company") a corporation incorporated under the laws of the State of *NEW YORK*, has undertaken a review of its internal unclaimed property procedures. During the course of this review the Company has determined that it may be holding unclaimed property which is due and reportable to the New York State Comptroller's Office of Unclaimed Funds (hereinafter "OUF"), and which has not been included by the Company in its prior unclaimed property report filings with the OUF or in any closed audits of the Company by the OUF.

The Company would like to come forward voluntarily to correct any previous underreporting of unclaimed property under the terms of this voluntary compliance agreement (hereinafter "Agreement"). The Company has not been contacted for audit by the OUF or a third party acting on behalf of the OUF to determine compliance with New York's Abandoned Property Law (hereinafter "APL"), except with respect to prior closed audits. Under the OUF's Voluntary Compliance Program the Company intends to file the necessary Abandoned Property Report and make payment to the OUF with respect to the Company's reporting obligations under the APL, in accordance with the following terms and conditions:

1.  The OUF will determine whether an examination of the Company's books and records must be accomplished by the OUF, or whether the process used by the Company in its own review may be used in lieu of an examination by the OUF. An examination by the OUF may consist of an on-site review of the books and records relating to any unclaimed property held by the Company subject to the reporting requirements of the APL and relevant case law.

2.  The scope of an examination by the OUF will include a review of any books and records related to property identified by the Company and the OUF as having probable nexus to the State of New York, including any records on which New York addresses might appear. The Company agrees to provide additional records and information within a reasonable period upon the request of the OUF.

3.  The Company will have the opportunity to participate in any examination, discuss any results and conclusions with the OUF, and make any corrections to any books and records in the event any errors are found or in the event the Company learns any relevant new facts with respect to the subject property during the course of such examination. No remittance shall be made to the OUF until the OUF provides the Company with its written concurrence as to the methodology used in determining the amount due the OUF under the APL. However, if the Company desires to make an estimated payment and file an abandoned property report prior to completion of the Voluntary Compliance Process, the Company may submit a written request to the Project Director. The OUF's approval of such request is predicated upon the Company's understanding that the Voluntary Compliance Process will not be considered finalized until the methodology used to determine the amount due OUF has been accepted by the Project Director and the Company's final Abandoned Property Report and payment has been received by the OUF.

4.  The examination and any resulting Abandoned Property Report will cover the reportable periods from 2007 through 2017. This would include, but is not limited to, unclaimed wages, accounts payable checks, refund checks and rebate checks issued and/or payable from 2003 to 2013 as well as other general ledger items including accounts payable and receivable credits including merchandise credits issued 2001 to 2013 and gift certificates sold between 2001 and 2011. Furthermore, the Company agrees to notify the OUF regarding any property

reportable to New York State or identifiable to a New York State resident that has been reported to or claimed by any other State.

5.  The Company reserves the right to terminate any examination at any time if, upon the advice of counsel, the Company believes that the OUF has exceeded its statutory authority under the laws of the State of New York to perform such examination, or the OUF has undertaken any actions beyond the agreed scope of the examination. The Company acknowledges that any such termination may result in subsequent administrative and/or legal action being taken by the OUF.

6.  In the event the Company's Abandoned Property Report is based upon the Company's own review, the OUF reserves the right to conduct an examination of relevant books and records within two years from the later of the date of the Abandoned Property Report, or the date of payment to the OUF by the Company.  Such an examination would be performed by employees of the OUF.  In the event the Company and the OUF do not come to agreement with respect to the Company's reporting obligations under the APL, any negotiations between the parties are not intended to be, and shall not be treated in any respect, as an admission of reporting liability by the Company.

7.  This Agreement and any resulting Abandoned Property Report and payment, are based upon representations of full and complete disclosure by the Company and/or its representatives. An erroneous or misrepresentation of facts or failure to make full disclosure during the Voluntary Compliance Process shall provide the OUF with a basis for nullification of this Agreement and any resulting Abandoned Property Report and payment in whole or in part.

8.  All negotiations will be treated as confidential information by the Company.  The OUF will protect all confidential information provided to it by the Company to the fullest extent possible, consistent with legal requirements and the responsibilities of the OUF.

9.  No interest or penalties will be imposed on the Company with respect to the unclaimed property payable to the OUF under any resulting Abandoned Property Report.

10. Payment by the Company to the OUF under any resulting Abandoned Property Report shall be in full satisfaction of all obligations imposed by the APL with respect to the property types and reporting periods set forth in paragraph 4 hereof, and all prior reporting periods.

11. The Company commits to maintain and retain accurate books and records on an ongoing basis, that will enable it to identify all unclaimed property subject to the APL (including but not limited to owner name, address, origination date and amount) and file complete and accurate Abandoned Property Reports annually in the future, as required under the APL. Prior to remitting property to the OUF the Company will conduct all required due diligence as set forth in Section 1422 of the APL.

12. Upon payment of the amount of unclaimed property determined to be owing under the APL, the OUF in accordance with Section 1404 of the APL, shall relieve and hold the Company harmless, to the extent of the amount paid, from any and all liability for any claims related to such unclaimed property.

13. If this Agreement is executed by a third party representing the Company, it will be considered null and void unless a "Voluntary Compliance Engagement Letter" relative to the Company's compliance with the APL is signed by the Company within thirty days of the date of this Agreement.

14. This Agreement shall be valid for a period of six months from the date executed by a duly authorized representative of the OUF. Should the Company require additional time to complete its research and file the applicable abandoned property report and payment, a written request must be submitted to the OUF prior to the expiration of the six month period. Such extension request shall provide specific details of the work performed, the estimated completion date, and an explanation as to why additional time is required. For this Agreement to continue in force and effect, the OUF must consent in writing to the extension request. Failure to obtain the OUF's written consent to a request for an extension, may subject the Company to late filing interest charges.

Upon execution of this Agreement, the OUF agrees: (i) to meet with the Company to determine whether an examination of the Company's books and records must be accomplished by the OUF, or whether the process used by the Company in its own review may be used in lieu of an examination by the OUF; (ii) discuss with the Company the methodology used in determining the amount due the OUF under the APL; and (iii) upon completion of the Voluntary Compliance Process, accept the Company's Abandoned Property Report and payment consistent with the foregoing terms and conditions.

AGREED AND ACKNOWLEDGED

Company: *CHINA CONSTRUCTION BANK,*
*NY BRANCH*

Signature By: *Loren Lampros*

Name: *LOREN LAMPROS*

Title: *SVP & CFO*

Address: *1095 AVE. OF THE AMERICAS*

*NEW YORK, NY 10036*

Telephone: *646-781-█*

E-mail address: ███████████

State of New York
Office of Unclaimed Funds

Signature By: *Jim Chen*

Date: *June 13, 2017*

Jim Chen
Project Director
NYS Office of Unclaimed Funds
Date ___ *June 13, 2017*

ALLISON LEE
Notary Public, State of New York
Reg. No. 02LE6341797
Qualified in Nassau County
My Commission Expires May 0, 20>->

Web
Rev. 01 01 17

(Page 7 of 7)

AC 2686 (1/02)  STATE OF NEW YORK – OFFICE OF THE STATE COMPTROLLER – **REPORT OF ABANDONED PROPERTY**

Page 1 of 1

For The Period Ending June 30 , 20 16

| Do Not Write in This Area OUF USE ONLY | Rec No | Name of Reporting Organization | Address of Reporting Organization | City | State | Zip |
|---|---|---|---|---|---|---|
| | | China Construction Bank, New York Branch | 1095 Avenue of the Americas, 33 floor | New York | NY | 10036 |

### Record 1

| | |
|---|---|
| Owner Last Name (20) | First Name (10)   M I   Suffix (3)   Account Title (70) Korea Kwangson Banking Corporation |

Lot No

Reg

| Owner Address 1 (30) Jungson-dong, Sungri street | Owner Address 2 (30) Central District | Owner City (20) Pyongyang | State (2) | Zip (9) | Country if Not USA North Korea |
|---|---|---|---|---|---|

| Soc Sec No /Empl ID No | Property Type (2) 1C | Property ID Number (20) 675250000001160 | Date (MMDDYY) 07-01-2010 | Initial Amount $ 238,607.77 | Escheated Amount $ 240,336.41 | Removal Indicator (If Applicable, Enter "P" or "R") P   Otherwise   R   Owner Claimed   Reduced to Zero | Multiple Owners Yes |
|---|---|---|---|---|---|---|---|

| Description of Security (70) OFAC  Blocked account | CUSIP Number of Security | No of Shares or Denomination | Method of Transfer check |
|---|---|---|---|

### Record 2

| Owner Last Name (20) | First Name (10)   M I   Suffix (3)   Account Title (70) |
|---|---|

Lot No

Reg

| Owner Address 1 (30) | Owner Address 2 (30) | Owner City (20) | State (2) | Zip (9) | Country if Not USA |
|---|---|---|---|---|---|

| Soc Sec No /Empl ID No | Property Type (2) | Property ID Number (20) | Date (MMDDYY) | Initial Amount $ | Escheated Amount $ | Removal Indicator (If Applicable, Enter "P" or "R") P   Otherwise   R   Owner Claimed   Reduced to Zero | Multiple Owners |
|---|---|---|---|---|---|---|---|

| Description of Security (70) | CUSIP Number of Security | No of Shares or Denomination | Method of Transfer |
|---|---|---|---|

### Record 3

| Owner Last Name (20) | First Name (10)   M I   Suffix (3)   Account Title (70) |
|---|---|

Lot No

Reg

| Owner Address 1 (30) | Owner Address 2 (30) | Owner City (20) | State (2) | Zip (9) | Country if Not USA |
|---|---|---|---|---|---|

| Soc Sec No /Empl ID No | Property Type (2) | Property ID Number (20) | Date (MMDDYY) | Initial Amount $ | Escheated Amount $ | Removal Indicator (If Applicable, Enter "P" or "R") P   Otherwise   R   Owner Claimed   Reduced to Zero | Multiple Owners |
|---|---|---|---|---|---|---|---|

| Description of Security (70) | CUSIP Number of Security | No of Shares or Denomination | Method of Transfer |
|---|---|---|---|

### Record 4

| Owner Last Name (20) | First Name (10)   M I   Suffix (3)   Account Title (70) |
|---|---|

Lot No

Reg

| Owner Address 1 (30) | Owner Address 2 (30) | Owner City (20) | State (2) | Zip (9) | Country if Not USA |
|---|---|---|---|---|---|

| Soc Sec No /Empl ID No | Property Type (2) | Property ID Number (20) | Date (MMDDYY) | Initial Amount $ | Escheated Amount $ | Removal Indicator (If Applicable, Enter "P" or "R") P   Otherwise   R   Owner Claimed   Reduced to Zero | Multiple Owners Yes |
|---|---|---|---|---|---|---|---|

| Description of Security (70) | CUSIP Number of Security | No of Shares or Denomination | Method of Transfer |
|---|---|---|---|

### Record 5

| Owner Last Name (20) | First Name (10)   M I   Suffix (3)   Account Title (70) |
|---|---|

Lot No

Reg

| Owner Address 1 (30) | Owner Address 2 (30) | Owner City (20) | State (2) | Zip (9) | Country if Not USA |
|---|---|---|---|---|---|

| Soc Sec No /Empl ID No | Property Type (2) | Property ID Number (20) | Date (MMDDYY) | Initial Amount $ | Escheated Amount $ | Removal Indicator (If Applicable, Enter "P" or "R") P   Otherwise   R   Owner Claimed   Reduced to Zero | Multiple Owners Yes |
|---|---|---|---|---|---|---|---|

| Description of Security (70) | CUSIP Number of Security | No of Shares or Denomination | Method of Transfer |
|---|---|---|---|

# EXHIBIT H

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

## Treasury Designates Financial Institution Tied to North Korea's WMD Proliferation

8/11/2009

**WASHINGTON**– The U.S. Department of the Treasury today designated the Korea Kwangson Banking Corp. (KKBC) under Executive Order (E.O.) 13382 for providing financial services in support of both Tanchon Commercial Bank (Tanchon) and Korea Hyoksin Trading Corporation (Hyoksin), a subordinate of the Korea Ryonbong General Corporation (Ryonbong). KKBC is based in North Korea and has operated at least one overseas branch in Dandong, China.

Tanchon and Ryonbong, were identified by the President as weapons of mass destruction (WMD) proliferators and listed in the Annex to E.O. 13382 in June 2005, and Hyoksin was designated by Treasury in July 2009 for being owned or controlled by Ryonbong. All three entities have been designated by the UN pursuant to UN Security Council Resolution (UNSCR) 1718 for their roles in North Korea's WMD and missile programs. E.O. 13382 freezes the assets of proliferators of WMD and their supporters and prohibits U.S. persons from engaging in transactions with them, thereby isolating them from the U.S. financial and commercial systems.

"North Korea's use of a little-known bank, KKBC, to mask the international business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey.

Since 2008, Tanchon has been utilizing KKBC to facilitate funds transfers likely amounting to millions of dollars, including transfers involving Korea Mining Development Trading Corporation (KOMID)-related funds from Burma to China in 2009. KOMID, which has been identified by the President in the Annex to E.O.13382 and designated by the UN pursuant to UNSCR 1718, is North Korea's premier arms dealer and main exporter of goods and equipment related to ballistic missiles and conventional weapons. Tanchon, the financial arm of KOMID, plays a key role in financing KOMID's sales of ballistic missiles. Additionally, Hyoksin, which the UN described as being involved in the development of weapons of mass destruction, sought to use KKBC in connection with a purchase of dual-use equipment in 2008.

Due to KKBC's relationship to Tanchon, Hyoksin, and Ryonbong, today's action is consistent with UNSCR 1718's requirement to freeze the funds of and deny financial services to UN-designated entities. It is also consistent with UNSCR 1874's call to prevent the provision of financial services or any financial assets that could contribute to North Korea's nuclear, ballistic missile, or other WMD-related programs.

###

# EXHIBIT I

United Nations



**Security Council**

S/RES/2270 (2016)

Distr.: General
2 March 2016

## Resolution 2270 (2016)

### Adopted by the Security Council at its 7638th meeting, on 2 March 2016

*The Security Council,*

*Recalling* its previous relevant resolutions, including resolution 825 (1993), resolution 1540 (2004), resolution 1695 (2006), resolution 1718 (2006), resolution 1874 (2009), resolution 1887 (2009), resolution 2087 (2013) and resolution 2094 (2013), as well as the statements of its President of 6 October 2006 (S/PRST/2006/41), 13 April 2009 (S/PRST/2009/7) and 16 April 2012 (S/PRST/2012/13),

*Reaffirming* that proliferation of nuclear, chemical and biological weapons, as well as their means of delivery, constitutes a threat to international peace and security,

*Expressing* gravest concern at the nuclear test conducted by the Democratic People's Republic of Korea ("the DPRK") on 6 January 2016 in violation of resolutions 1718 (2006), 1874 (2009), 2087 (2013) and 2094 (2013), and at the challenge such a test constitutes to the Treaty on Non-Proliferation of Nuclear Weapons ("the NPT") and to international efforts aimed at strengthening the global regime of non-proliferation of nuclear weapons, and the danger it poses to peace and stability in the region and beyond,

*Underlining* once again the importance that the DPRK respond to other security and humanitarian concerns of the international community,

*Underlining* also that measures imposed by this resolution are not intended to have adverse humanitarian consequences for the civilian population DPRK,

*Regretting* the DPRK's diversion of financial, technical and industrial resources toward developing its nuclear weapons and ballistic missile program, and condemning its declared intent to develop nuclear weapons,

*Expressing* deep concern at the grave hardship that the DPRK people are subjected to,

*Expressing* great concern that the DPRK's arms sales have generated revenues that are diverted to the pursuit of nuclear weapons and ballistic missiles while DPRK citizens have great unmet needs,

16-03394 (E)


Please recycle 

*Expressing* serious concern that the DPRK has continued to violate relevant Security Council resolutions through repeated launches of ballistic missiles in 2014 and 2015, as well as the submarine-launched ballistic missile ejection test in 2015 and *noting* that all such ballistic missile activities contribute to the DPRK's development of nuclear weapons delivery systems and increase tension in the region and beyond,

*Expressing* continued concern that the DPRK is abusing the privileges and immunities accorded under the Vienna Conventions on Diplomatic and Consular Relations,

*Expressing* its gravest concern that the DPRK's ongoing nuclear-, and ballistic missile-related activities have further generated increased tension in the region and beyond, and *determining* that there continues to exist a clear threat to international peace and security,

*Acting* under Chapter VII of the Charter of the United Nations, and taking measures under its Article 41,

1.    *Condemns* in the strongest terms the nuclear test conducted by the DPRK on 6 January 2016 in violation and flagrant disregard of the Council's relevant resolutions, and further *condemns* the DPRK's launch of 7 February 2016, which used ballistic missile technology and was in serious violation of resolutions 1718 (2006), 1874 (2009), 2087 (2013), and 2094 (2013);

2.    *Reaffirms* its decisions that the DPRK shall not conduct any further launches that use ballistic missile technology, nuclear tests, or any other provocation, and shall suspend all activities related to its ballistic missile program and in this context re-establish its pre-existing commitments to a moratorium on missile launches, and *demands* that the DPRK immediately comply fully with these obligations;

3.    *Reaffirms* its decisions that the DPRK shall abandon all nuclear weapons and existing nuclear programs in a complete, verifiable and irreversible manner, and immediately cease all related activities;

4.    *Reaffirms* its decision that the DPRK shall abandon all other existing weapons of mass destruction and ballistic missile programs in a complete, verifiable and irreversible manner;

5.    *Reaffirms* that, pursuant to paragraph 8 (c) of resolution 1718 (2006), all Member States shall prevent any transfers to the DPRK by their nationals or from their territories, or from the DPRK by its nationals or from its territory, of technical training, advice, services or assistance related to the provision, manufacture, maintenance or use of nuclear-related, ballistic missile-related or other weapons of mass destruction-related items, materials, equipment, goods and technology, and *underscores* that this provision prohibits the DPRK from engaging in any form of technical cooperation with other Member States on launches using ballistic missile technology, even if characterized as a satellite launch or space launch vehicle;

6.    *Decides* that the measures in paragraph 8 (a) of resolution 1718 (2006) shall also apply to all arms and related materiel, including small arms and light weapons and their related materiel, as well as to financial transactions, technical training, advice, services or assistance related to the provision, manufacture, maintenance or use of such arms and related materiel;

7.   *Affirms* that the obligations imposed in paragraphs 8 (a), 8 (b) and 8 (c) of resolution 1718 (2006), as extended by paragraphs 9 and 10 of resolution 1874 (2009), apply with respect to the shipment of items to or from the DPRK for repair, servicing, refurbishing, testing, reverse-engineering, and marketing, regardless of whether ownership or control is transferred, and *underscores* that the measures specified in paragraph 8 (e) of resolution 1718 (2006) shall also apply to any individual traveling for the purposes of carrying out the activities described in this paragraph;

8.   *Decides* that the measures imposed in paragraphs 8 (a) and 8 (b) of resolution 1718 (2006) shall also apply to any item, except food or medicine, if the State determines that such item could directly contribute to the development of the DPRK's operational capabilities of its armed forces, or to exports that support or enhance the operational capabilities of armed forces of another Member State outside the DPRK, and *decides* also that this provision shall cease to apply to the supply, sale or transfer of an item, or its procurement, if:

(a)   the State determines that such activity is exclusively for humanitarian purposes or exclusively for livelihood purposes which will not be used by DPRK individuals or entities to generate revenue, and also not related to any activity prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, provided that the State notifies the Committee in advance of such determination and also informs the Committee of measures taken to prevent the diversion of the item for such other purposes, or

(b)   the Committee has determined on a case-by-case basis that a particular supply, sale or transfer would not be contrary to the objectives of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution;

9.   *Recalls* that paragraph 9 of resolution 1874 (2009) requires States to prohibit the procurement from the DPRK of technical training, advice, services or assistance related to the provision, manufacture, maintenance or use of arms and related materiel, and *clarifies* that this paragraph prohibits States from engaging in the hosting of trainers, advisors, or other officials for the purpose of military-, paramilitary- or police-related training;

10.   *Decides* that the measures specified in paragraph 8 (d) of resolution 1718 (2006) shall apply also to the individuals and entities listed in Annex I and II of this resolution and to any individuals or entities acting on their behalf or at their direction, and to entities owned or controlled by them, including through illicit means;

11.   *Decides* that the measures specified in paragraph 8 (e) of resolution 1718 (2006) shall apply also to the individuals listed in Annex I of this resolution and to individuals acting on their behalf or at their direction;

12.   *Affirms* that "economic resources," as referred to in paragraph 8 (d) of resolution 1718 (2006), includes assets of every kind, whether tangible or intangible, movable or immovable, actual or potential, which potentially may be used to obtain funds, goods, or services, such as vessels (including maritime vessels);

13.   *Decides* that if a Member State determines that a DPRK diplomat, governmental representative, or other DPRK national acting in a governmental

capacity, is working on behalf or at the direction of a designated individual or entity, or of an individual or entities assisting in the evasion of sanctions or violating the provisions of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, then the Member State shall expel the individual from its territory for the purpose of repatriation to the DPRK consistent with applicable national and international law, provided that nothing in this paragraph shall impede the transit of representatives of the Government of the DPRK to the United Nations Headquarters or other UN facilities to conduct United Nations business, and *decides* that the provisions of this paragraph shall not apply with respect to a particular individual if: a) the presence of the individual is required for fulfillment of a judicial process, b) the presence of the individual is required exclusively for medical, safety or other humanitarian purposes, or c) the Committee has determined on a case-by-case basis that the expulsion of the individual would be contrary to the objectives of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) and this resolution;

14. *Decides* that, if a Member State determines that an individual who is not a national of that State is working on behalf of or at the direction of a designated individual or entity or assisting the evasion of sanctions or violating the provisions of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, then Member States shall expel the individual from their territories for the purpose of repatriation to the individual's state of nationality, consistent with applicable national and international law, unless the presence of the individual is required for fulfillment of a judicial process or exclusively for medical, safety or other humanitarian purposes, or the Committee has determined on a case-by-case basis that the expulsion of the individual would be contrary to the objectives of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, provided that nothing in this paragraph shall impede the transit of representatives of the Government of the DPRK to the United Nations Headquarters or other UN facilities to conduct United Nations business;

15. *Underscores* that, as a consequence of implementing the obligations imposed in paragraph 8 (d) of resolution 1718 (2006) and paragraphs 8 and 11 of resolution 2094 (2013), all Member States shall close the representative offices of designated entities and prohibit such entities, as well as individuals or entities acting for or on their behalf, directly or indirectly, from participating in joint ventures or any other business arrangements, and *underscores* that if a representative of such an office is a DPRK national, then States are required to expel the individual from their territories for the purpose of repatriation to the DPRK consistent with applicable national and international law, pursuant to and consistent with paragraph 10 of resolution 2094 (2013);

16. *Notes* that the DPRK frequently uses front companies, shell companies, joint ventures and complex, opaque ownership structures for the purpose of violating measures imposed in relevant Security Council resolutions, and, in this regard, *directs* the Committee, with the support of the Panel, to identify individuals and entities engaging in such practices and, if appropriate, designate them to be subject to the measures imposed in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) and this resolution;

17. *Decides* that all Member States shall prevent specialized teaching or training of DPRK nationals within their territories or by their nationals of disciplines which could contribute to the DPRK's proliferation sensitive nuclear

activities or the development of nuclear weapon delivery systems, including teaching or training in advanced physics, advanced computer simulation and related computer sciences, geospatial navigation, nuclear engineering, aerospace engineering, aeronautical engineering and related disciplines;

18.    *Decides* that all States shall inspect the cargo within or transiting through their territory, including in their airports, seaports and free trade zones, that has originated in the DPRK, or that is destined for the DPRK, or has been brokered or facilitated by the DPRK or its nationals, or by individuals or entities acting on their behalf or at their direction, or entities owned or controlled by them, or by designated individuals or entities, or that is being transported on DPRK flagged aircraft or maritime vessels, for the purposes of ensuring that no items are transferred in violation of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) and this resolution, and calls upon States to implement such inspections in a manner that minimizes the impact on the transfer of cargo that the State determines is for humanitarian purposes;

19.    *Decides* that Member States shall prohibit their nationals and those in their territories from leasing or chartering their flagged vessels or aircraft or providing crew services to the DPRK, and *decides* that this prohibition shall also apply with respect to any designated individuals or entities, any other DPRK entities, any other individuals or entities whom the State determines to have assisted in the evasion of sanctions or in violating the provisions of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, any individuals or entities acting on behalf or at the direction of any of the aforementioned, and any entities owned or controlled by any of the aforementioned, *calls upon* Member States to de register any vessel that is owned, operated or crewed by the DPRK, further *calls upon* Member States not to register any such vessel that is de-registered by another Member State pursuant to this paragraph, and *decides* that this provision shall not apply with respect to such leasing, chartering or provision of crew services notified to the Committee in advance on a case-by-case basis accompanied by: a) information demonstrating that such activities are exclusively for livelihood purposes which will not be used by DPRK individuals or entities to generate revenue, and b) information on measures taken to prevent such activities from contributing to violations of the aforementioned resolutions;

20.    *Decides* that all States shall prohibit their nationals, persons subject to their jurisdiction and entities incorporated in their territory or subject to their jurisdiction from registering vessels in the DPRK, obtaining authorization for a vessel to use the DPRK flag, and from owning, leasing, operating, providing any vessel classification, certification or associated service, or insuring any vessel flagged by the DPRK, and *decides* that this measure shall not apply to activities notified in advance by the Committee on a case-by-case basis, following provision to the Committee of detailed information on the activities, including the names of individuals and entities involved in them, information demonstrating that such activities are exclusively for livelihood purposes which will not be used by DPRK individuals or entities to generate revenue and on measures taken to prevent such activities from contributing to violations of resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution;

21.    *Decides* that all States shall deny permission to any aircraft to take off from, land in or overfly, unless under the condition of landing for inspection, their

territory, if they have information that provides reasonable grounds to believe that the aircraft contains items the supply, sale, transfer or export of which is prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, except in the case of an emergency landing, and *calls upon* all States, when considering whether to grant overflight permission to flights to assess known risk factors;

22.   *Decides* that all Member States shall prohibit the entry into their ports of any vessel if the Member State has information that provides reasonable grounds to believe the vessel is owned or controlled, directly or indirectly, by a designated individual or entity, or contains cargo the supply, sale, transfer or export of which is prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, unless entry is required in the case of emergency or in the case of return to its port of origination, or for inspection, or unless the Committee determines in advance that such entry is required for humanitarian purposes or any other purposes consistent with the objectives of this resolution;

23.   *Recalls* that the Committee has designated the DPRK firm Ocean Maritime Management (OMM), *notes* that the vessels specified in Annex III of this resolution are economic resources controlled or operated by OMM and therefore subject to the asset freeze imposed in paragraph 8 (d) of resolution 1718 (2006), and *underscores* that Member States are required to implement the relevant provisions of that resolution;

24.   *Decides* that the DPRK shall abandon all chemical and biological weapons and weapons-related programs, and shall act strictly in accordance with its obligations as a State Party to the Convention on the Prohibition of the Development, Production, or Stockpiling of Bacteriological (Biological) and Toxin Weapons and Their Destruction, and *calls upon* the DPRK to accede to the Convention of the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and Their Destruction, and then to immediately comply with its provisions;

25.   *Decides* to adjust the measures imposed by paragraph 8 of resolution 1718 (2006) and this resolution through the designation of additional goods, *directs* the Committee to undertake its tasks to this effect and to report to the Security Council within fifteen days of adoption of this resolution, and further *decides* that, if the Committee has not acted, then the Security Council will complete action to adjust the measures within seven days of receiving that report;

26.   *Directs* the Committee to review and update the items contained in S/2006/853/CORR.1 no later than sixty days from the adoption of this resolution and on an annual basis thereafter;

27.   *Decides* that the measures imposed in paragraphs 8 (a) and 8 (b) of resolution 1718 (2006) shall also apply to any item if the State determines that such item could contribute to the DPRK's nuclear or ballistic missile programs or other weapons of mass destruction programs, activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013), and this resolution, or to the evasion of measures imposed by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013), and this resolution;

28.   *Reaffirms* paragraphs 14 through 16 of resolution 1874 (2009), and paragraph 8 of resolution 2087 (2013), and *decides* that these paragraphs shall apply

also with respect to any items the supply, sale or transfer of which is prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution identified in inspections conducted pursuant to paragraph 18 of this resolution;

29.   *Decides* that the DPRK shall not supply, sell or transfer, directly or indirectly, from its territory or by its nationals or using its flag vessels or aircraft, coal, iron, and iron ore, and that all States shall prohibit the procurement of such material from the DPRK by their nationals, or using their flag vessels or aircraft, and whether or not originating in the territory of the DPRK, and *decides* that this provision shall not apply with respect to:

(a)   Coal that the procuring State confirms on the basis of credible information has originated outside the DPRK and was transported through the DPRK solely for export from the Port of Rajin (Rason), provided that the State notifies the Committee in advance and such transactions are unrelated to generating revenue for the DPRK's nuclear or ballistic missile programs or other activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution; and,

(b)   Transactions that are determined to be exclusively for livelihood purposes and unrelated to generating revenue for the DPRK's nuclear or ballistic missile programs or other activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution;

30.   *Decides* that the DPRK shall not supply, sell or transfer, directly or indirectly, from its territory or by its nationals or using its flag vessels or aircraft, gold, titanium ore, vanadium ore, and rare earth minerals, and that all States shall prohibit the procurement of such material from the DPRK by their nationals, or using their flag vessels or aircraft, and whether or not originating in the territory of the DPRK;

31.   *Decides* that all States shall prevent the sale or supply, by their nationals or from their territories or using their flag vessels or aircraft, of aviation fuel, including aviation gasoline, naptha-type jet fuel, kerosene-type jet fuel, and kerosene-type rocket fuel, whether or not originating in their territory, to the territory of the DPRK, or unless the Committee has approved in advance on an exceptional case-by-case basis the transfer to the DPRK of such products for verified essential humanitarian needs, subject to specified arrangements for effective monitoring of delivery and use, and *decides* also that this provision shall not apply with respect to the sale or supply of aviation fuel to civilian passenger aircraft outside the DPRK exclusively for consumption during its flight to the DPRK and its return flight;

32.   *Decides* that the asset freeze imposed by paragraph 8 (d) of resolution 1718 (2006) shall apply to all the funds, other financial assets and economic resources outside of the DPRK that are owned or controlled, directly or indirectly, by entities of the Government of the DPRK or the Worker's Party of Korea, or by individuals or entities acting on their behalf or at their direction, or by entities owned or controlled by them, that the State determines are associated with the DPRK's nuclear or ballistic missile programs or other activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, *decides* further that all States except the DPRK shall ensure that any funds, financial assets or economic resources are prevented from being made available by their

nationals or by any individuals or entities within their territories, to or for the benefit of such individuals or entities, or individuals or entities acting on their behalf or at their direction, or entities owned or controlled by them, and *decides* that these measures shall not apply with respect to funds, other financial assets and economic resources that are required to carry out activities of the DPRK's missions to the United Nations and its specialized agencies and related organizations or other diplomatic and consular missions of the DPRK, and to any funds, other financial assets and economic resources that the Committee determines in advance on a case-by-case basis are required for the delivery of humanitarian assistance, denuclearization or any other purpose consistent with the objectives of this resolution;

33.   *Decides* that States shall prohibit in their territories the opening and operation of new branches, subsidiaries, and representative offices of DPRK banks, *decides* further that States shall prohibit financial institutions within their territories or subject to their jurisdiction from establishing new joint ventures and from taking an ownership interest in or establishing or maintaining correspondent relationships with DPRK banks, unless such transactions have been approved by the Committee in advance, and *decides* that States shall take the necessary measures to close such existing branches, subsidiaries and representative offices, and also to terminate such joint ventures, ownership interests and correspondent banking relationships with DPRK banks within ninety days from the adoption of this resolution;

34.   *Decides* that States shall prohibit financial institutions within their territories or subject to their jurisdiction from opening new representative offices or subsidiaries, branches or banking accounts in the DPRK;

35.   *Decides* that States shall take the necessary measures to close existing representative offices, subsidiaries or banking accounts in the DPRK within ninety days, if the State concerned has credible information that provides reasonable grounds to believe that such financial services could contribute to the DPRK's nuclear or ballistic missile programs, or other activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, and *decides* further that this provision shall not apply if the Committee determines on a case-by-case basis that such offices, subsidiaries or accounts are required for the delivery of humanitarian assistance or the activities of diplomatic missions in the DPRK pursuant to the Vienna Convention on Diplomatic Relations or the activities of the United Nations or its specialized agencies or related organizations, or for any other purposes consistent with resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution;

36.   *Decides* that all States shall prohibit public and private financial support from within their territories or by persons or entities subject to their jurisdiction for trade with the DPRK (including the granting of export credits, guarantees or insurance to their nationals or entities involved in such trade) where such financial support could contribute to the DPRK's nuclear or ballistic missile programs or other activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, including paragraph 8;

37.   *Expresses* concern that transfers to the DPRK of gold may be used to evade the measures imposed in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) and this resolution, and *clarifies* that all States shall apply the measures set forth in paragraph 11 of resolution 2094 (2013) to the transfers of gold,

including through gold couriers, transiting to and from the DPRK so as to ensure such transfers of gold do not contribute to the DPRK's nuclear or ballistic missile programs, or other activities prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, or to the evasion of measures imposed by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution;

38.   *Recalls* that the Financial Action Task Force (FATF) has called upon countries to apply enhanced due diligence and effective countermeasure to protect their jurisdictions from the DPRK's illicit financial activity, and *calls upon* Member States to apply the FATF Recommendation 7, its Interpretive Note, and related guidance to effectively implement targeted financial sanctions related to proliferation;

39.   *Reaffirms* the measures imposed in paragraph 8 (a) (iii) of resolution 1718 (2006) regarding luxury goods, and *clarifies* that the term "luxury goods" includes, but is not limited to, the items specified in Annex V of this resolution;

40.   *Calls upon* all States to report to the Security Council within ninety days of the adoption of this resolution, and thereafter upon request by the Committee, on concrete measures they have taken in order to implement effectively the provisions of this resolution, *requests* the Panel of Experts established pursuant to resolution 1874 (2009), in cooperation with other UN sanctions monitoring groups, to continue its efforts to assist States in preparing and submitting such reports in a timely manner, and *directs* the Committee to prioritize outreach to those Member States who have never submitted implementation reports as requested by the Security Council;

41.   *Calls upon* all States to supply information at their disposal regarding non-compliance with the measures imposed in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution;

42.   *Encourages* all States to examine the circumstances of previously reported sanctions violations, particularly the items seized or activities prevented pursuant to the relevant resolutions, so as to assist in ensuring full and appropriate implementation of these resolutions, especially paragraph 27 of this resolution, and *notes* in this regard the reporting of the Panel of Experts and the information regarding sanctions violations that the Committee has released publicly;

43.   *Directs* the Committee to respond effectively to violations of the measures decided in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013), and this resolution, and, in this regard, *directs* the Committee to designate additional individuals and entities to be subject to the measures imposed in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013), and this resolution;

44.   *Directs* the Committee to continue its efforts to assist Member States in implementing the measures imposed on the DPRK, and, in this regard, *requests* the Committee to draft and circulate a comprehensive compilation of all the measures imposed in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013), and this resolution so as to facilitate Member State implementation;

45.   *Directs* the Committee to update the information contained on the Committee's list of individuals and entities, including new aliases and front

companies, and *directs* the Committee to complete this task within 45 days of the adoption of this resolution and every twelve months thereafter;

46.   *Decides* that the mandate of the Committee, as set out in paragraph 12 of resolution 1718 (2006), shall apply with respect to the measures imposed in resolution 1874 (2009), 2094 (2013) and this resolution;

47.   *Emphasizes* the importance of all States, including the DPRK, taking the necessary measures to ensure that no claim shall lie at the instance of the DPRK, or of any person or entity in the DPRK, or of persons or entities designated for measures set forth in resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, or any person claiming through or for the benefit of any such person or entity, in connection with any contract or other transaction where its performance was prevented by reason of the measures imposed by this resolution or previous resolutions;

48.   *Underlines* that measures imposed by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) and this resolution are not intended to have adverse humanitarian consequences for the civilian population of the DPRK or to affect negatively those activities, including economic activities and cooperation, that are not prohibited by resolutions 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013) or this resolution, and the work of international organizations and non-governmental organization carrying out assistance and relief activities in the DPRK for the benefit of the civilian population of the DPRK;

49.   *Reiterates* the importance of maintaining peace and stability on the Korean Peninsula and in north-east Asia at large, and *expresses* its commitment to a peaceful, diplomatic and political solution to the situation and welcomes efforts by Council members as well as other States to facilitate a peaceful and comprehensive solution through dialogue and to refrain from any actions that might aggravate tensions;

50.   *Reaffirms* its support to the Six Party Talks, *calls* for their resumption, and *reiterates* its support for the commitments set forth in the Joint Statement of 19 September 2005 issued by China, the DPRK, Japan, the Republic of Korea, the Russian Federation, and the United States, including that the goal of the Six-Party Talks is the verifiable denuclearization of the Korean Peninsula in a peaceful manner, that the United States and the DPRK undertook to respect each other's sovereignty and exist peacefully together, and that the Six Parties undertook to promote economic cooperation, and all other relevant commitments;

51.   *Affirms* that it shall keep the DPRK's actions under continuous review and is prepared to strengthen, modify, suspend or lift the measures as may be needed in light of the DPRK's compliance, and, in this regard, *expresses its determination* to take further significant measures in the event of a further DPRK nuclear test or launch;

52.   *Decides* to remain seized of the matter.

**Annex I**

**Travel Ban/Asset Freeze (Individuals)**

1. CHOE CHUN-SIK

   a. *Description*: Choe Chun-sik was the director of the Second Academy of Natural Sciences (SANS) and was the head of the DPRK's long-range missile program.

   b. *AKA*: Choe Chun Sik; Ch'oe Ch'un Sik

   c. *Identifiers*: DOB: 12 October 1954; Nationality: DPRK

2. CHOE SONG IL

   a. *Description*: Tanchon Commercial Bank Representative in Vietnam

   b. *AKA*: NA

   c. *Identifiers*: Passport: 472320665; Passport Date of Expiration: 26 Sep 2017; Passport: 563120356; Nationality: DPRK

3. HYON KWANG IL

   a. *Description*: Hyon Kwang Il is the Department Director for Scientific Development at the National Aerospace Development Administration.

   b. *AKA*: Hyon Gwang Il

   c. *Identifiers*: DOB: 27 May 1961; Nationality: DPRK

4. JANG BOM SU

   a. *Description*: Tanchon Commercial Bank Representative in Syria

   b. *AKA*: Jang Pom Su

   c. *Identifiers*: DOB: 15 April 1957; Nationality: DPRK

5. JANG YONG SON

   a. *Description*: Korea Mining Development Trading Corporation (KOMID) Representative in Iran

   b. *AKA*: NA

   c. *Identifiers*: DOB: 20 February 1957; Nationality: DPRK

6. JON MYONG GUK

   a. *Description*: Tanchon Commercial Bank Representative in Syria

   b. *AKA*: Cho'n Myo'ng-kuk

   c. *Identifiers*: Passport:4721202031; Passport Date of Expiration: 21 Feb 2017; Nationality: DPRK; DOB: 18 Oct 1976

7. KANG MUN KIL

   a. *Description*: Kang Mun Kil has conducted nuclear procurement activities as a representative of Namchongang, also known as Namhung.

   b. *AKA*: Jiang Wen-ji

   c. *Identifiers*: Passport: PS 472330208; Passport Date of Expiration: 4 July 2017; Nationality: DPRK

8. KANG RYONG

   a. *Description*: Korea Mining Development Trading Corporation (KOMID) Representative in Syria

   b. *AKA*: NA

   c. *Identifiers*: DOB: 21 August 1969; Nationality: DPRK

9. KIM JUNG JONG

   a. *Description*: Tanchon Commercial Bank Representative in Vietnam

   b. *AKA*: Kim Chung Chong

   c. *Identifiers*: Passport: 199421147 Passport Date of Expiration: 29 Dec 2014; Passport: 381110042, Passport Date of Expiration: 25 Jan 2016; Passport: 563210184, Passport Date of Expiration: 18 Jun 2018; DOB: 07 Nov 1966, Nationality: DPRK

10. KIM KYU

   a. *Description*: Korea Mining Development Trading Corporation (KOMID) External Affairs Officer

   b. *AKA*: NA

   c. *Identifiers*: DOB: 30 July 1968, Nationality: DPRK

11. KIM TONG MY'ONG

   a. *Description*: Kim Tong My'ong is the President of Tanchon Commercial Bank and has held various positions within Tanchon Commercial bank since at least 2002. He has also played a role in managing Amroggang's affairs.

   b. *AKA*: Kim Chin-So'k, Kim Tong-Myong, Kim Jin-Sok; Kim, Hyok-Chol

   c. *Identifiers*: DOB: 1964; Nationality: DPRK

12. KIM YONG CHOL

   a. *Description*: KOMID Representative in Iran

   b. *AKA*: NA

   c. *Identifiers*: DOB. 18 February 1962; Nationality: DPRK

S/RES/2270 (2016)

13. KO TAE HUN

    a. *Description*: Tanchon Commercial Bank Representative

    b. *AKA*: Kim Myong Gi

    c. *Identifiers*: Passport: 563120630; Passport Date of Expiration: 20 March 2018, D.O.B. 25 May 1972; Nationality: DPRK

14. RI MAN GON

    a. *Description*: Ri Man Gon is the Minister of the Munitions Industry Department.

    b. *AKA*: n/a

    c. *Identifiers*: DOB: 29 October 1945; Passport number: PO381230469; Passport Date of Expiration: 6 April 2016; Nationality: DPRK

15. RYU JIN

    a. *Description*: KOMID Representative in Syria

    b. *AKA*: NA

    c. *Identifiers*: DOB: 07 August 1965; Passport Number: 563410081; Nationality: DPRK

16. YU CHOL U

    a. *Description*: Yu Chol U is the Director of the National Aerospace Development Administration.

    b. *AKA*: n/a

    c. *Identifiers*: Nationality: DPRK

    <u>List Update for Alias</u>: Ra, Kyong-Su (KPi.008) — *New AKA*: Chang, Myong Ho

S/RES/2270 (2016)

## Annex II

### Asset Freeze (Entities)

1. ACADEMY OF NATIONAL DEFENSE SCIENCE

   a. *Description*: The Academy of National Defense Science is involved in the DPRK's efforts to advance the development of its ballistic missile and nuclear weapons programs.

   b. *AKA*: n/a

   c. *Location*: Pyongyang, DPRK

2. CHONGCHONGANG SHIPPING COMPANY

   a. *Description*: The Chongchongang Shipping Company, through its vessel, the Chong Chon Gang, attempted to directly import the illicit shipment of conventional weapons and arms to the DPRK in July 2013.

   b. *AKA*: Chong Chon Gang Shipping Co. Ltd.

   c. *Location*: Address: 817 Haeun, Donghung-dong, Central District, Pyongyang, DPRK; Alternate Address: 817, Haeum, Tonghun-dong, Chung-gu, Pyongyang, DPRK; IMO Number: 5342883

3. DAEDONG CREDIT BANK (DCB)

   a. *Description*: Daedong Credit Bank has provided financial services to the Korea Mining Development Trading Corporation (KOMID) and Tanchon Commercial Bank. Since at least 2007, DCB has facilitated hundreds of financial transactions worth millions of dollars on behalf of KOMID and Tanchon Commercial Bank. In some cases, DCB has knowingly facilitated transactions by using deceptive financial practices.

   b. *AKA*: DCB; AKA: Taedong Credit Bank

   c. *Location*: Address: Suite 401, Potonggang Hotel, Ansan-Dong, Pyongchon District, Pyongyang, DPRK; Alternate Address: Ansan-dong, Botonggang Hotel, Pongchon, Pyongyang, DPRK; SWIFT: DCBK KKPY

4. HESONG TRADING COMPANY

   a. *Description*: The Korea Mining Development Trading Corporation (KOMID) is the parent company of Hesong Trading Corporation.

   b. *Location*: Pyongyang, DPRK

5. KOREA KWANGSON BANKING CORPORATION (KKBC)

   a. *Description*: KKBC provides financial services in support to Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, a subordinate of the Korea Ryonbong General Corporation. Tanchon Commercial Bank has used KKBC to facilitate funds transfers likely amounting to millions of dollars, including transfers involving Korea Mining Development Corporation related funds.

   b.   *AKA*: KKBC

   c.   *Address*: Jungson-dong, Sungri Street, Central District, Pyongyang, DPRK

6.   KOREA KWANGSONG TRADING CORPORATION

   a.   *Description*: The Korea Ryongbong General Corporation is the parent company of Korea Kwangsong Trading Corporation.

   b.   *Address*: Rakwon-dong, Pothonggang District, Pyongyang, DPRK

7.   MINISTRY OF ATOMIC ENERGY INDUSTRY

   a.   *Description*: The Ministry of Atomic Energy Industry was created in 2013 for the purpose of modernizing the DPRK's atomic energy industry to increase the production of nuclear materials, improve their quality, and further develop an independent DPRK nuclear industry. As such, the MAEI is known to be a critical player in the DPRK's development of nuclear weapons and is in charge of day-to-day operation of the country's nuclear weapons program, and under it are other nuclear-related organizations. Under this ministry are a number of nuclear-related organizations and research centers, as well as two committees: an Isotope Application Committee and a Nuclear Energy Committee. The MAEI also directs a nuclear research center at Yongbyun, the site of the DPRK's known plutonium facilities. Furthermore, in the 2015 Panel of Experts (POE) report, the POE stated that Ri Je-son, a former director of the GBAE who was designated by the Committee established pursuant to resolution 1718 (2006) in 2009 for engagement in or support for nuclear related programs, was appointed as head of the MAEI on April 9, 2014.

   b.   *AKA*: MAEI

   c.   *Address*: Haeun-2-dong, Pyongchon District, Pyongyang, DPRK

8.   MUNITIONS INDUSTRY DEPARTMENT

   a.   *Description*: The Munitions Industry Department is involved in key aspects of the DPRK's missile program. MID is responsible for overseeing the development of the DPRK's ballistic missiles, including the Taepo Dong-2. The MID oversees the DPRK's weapons production and R&D programs, including the DPRK's ballistic missile program. The Second Economic Committee and the Second Academy of Natural Sciences — also designated in August 2010 — are subordinate to the MID. The MID in recent years has worked to develop the KN08 road-mobile ICBM.

   b.   *AKA*: Military Supplies Industry Department

   c.   *Location*: Pyongyang, DPRK

9.   NATIONAL AEROSPACE DEVELOPMENT ADMINISTRATION

   a.   *Description*: NADA is involved in the DPRK's development of space science and technology, including satellite launches and carrier rockets.

   b.   *AKA*: NADA

   c.   *Location*: DPRK

10.  OFFICE 39

    a.  *Description*: DPRK government entity.

    b.  *AKA*: Office #39; AKA: Office No. 39; AKA: Bureau 39; AKA: Central Committee Bureau 39; AKA: Third Floor; AKA: Division 39

    c.  *Location*: DPRK

11.  RECONNAISSANCE GENERAL BUREAU

    a.  *Description*: The Reconnaissance General Bureau is the DPRK's premiere intelligence organization, created in early 2009 by the merger of existing intelligence organizations from the Korean Workers' Party, the Operations Department and Office 35, and the Reconnaissance Bureau of the Korean People's Army. The Reconnaissance General Bureau trades in conventional arms and controls the DPRK conventional arms firm Green Pine Associated Corporation.

    b.  *AKA*: Chongch'al Ch'ongguk; KPA Unit 586; RGB

    c.  *Location*: Address: Hyongjesan-Guyok, Pyongyang, DPRK; Alternate Address: Nungrado, Pyongyang, DPRK.

12.  SECOND ECONOMIC COMMITTEE

    a.  *Description*: The Second Economic Committee is involved in key aspects of the DPRK's missile program. The Second Economic Committee is responsible for overseeing the production of the DPRK's ballistic missiles, and directs the activities of KOMID.

    b.  *AKA*: N/A

    c.  *Location*: Kangdong, DPRK

    List Update for Alias: NAMCHONGANG TRADING CORPORATION (KPe.004) — New AKA: Namhung Trading Corporation

**Annex III**

## OMM Vessels

| Ship Name | IMO Number |
|---|---|
| 1. CHOL RYONG (RYONG GUN BONG) | 8606173 |
| 2. CHONG BONG(GREENLIGHT)(BLUE NOUVELLE) | 8909575 |
| 3. CHONG RIM 2 | 8916293 |
| 4. DAWNLIGHT | 9110236 |
| 5. EVER BRIGHT 88 (J STAR) | 8914934 |
| 6. GOLD STAR 3 (BENEVOLENCE 2) | 8405402 |
| 7. HOE RYONG | 9041552 |
| 8. HU CHANG (O UN CHONG NYON) | 8330815 |
| 9. HUI CHON (HWANG GUM SAN 2) | 8405270 |
| 10. JH 86 | 8602531 |
| 11. JI HYE SAN (HYOK SIN 2) | 8018900 |
| 12. JIN Tal | 9163154· |
| 13. JIN TENG | 9163166 |
| 14. KANG GYE (PI RYU GANG) | 8829593 |
| 15. MI RIM | 8713471 |
| 16. MI RIM 2 | 9361407 |
| 17. O RANG (PO THONG GANG) | 8829555 |
| 18. ORION STAR (RICHOCEAN) | 9333589 |
| 19. RA NAM 2 | 8625545 |
| 20. RANAM 3 | 9314650 |
| 21. RYO MYONG | 8987333 |
| 22. RYONG RIM (JON JIN 2) | 8018912 |
| 23. SE PHO (RAK WON 2) | 8819017 |
| 24. SONGJIN (JANG JA SAN CHONG NYON HO) | 8133530 |
| 25. SOUTH HILL 2 | 8412467 |
| 26. SOUTH HILL 5 | 9138680 |
| 27. TAN CHON (RYONG GANG 2) | 7640378 |

**S/RES/2270 (2016)**

| Ship Name | IMO Number |
|---|---|
| 28.    THAE PYONG SAN (PETREL 1) | 9009085 |
| 29.    TONG HUNG SAN (CHONG CHON GANG) | 7937317 |
| 30.    GRAND KARO | 8511823 |
| 31.    TONG HUNG 1 | 8661575 |

16-03394

**Annex IV:**

### Luxury Goods

(a)   Luxury watches: wrist, pocket, and other with a case of precious metal or of metal clad with precious metal

(b)   Transportation items, as follows:

    (1)   aquatic recreational vehicles (such as personal watercraft)

    (2)   snowmobiles (valued greater than $2,000)

(c)   Items of lead crystal

(d)   Recreational sports equipment

———————

EXHIBIT J

United Nations                                                S/RES/1718 (2006)



# Security Council

Distr.: General
14 October 2006

## Resolution 1718 (2006)

### Adopted by the Security Council at its 5551st meeting, on 14 October 2006

*The Security Council,*

*Recalling* its previous relevant resolutions, including resolution 825 (1993), resolution 1540 (2004) and, in particular, resolution 1695 (2006), as well as the statement of its President of 6 October 2006 (S/PRST/2006/41),

*Reaffirming* that proliferation of nuclear, chemical and biological weapons, as well as their means of delivery, constitutes a threat to international peace and security,

*Expressing the gravest concern* at the claim by the Democratic People's Republic of Korea (DPRK) that it has conducted a test of a nuclear weapon on 9 October 2006, and at the challenge such a test constitutes to the Treaty on the Non-Proliferation of Nuclear Weapons and to international efforts aimed at strengthening the global regime of non-proliferation of nuclear weapons, and the danger it poses to peace and stability in the region and beyond,

*Expressing* its firm conviction that the international regime on the non-proliferation of nuclear weapons should be maintained and recalling that the DPRK cannot have the status of a nuclear-weapon state in accordance with the Treaty on the Non-Proliferation of Nuclear Weapons,

*Deploring* the DPRK's announcement of withdrawal from the Treaty on the Non-Proliferation of Nuclear Weapons and its pursuit of nuclear weapons,

*Deploring further* that the DPRK has refused to return to the Six-Party talks without precondition,

*Endorsing* the Joint Statement issued on 19 September 2005 by China, the DPRK, Japan, the Republic of Korea, the Russian Federation and the United States,

*Underlining* the importance that the DPRK respond to other security and humanitarian concerns of the international community,

*Expressing* profound concern that the test claimed by the DPRK has generated increased tension in the region and beyond, and *determining* therefore that there is a clear threat to international peace and security,

06-57207 (E)



*Acting* under Chapter VII of the Charter of the United Nations, and taking measures under its Article 41,

1.      *Condemns* the nuclear test proclaimed by the DPRK on 9 October 2006 in flagrant disregard of its relevant resolutions, in particular resolution 1695 (2006), as well as of the statement of its President of 6 October 2006 (S/PRST/2006/41), including that such a test would bring universal condemnation of the international community and would represent a clear threat to international peace and security;

2.      *Demands* that the DPRK not conduct any further nuclear test or launch of a ballistic missile;

3.      *Demands* that the DPRK immediately retract its announcement of withdrawal from the Treaty on the Non-Proliferation of Nuclear Weapons;

4.      *Demands* further that the DPRK return to the Treaty on the Non-Proliferation of Nuclear Weapons and International Atomic Energy Agency (IAEA) safeguards, and *underlines* the need for all States Parties to the Treaty on the Non-Proliferation of Nuclear Weapons to continue to comply with their Treaty obligations;

5.      *Decides* that the DPRK shall suspend all activities related to its ballistic missile programme and in this context re-establish its pre-existing commitments to a moratorium on missile launching;

6.      *Decides* that the DPRK shall abandon all nuclear weapons and existing nuclear programmes in a complete, verifiable and irreversible manner, shall act strictly in accordance with the obligations applicable to parties under the Treaty on the Non-Proliferation of Nuclear Weapons and the terms and conditions of its International Atomic Energy Agency (IAEA) Safeguards Agreement (IAEA INFCIRC/403) and shall provide the IAEA transparency measures extending beyond these requirements, including such access to individuals, documentation, equipments and facilities as may be required and deemed necessary by the IAEA;

7.      *Decides* also that the DPRK shall abandon all other existing weapons of mass destruction and ballistic missile programme in a complete, verifiable and irreversible manner;

8.      *Decides* that:

(a)      All Member States shall prevent the direct or indirect supply, sale or transfer to the DPRK, through their territories or by their nationals, or using their flag vessels or aircraft, and whether or not originating in their territories, of:

(i)      Any battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems as defined for the purpose of the United Nations Register on Conventional Arms, or related materiel including spare parts, or items as determined by the Security Council or the Committee established by paragraph 12 below (the Committee);

(ii)      All items, materials, equipment, goods and technology as set out in the lists in documents S/2006/814 and S/2006/815, unless within 14 days of adoption of this resolution the Committee has amended or completed their provisions also taking into account the list in document S/2006/816, as well as other items, materials, equipment, goods and technology, determined by the

Security Council or the Committee, which could contribute to DPRK's nuclear-related, ballistic missile-related or other weapons of mass destruction-related programmes;

(iii)  Luxury goods;

(b)   The DPRK shall cease the export of all items covered in subparagraphs (a) (i) and (a) (ii) above and that all Member States shall prohibit the procurement of such items from the DPRK by their nationals, or using their flagged vessels or aircraft, and whether or not originating in the territory of the DPRK;

(c)   All Member States shall prevent any transfers to the DPRK by their nationals or from their territories, or from the DPRK by its nationals or from its territory, of technical training, advice, services or assistance related to the provision, manufacture, maintenance or use of the items in subparagraphs (a) (i) and (a) (ii) above;

(d)   All Member States shall, in accordance with their respective legal processes, freeze immediately the funds, other financial assets and economic resources which are on their territories at the date of the adoption of this resolution or at any time thereafter, that are owned or controlled, directly or indirectly, by the persons or entities designated by the Committee or by the Security Council as being engaged in or providing support for, including through other illicit means, DPRK's nuclear-related, other weapons of mass destruction-related and ballistic missile-related programmes, or by persons or entities acting on their behalf or at their direction, and ensure that any funds, financial assets or economic resources are prevented from being made available by their nationals or by any persons or entities within their territories, to or for the benefit of such persons or entities;

(e)   All Member States shall take the necessary steps to prevent the entry into or transit through their territories of the persons designated by the Committee or by the Security Council as being responsible for, including through supporting or promoting, DPRK policies in relation to the DPRK's nuclear-related, ballistic missile-related and other weapons of mass destruction-related programmes, together with their family members, provided that nothing in this paragraph shall oblige a state to refuse its own nationals entry into its territory;

(f)   In order to ensure compliance with the requirements of this paragraph, and thereby preventing illicit trafficking in nuclear, chemical or biological weapons, their means of delivery and related materials, all Member States are called upon to take, in accordance with their national authorities and legislation, and consistent with international law, cooperative action including through inspection of cargo to and from the DPRK, as necessary;

9.   *Decides* that the provisions of paragraph 8 (d) above do not apply to financial or other assets or resources that have been determined by relevant States:

(a)   To be necessary for basic expenses, including payment for foodstuffs, rent or mortgage, medicines and medical treatment, taxes, insurance premiums, and public utility charges, or exclusively for payment of reasonable professional fees and reimbursement of incurred expenses associated with the provision of legal services, or fees or service charges, in accordance with national laws, for routine holding or maintenance of frozen funds, other financial assets and economic resources, after notification by the relevant States to the Committee of the intention

to authorize, where appropriate, access to such funds, other financial assets and economic resources and in the absence of a negative decision by the Committee within five working days of such notification;

(b)   To be necessary for extraordinary expenses, provided that such determination has been notified by the relevant States to the Committee and has been approved by the Committee; or

(c)   To be subject of a judicial, administrative or arbitral lien or judgement, in which case the funds, other financial assets and economic resources may be used to satisfy that lien or judgement provided that the lien or judgement was entered prior to the date of the present resolution, is not for the benefit of a person referred to in paragraph 8 (d) above or an individual or entity identified by the Security Council or the Committee, and has been notified by the relevant States to the Committee;

10.   *Decides* that the measures imposed by paragraph 8 (e) above shall not apply where the Committee determines on a case-by-case basis that such travel is justified on the grounds of humanitarian need, including religious obligations, or where the Committee concludes that an exemption would otherwise further the objectives of the present resolution;

11.   *Calls upon* all Member States to report to the Security Council within thirty days of the adoption of this resolution on the steps they have taken with a view to implementing effectively the provisions of paragraph 8 above;

12.   *Decides* to establish, in accordance with rule 28 of its provisional rules of procedure, a Committee of the Security Council consisting of all the members of the Council, to undertake the following tasks:

(a)   To seek from all States, in particular those producing or possessing the items, materials, equipment, goods and technology referred to in paragraph 8 (a) above, information regarding the actions taken by them to implement effectively the measures imposed by paragraph 8 above of this resolution and whatever further information it may consider useful in this regard;

(b)   To examine and take appropriate action on information regarding alleged violations of measures imposed by paragraph 8 of this resolution;

(c)   To consider and decide upon requests for exemptions set out in paragraphs 9 and 10 above;

(d)   To determine additional items, materials, equipment, goods and technology to be specified for the purpose of paragraphs 8 (a) (i) and 8 (a) (ii) above;

(e)   To designate additional individuals and entities subject to the measures imposed by paragraphs 8 (d) and 8 (e) above;

(f)   To promulgate guidelines as may be necessary to facilitate the implementation of the measures imposed by this resolution;

(g)   To report at least every 90 days to the Security Council on its work, with its observations and recommendations, in particular on ways to strengthen the effectiveness of the measures imposed by paragraph 8 above;

13.   *Welcomes and encourages further* the efforts by all States concerned to intensify their diplomatic efforts, to refrain from any actions that might aggravate

tension and to facilitate the early resumption of the Six-Party Talks, with a view to the expeditious implementation of the Joint Statement issued on 19 September 2005 by China, the DPRK, Japan, the Republic of Korea, the Russian Federation and the United States, to achieve the verifiable denuclearization of the Korean Peninsula and to maintain peace and stability on the Korean Peninsula and in north-east Asia;

14.   *Calls upon* the DPRK to return immediately to the Six-Party Talks without precondition and to work towards the expeditious implementation of the Joint Statement issued on 19 September 2005 by China, the DPRK, Japan, the Republic of Korea, the Russian Federation and the United States;

15.   *Affirms* that it shall keep DPRK's actions under continuous review and that it shall be prepared to review the appropriateness of the measures contained in paragraph 8 above, including the strengthening, modification, suspension or lifting of the measures, as may be needed at that time in light of the DPRK's compliance with the provisions of the resolution;

16.   *Underlines* that further decisions will be required, should additional measures be necessary;

17.   *Decides* to remain actively seized of the matter.

---

# EXHIBIT K

L 60/78          EN          Official Journal of the European Union          5.3.2016

## COUNCIL DECISION (CFSP) 2016/319

### of 4 March 2016

### amending Decision 2013/183/CFSP concerning restrictive measures against the Democratic People's Republic of Korea

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on European Union, and in particular Article 29 thereof,

Having regard to Council Decision 2013/183/CFSP of 22 April 2013 concerning restrictive measures against the Democratic People's Republic of Korea and repealing Decision 2010/800/CFSP (¹), and in particular Article 19(1) and (2) thereof,

Having regard to the proposal from the High Representative of the Union for Foreign Affairs and Security Policy,

Whereas:

(1)    On 22 April 2013, the Council adopted Decision 2013/183/CFSP.

(2)    On 2 March 2016, the United Nations Security Council adopted Resolution 2270 (2016) adding 16 persons and 12 entities to the list of persons and entities subject to restrictive measures, and updated the identifying information relating to one person and two entities subject to restrictive measures.

(3)    Annex I to Decision 2013/183/CFSP should therefore be amended accordingly.

(4)    The entries for one person and seven entities listed in Annex II to Decision 2013/183/CFSP should be deleted, as they have been listed in Annex I to that Decision.

(5)    Annex II to Decision 2013/183/CFSP should therefore be amended accordingly,

HAS ADOPTED THIS DECISION:

### Article 1

Annexes I and II to Decision 2013/183/CFSP are amended as set out in the Annex to this Decision.

### Article 2

This Decision shall enter into force on the date of its publication in the *Official Journal of the European Union*.

Done at Brussels, 4 March 2016.

*For the Council*
*The President*
A.G. KOENDERS

─────

(¹) OJ L 111, 23.4.2013, p. 52.

*ANNEX*

(1) The persons and entities listed below are added to the list of persons and entities subject to restrictive measures set out in Annex I to Decision 2013/183/CFSP:

A. **Persons**

| | Name | Alias | Date of birth | Date of desig-nation | Statement of Reasons |
|---|---|---|---|---|---|
| 13. | Choe Chun-Sik | Choe Chun Sik; Ch'oe Ch'un Sik | DOB: 12 October 1954; Nationality: DPRK | 2.3.2016 | Choe Chun-sik was the director of the Second Academy of Natural Sciences (SANS) and was the head of the DPRK's long-range missile program. |
| 14. | Choe Song Il | | Passport: 472320665 Date of Expiration: 26 September 2017; Passport: 563120356 Nationality: DPRK | 2.3.2016 | Tanchon Commercial Bank Representative in Vietnam. |
| 15. | Hyon Kwang II | Hyon Gwang Il | DOB: 27 May 1961; Nationality: DPRK | 2.3.2016 | Hyon Kwang II is the Department Director for Scientific Development at the National Aerospace Development Administration. |
| 16. | Jang Bom Su | Jang Pom Su | DOB: 15 April 1957; Nationality: DPRK | 2.3.2016 | Tanchon Commercial Bank Representative in Syria. |
| 17. | Jang Yong Son | | DOB: 20 February 1957; Nationality: DPRK | 2.3.2016 | Korea Mining Development Trading Corporation (KOMID) Representative in Iran. |
| 18. | Jon Myong Guk | Cho 'n Myo 'ng-kuk | Passport: 4721202031; Passport Date of Expiration: 21 Feb 2017; Nationality: DPRK; DOB: 18 Oct 1976 | 2.3.2016 | Tanchon Commercial Bank Representative in Syria. |
| 19. | Kang Mun Kil | Jiang Wen-ji | Passport: PS472330208; Passport Date of Expiration: 4 July 2017; Nationality: DPRK; | 2.3.2016 | Kang Mun Kil has conducted nuclear procurement activities as a representative of Namchongang, also known as Namhung. |
| 20. | Kang Ryong | | DOB: 21 August 1969; Nationality: DPRK | 2.3.2016 | Korea Mining Development Trading Corporation (KOMID) Representative in Syria. |
| 21. | Kim Jung Jong | Kim Chung Chong | Passport: 199421147 Passport Date of Expiration: 29 Dec 2014; | 2.3.2016 | Tanchon Commercial Bank Representative in Vietnam. |

L 60/80          EN          Official Journal of the European Union          5.3.2016

| | Name | Alias | Date of birth | Date of designation | Statement of Reasons |
|---|---|---|---|---|---|
| | | | Passport: 381110042, Passport Date of Expiration: 25 Jan 2016;<br><br>Passport: 563210184, Passport Date of Expiration: 18 Jun 2018;<br>DOB: 7 Nov 1966,<br>Nationality: DPRK | | |
| 22. | Kim Kyu | | DOB: 30 July 1968, Nationality: DPRK | 2.3.2016 | Korea Mining Development Trading Corporation (KOMID) External Affairs Officer. |
| 23. | Kim Tong My'ong | Kim Chin-So'k; Kim Tong-Myong; Kim Jin-Sok; Kim, Hyok-Chol | DOB: 1964; Nationality: DPRK | 2.3.2016 | Kim Tong My'ong is the President of Tanchon Commercial Bank and has held various positions within Tanchon Commercial bank since at least 2002. He has also played a role in managing Amroggang's affairs. |
| 24. | Kim Yong Chol | | DOB: 18 February 1962; Nationality: DPRK | 2.3.2016 | KOMID Representative in Iran. |
| 25. | Ko Tae Hun | Kim Myong Gi | Passport: 563120630; Passport Date of Expiration: 20 March 2018, D.O.B. 25 May 1972; Nationality: DPRK | 2.3.2016 | Tanchon Commercial Bank Representative. |
| 26. | Ri Man Gon | | DOB: 29 October 1945; Passport number: P0381230469; Passport Date of Expiration: 6 April 2016; Nationality: DPRK | 2.3.2016 | Ri Man Gon is the Minister of the Munitions Industry Department. |
| 27. | Ryu Jin | | DOB: 7 August 1965; Passport Number: 563410081; Nationality: DPRK | 2.3.2016 | KOMID Representative in Syria. |
| 28. | Yu Chol U | | Nationality: DPRK | 2.3.2016 | Yu Chol U is the Director of the National Aerospace Development Administration. |

(2) The entry concerning the person listed below, as set out in Annex I to Council Decision 2013/183/CFSP, is replaced by the following entry:

| | Name | Alias | Date of birth | Date of desig-nation | Statement of Reasons |
|---|---|---|---|---|---|
| 8. | Ra Ky'ong-Su | Ra Kyung-Su<br>Chang, Myong Ho | | 22.1.2013 | Ra Ky'ong-Su is a Tanchon Commercial Bank (TCB) official. In this capacity he has facilitated transactions for TCB. Tanchon was designated by the Committee in April 2009 as the main DPRK financial entity responsible for sales of conventional arms, ballistic missiles, and goods related to the assembly and manu-facture of such weapons. |

(3) The entities listed below shall be inserted in the list of entities subject to restrictive measures as set out in Annex I to Council Decision 2013/183/CFSP:

B. **Entities**

| | Name | Alias | Location | Date of desig-nation | Other information |
|---|---|---|---|---|---|
| 21. | Academy of National Defense Science | | Pyongyang, DPRK | 2.3.2016 | The Academy of National Defense Science is involved in the DPRK's efforts to advance the development of its ballistic missile and nuclear weapons programs. |
| 22. | Chongchongang Shipping Company | Chong Chon Gang Ship-ping Co. Ltd. | Address: 817 Haeun, Don-ghung-dong, Central District, Pyongyang, DPRK; Alternate Address: 817, Haeum, Ton-ghun-dong, Chung-gu, Pyon-gyang, DPRK; IMO Number: 5342883 | 2.3.2016 | The Chongchongang Shipping Company, through its vessel, the Chong Chon Gang, attempted to directly import the illicit ship-ment of conventional weapons and arms to the DPRK in July 2013. |
| 23. | Daedong Credit Bank (DCB) | DCB; Taedong Credit Bank | Address: Suite 401, Potong-gang Hotel, Ansan-Dong, PyongchonDistrict, Pyongyang, DPRK; Alternate Address: An-san-dong, Botonggang Hotel, Pongchon, Pyongyang, DPRK; SWIFT: DCBK KKPY | 2.3.2016 | Daedong Credit Bank has provided financial services to the Korea Mining Development Trading Corporation (KOMID) and Tanchon Commercial Bank. Since at least 2007, DCB has facili-tated hundreds of financial transactions worth millions of dollars on behalf of KOMID and Tanchon Commercial Bank. In some cases, DCB has knowingly facilitated transactions by using de-ceptive financial practices. |

| | Name | Alias | Location | Date of designation | Other information |
|---|---|---|---|---|---|
| 24. | Hesong Trading Company | | Pyongyang, DPRK | 2.3.2016 | The Korea Mining Development Corporation (KOMID) is the parent company of Hesong Trading Corporation. |
| 25. | Korea Kwangson Banking Corporation (KKBC) | KKBC | Jungson-dong, Sungri Street, Central District, Pyongyang, DPRK | 2.3.2016 | KKBC provides financial services in support to Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, a subordinate of the Korea Ryonbong General Corporation. Tanchon Commercial Bank has used KKBC to facilitate funds transfers likely amounting to millions of dollars, including transfers involving Korea Mining Development Corporation related funds. |
| 26. | Korea Kwangsong Trading Corporation | | Rakwon-dong, Pothonggang District, Pyongyang, DPRK | 2.3.2016 | The Korea Ryongbong General Corporation is the parent company of Korea Kwangsong Trading Corporation. |
| 27. | Ministry of Atomic Energy Industry | MAEI | Haeun-2-dong, Pyongchon District, Pyongyang, DPRK | 2.3.2016 | The Ministry of Atomic Energy Industry was created in 2013 for the purpose of modernising the DPRK's atomic energy industry to increase the production of nuclear materials, improve their quality, and further develop an independent DPRK nuclear industry. As such, the MAEI is known to be a critical player in the DPRK's development of nuclear weapons and is in charge of day-to-day operation of the country's nuclear weapons program, and under it are other nuclear-related organisations. Under this ministry are a number of nuclear-related organisations and research centres, as well as two committees: an Isotope Application Committee and a Nuclear Energy Committee. The MAEI also directs a nuclear research centre at Yongbyun, the site of the DPRK's known plutonium facilities. Furthermore, in the 2015 Panel of Experts (POE) report, the POE stated that Ri Je-son, a former director of the GBAE who was designated by the Committee established pursuant to resolution 1718 (2006) in 2009 for engagement in or support for nuclear related programs, was appointed as head of the MAEI on April 9, 2014. |

| | Name | Alias | Location | Date of designation | Other information |
|---|---|---|---|---|---|
| 28. | Munitions Industry Department | Military Supplies Industry Department | Pyongyang, DPRK | 2.3.2016 | The Munitions Industry Department is involved in key aspects of the DPRK's missile program. MID is responsible for overseeing the development of the DPRK's ballistic missiles, including the Taepo Dong-2.The MID oversees the DPRK's weapons production and R&D programs, including the DPRK's ballistic missile program. The Second Economic Committee and the Second Academy of Natural Sciences — also designated in August 2010 — are subordinate to the MID. The MID in recent years has worked to develop the KN08 road-mobile ICBM. |
| 29. | National Aerospace Development Administration | NADA | DPRK | 2.3.2016 | NADA is involved in the DPRK's development of space science and technology, including satellite launches and carrier rockets. |
| 30. | Office 39 | Office #39; Office No. 39; Bureau 39; Central Committee Bureau 39; Third Floor; Division 39 | DPRK | 2.3.2016 | DPRK government entity. |
| 31. | Reconnaissance General Bureau | Chongch'al Ch'ongguk; KPA Unit 586; RGB | Hyongjesan- Guyok, Pyongyang, DPRK; Alternate Address: Nungrado, Pyongyang, DPRK | 2.3.2016 | The Reconnaissance General Bureau is the DPRK's premiere intelligence organisation, created in early 2009 by the merger of existing intelligence organisations from the Korean Workers' Party, the Operations Department and Office 35, and the Reconnaissance Bureau of the Korean People's Army. The Reconnaissance General Bureau trades in conventional arms and controls the DPRK conventional arms firm Green Pine Associated Corporation. |
| 32. | Second Economic Committee | | Kangdong, DPRK | 2.3.2016 | The Second Economic Committee is involved in key aspects of the DPRK's missile program. The Second Economic Committee is responsible for overseeing the production of the DPRK's ballistic missiles, and directs the activities of KOMID. |

(4)  The entries concerning the entities listed below, as set out in Annex I to Council Decision 2013/183/CFSP, is replaced by the following entries:

| | Name | Alias | Location | Date of designation | Other information |
|---|---|---|---|---|---|
| 4. | Namchongang Trading Corporation | NCG; NAMCHONGANG TRADING;NAM CHON GANG CORPORATION; NOMCHONGANG TRADING CO.; NAM CHONG GAN TRADING CORPORATION; Namhung Trading Corporation | Pyongyang, DPRK | 16.7.2009 | Namchongang is a DPRK trading company subordinate to the General Bureau of Atomic Energy (GBAE). Namchongang has been involved in the procurement of Japanese-origin vacuum pumps that were identified at a DPRK nuclear facility, as well as nuclear-related procurement associated with a German individual. It has further been involved in the purchase of aluminium tubes and other equipment specifically suitable for a uranium enrichment programme from the late 1990s. Its representative is a former diplomat who served as DPRK's representative for the International Atomic Energy Agency (IAEA) inspection of the Yongbyon nuclear facilities in 2007. Namchongang's proliferation activities are of grave concern given the DPRK's past proliferation activities. |
| 20. | Ocean Maritime Management Company, Limited (OMM) Vessels with IMO Number: <br> a) Chol Ryong (Ryong Gun Bong) <br> 8606173 <br> b) Chong Bong (Greenlight) (Blue Nouvelle) <br> 8909575 <br> c) Chong Rim 2 <br> 8916293 <br> d) Dawnlight <br> 9110236 <br> e) Ever Bright 88 (J Star) <br> 8914934 <br> f) Gold Star 3 (benevolence) <br> 8405402 | | Donghung Dong, Central District. PO BOX 120. Pyongyang, DPRK; <br><br> Dongheung-dong Changwang Street, Chung-Ku, PO Box 125, Pyongyang. | 28.7.2014 | Ocean Maritime Management Company, Limited (IMO Number: 1790183) is the operator/manager of the vessel Chong Chon Gang. It played a key role in arranging the shipment of concealed cargo of arms and related materiel from Cuba to the DPRK in July 2013. As such, Ocean Maritime Management Company, Limited contributed to activities prohibited by the resolutions, namely the arms embargo imposed by resolution 1718 (2006), as modified by resolution 1874 (2009), and contributed to the evasion of the measures imposed by these resolutions. |

| | Name | Alias | Location | Date of desig-nation | Other information |
|---|---|---|---|---|---|
| g) | Hoe Ryong<br>9041552 | | | | |
| h) | Hu Chang (O Un Chong Nyon)<br>8330815 | | | | |
| i) | Hui Chon (Hwang Gum San 2)<br>8405270 | | | | |
| j) | JH 86<br>8602531 | | | | |
| k) | Ji Hye San (Hyok Sin 2)<br>8018900 | | | | |
| l) | Jin Tal<br>9163154· | | | | |
| m) | Jin Teng<br>9163166 | | | | |
| n) | Kang Gye (Pi Ryu Gang)<br>8829593 | | | | |
| o) | Mi Rim<br>8713471 | | | | |
| p) | Mi Rim 2<br>9361407 | | | | |
| q) | O Rang (Po Thong Gang)<br>8829555 | | | | |
| r) | Orion Star (Richocean)<br>9333589 | | | | |
| s) | Ra Nam 2<br>8625545 | | | | |
| t) | RaNam 3<br>9314650 | | | | |
| u) | Ryo Myong<br>8987333 | | | | |

| | Name | Alias | Location | Date of desig-nation | Other information |
|---|---|---|---|---|---|
| v) | Ryong Rim (Jon Jin 2) 8018912 | | | | |
| w) | Se Pho (Rak Won 2) 8819017 | | | | |
| x) | Songjin (Jang Ja San Chong Nyon Ho) 8133530 | | | | |
| y) | South Hill 2 8412467 | | | | |
| z) | South Hill 5 9138680 | | | | |
| aa) | Tan Chon (Ryong Gang 2) 7640378 | | | | |
| bb) | Thae Pyong San (Petrel 1) 9009085 | | | | |
| cc) | Tong Hung San (Chong Chon Gang) 7937317 | | | | |
| dd) | Grand Karo 8511823 | | | | |
| ee) | Tong Hung 1 8661575 | | | | |

EN      Official Journal of the European Union

(5) The person and entities listed below are deleted from the list set out in Annex II to Council Decision 2013/183/CFSP

I. *Persons and entities responsible the DPRK's nuclear related, ballistic missile-related or other weapons of mass destruction related programmes, or person acting on their behalf or at their direction, or entities owned or controlled by them.*

B. **Entities**

4.   Second Economic Committee

7.   Hesong Trading Corporation

10.   Korea Kwangson Trading Corporation

11.   Munitions Industry Department (a.k.a. Military Supplies Industry Department)

12.   Reconnaissance General Bureau (RGB) (a.k.a. Chongch'al Ch'ongguk; KPA Unit 586)

II. *Persons and entities providing financial services that could contribute to the DPRK's nuclear related, ballistic missile-related or other weapons of mass destruction related programmes.*

A. **Persons**

3.   Kim Tong-Myo'ng (a.k.a. Kim Chin-so'k)

B. **Entities**

3.   Korea Kwangson Banking Corporation (KKBC) (a.k.a.: Korea Kwangson Banking Corp; KKBC)

4.   Office 39, of the Korean Workers' Party (a.k.a.: Office #39; Office No. 39; Bureau 39; Central Committee Bureau 39; Third Floor; Division 39)

———

# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| $1,071,251.44 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) ) ) |
|  | ) |
| $347,446.93 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) ) ) |
|  | ) |
| $42,632.00 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) ) ) |
|  | ) |
| $30,258.00 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) ) ) |
|  | ) |
| $253,638.25 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; and | ) ) ) |
|  | ) |
| $157,749.07 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) ) ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Civil Action No. _____

_____

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

COMES NOW, Plaintiff, the United States of America, by and through the United States

Attorney for the District of Columbia, and brings this verified complaint for forfeiture in a civil

action *in rem* against $1,902,976.00 associated with Mingzheng International Trading Limited

(Mingzheng) (the "Defendant Funds"), further described as: $1,071,251.44 of funds associated

with Mingzheng; $347,446.93 of funds associated with Mingzheng; $42,632.00 of funds associated with Mingzheng; $30,258.00 of funds associated with Mingzheng; $253,638.25 of funds associated with Mingzheng; and $157,749.07 of funds associated with Mingzheng, all which are being held at six U.S. financial institutions, and alleges as follows:

## NATURE OF ACTION AND THE DEFENDANTS *IN REM*

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") of a scheme by Mingzheng International Trading Limited ("Mingzheng"), a front company incorporated in Hong Kong, to launder U.S. dollars on behalf of sanctioned North Korean entities. As described in detail below, North Korea has used the state-run Foreign Trade Bank ("FTB") to work with a host of front companies in order to access the U.S. financial system and evade the U.S. sanctions imposed on FTB and its sanctioned affiliates. In particular, Mingzheng acts as a front company to make U.S. dollar payments on behalf of a covert foreign branch of FTB, which is otherwise barred from making such U.S. dollar payments. Consistent with front companies, Mingzheng has no website or purported business purpose in corporate documents. Specifically, between October and November 2015, Mingzheng was a counterparty to 20 illicit wire transfers in U.S. dollars, totaling $1,902,976.00, which were routed through U.S. correspondent banking accounts, and which comprise the Defendant Funds. These transfers were in violation of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*., the conspiracy statute, codified at 18 U.S.C. § 371, and the federal money laundering statute, codified at 18 U.S.C. § 1956(a)(2)(A), (h).

2.      The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of IEEPA and a conspiracy to violate IEEPA. In addition, the Defendant Funds are subject to forfeiture pursuant

to 18 U.S.C. § 981(a)(1)(A) as property involved in, and traceable to money laundering violations and a conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(2)(A), (h).

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the District of Columbia. The Defendant Funds are currently held in a bank account in the United States. The coconspirators failed to seek or obtain licenses from the Department of the Treasury's Office of Foreign Asset Controls ("OFAC"), which is located in Washington, D.C., for conducting transactions with these funds, which licenses were required under United States law.

**STATUTORY FRAMEWORK**

## I. THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

5.      This investigation relates to violations of regulations issued pursuant to IEEPA. By virtue of IEEPA, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. *See* 50 U.S.C. §§ 1701, 1702. Pursuant to that authority, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions, including financial transactions, with North Korea by U.S. persons or involving U.S.-origin goods.

6.      Pursuant to 50 U.S.C. § 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to Section 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime.

7.      18 U.S.C. § 371 criminalizes a conspiracy to violate IEEPA.

8.      By the authority vested in the President by IEEPA, on or about June 28, 2005, the President signed Executive Order ("E.O.") 13382 blocking the property of persons engaged in weapons of mass destruction proliferation activities and their support networks and denying designated proliferators access to the U.S. financial and commercial systems. This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury, together with the U.S. Department of State, is authorized to designate additional proliferators of weapons of mass destruction and their supporters under the authorities provided by E.O. 13382. When the Department of the Treasury so designates additional persons (individuals and entities), these persons are added to a list of Specially Designated Nationals ("SDN").

9.      On or about April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations" to implement E.O. 13382. 31 C.F.R. § 544.101 *et seq*. Pursuant to 31 C.F.R. § 544.405, no U.S. person may provide financial or other services for the benefit of a person or entity added to the SDN list pursuant to the authorities provided by E.O. 13382, except as authorized or licensed by OFAC. Additionally, a non-U.S. person may not cause the provision of financial or other services by a U.S. person for the benefit of a person or entity so designated under these sanctions, except as authorized or licensed by OFAC. *See* 31 C.F.R. § 544.405; 50 U.S.C. § 1705.

10.     In March 2013, OFAC designated FTB as an SDN pursuant to E.O. 13382.

II.     **ANTI-MONEY LAUNDERING OBLIGATIONS**

11.     According to the U.S. Department of the Treasury ("Treasury Department"), the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with

national anti-money laundering requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by OFAC. The Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

12.     U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

13.     One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons (individuals and entities) designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

14.     Criminals are aware of the SDN list and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent sanctioned parties from transacting in U.S. dollars. As a result, criminals employ front companies to engage in transactions

on their behalf, in order to prevent banks from learning that the sanctioned entity is a party to the transaction.

15.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

16.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

17.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA.

## III.     FORFEITURE

18.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA is subject to forfeiture.

19.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture.

## FACTS GIVING RISE TO FORFEITURE

## I.     BACKGROUND ON NORTH KOREAN MONEY LAUNDERING

20.     Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A, as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. A Section 311 finding and the related special measure are implemented through various orders and regulations incorporated into 31 C.F.R. Chapter X. A violation of 31 U.S.C. § 5318A is punishable criminally pursuant to 31 U.S.C. § 5322. In order to protect the integrity of the U.S. financial system, a Section 311 finding legally prevents persons from causing U.S. financial institutions from

engaging in any type of financial transaction with an entity within the jurisdiction deemed an area of money-laundering concern.

21.    In May 2016, FinCEN made a Section 311 finding against North Korea. Specifically, FinCEN's finding deemed *the entire North Korean financial sector* as a primary jurisdiction of money-laundering concern. *See* Federal Register, Vol. 81, No. 107 (June 3, 2016).

22.    FinCEN targeted the entire North Korean financial sector because it is comprised entirely of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of weapons of mass destruction (WMD) and the development of ballistic missiles in violation of international and U.S. sanctions," and because these institutions are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism (''AML/CFT'') controls." Federal Register, Vol. 81, No. 217 at 78715.

23.    FinCEN's Section 311 action included a finding that North Korean financial institutions continued to access the U.S. financial system, in violation of the U.S. sanctions. The finding further stated that *millions* of U.S. dollars' worth of illicit transactions were flowing through U.S. correspondent accounts in spite of the sanctions because of the coordinated use of money laundering techniques to conceal North Korea's involvement and the processing of the payments by North Korean financial institutions. Specifically, FinCEN found that:

> North Korea continues to advance its nuclear and ballistic missile programs in violation of international treaties, international censure and sanctions measures, and U.S. law. North Korea does this using an extensive overseas network of front companies, shell companies, joint ventures, and opaque business relationships. North Korea conducts almost no banking in true name in the formal financial system given that many of its outward facing agencies and financial institutions have been sanctioned by the United States, the United Nations, or both.

While none of North Korea's financial institutions maintain correspondent accounts with U.S. financial institutions, *North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives* that obfuscate the true originator, beneficiary, and purpose of transactions. We assess that *these deceptive practices have allowed millions of U.S. dollars of [North Korean] illicit activity to flow through U.S. correspondent accounts*.

Moreover, although U.S. and international sanctions have served to significantly isolate North Korean banks from the international financial system, the North Korean government continues to access the international financial system to support its [weapons of mass destruction] and conventional weapons programs. This is made possible through its use of aliases, agents, foreign individuals in multiple jurisdictions, and a long-standing network of front companies and North Korean embassy personnel which support illicit activities through banking, bulk cash, and trade. Front company transactions originating in foreign-based banks *have been processed through correspondent bank accounts in the United States* and Europe.

Federal Register, Vol. 81, No. 107 at 35442 (emphasis added).

## II.    ILLICIT NORTH KOREAN USE OF CORRESPONDENT BANKING CHANNELS

### A.    NORTH KOREAN BANKS ENGAGE IN U.S. DOLLAR TRANSACTIONS BY LAUNDERING FUNDS THROUGH NUMEROUS FRONT COMPANIES

24.    Information gathered from Treasury Department designations, the FinCEN 311 finding, the February 17, 2017, report on North Korea by the United Nations Panel of Experts ("Panel of Experts"), and from related North Korean investigations, leads law enforcement to conclude that the North Korean financial institutions identified below have repeatedly utilized the U.S. financial system in violation of the U.S. economic sanctions.

25.    Specifically, law enforcement has learned that these North Korean financial institutions employ front companies to establish and maintain offshore U.S. dollar accounts for the purposes of remitting wire transfers denominated in U.S. dollars on behalf of sanctioned North Korean entities. Although North Korean financial facilitators engage in U.S. dollar transactions

overseas, funds are still cleared through a U.S. correspondent bank account, thereby triggering the U.S. economic sanctions. These wire transfers often involve the remittance of payments denominated in U.S. dollars originating from foreign financial institutions located outside the United States which must clear through established correspondent banking relationships to U.S. financial institutions in the United States. Once the wire transfers are cleared through the U.S. financial institutions, payments are transmitted to offshore U.S. dollar accounts maintained by front companies on behalf of North Korean financial institutions.

26.     The 2017 Report of the Panel of Experts noted the central role of North Korean banks in allowing North Korean entities to continue to illegally access the U.S. financial system. Specifically, the report states that:

> [T]he Democratic People's Republic of Korea has continued to access the international financial system to support its activities. Financial networks of the Democratic People's Republic of Korea have adapted to these sanctions, using evasive methods to maintain access to formal banking channels and bulk cash transfers to facilitate prohibited activities.
>
> . . .
>
> The Panel has identified multiple ways in which *the financial institutions and networks of the Democratic People's Republic of Korea access the international banking system* to engage in activities in violation and/or evasion of the provisions of the resolutions:
>
> • *Banks of the Democratic People's Republic of Korea, including designated banks*, hold correspondent or payable-through accounts with foreign banks
>
> • Banks of the Democratic People's Republic of Korea form joint ventures with foreign companies
>
> • Foreign companies establish banks inside the Democratic People's Republic of Korea

- • *Banks of the Democratic People's Republic of Korea, including designated banks, maintain representative offices abroad.*

2017 Report of the Panel of Experts, at 79-80 (emphasis added).

27.     Similar to FinCEN, the Panel of Experts found that the North Korean financial network continues to process U.S. dollar transactions by employing "numerous front companies bearing no paper trail that leads to the Democratic People's Republic of Korea." *Id.* at 80.

28.     The front companies engage in this scheme in support of purchases ultimately benefiting sanctioned North Korean end users, including North Korean military and North Korean weapons programs. In a 2013 designation of a North Korean financial institution, the Treasury Department noted that this North Korean bank was "part of the web of banks, front companies and government agencies that support North Korea's continued proliferation activities." https://www.treasury.gov/press-center/press-releases/Pages/tg1828.aspx. On June 1, 2016, the Treasury Department again noted that "North Korea uses *state-controlled financial institutions* and front companies to conduct international financial transactions that support the proliferation and development of [weapons of mass destruction] and ballistic missiles." https://www.treasury.gov/press-center/press-releases/Pages/jl0471.aspx (emphasis added).

B.     RECENT CRIMINAL COMPLAINT AGAINST A RELATED NORTH KOREAN BANK HIGHLIGHTS HOW THE NORTH KOREAN FINANCIAL SECTOR HAS CONTINUED TO TRANSACT IN U.S. DOLLARS IN VIOLATION OF THE SANCTIONS

29.     In 2016, a criminal complaint was filed in the District of New Jersey against Dandong Hongxiang for laundering U.S. dollars on behalf of Korea Kwangson Banking Corporation ("KKBC"). KKBC (further described below to be a subsidiary of FTB) is a North Korean bank that was previously designated by OFAC and the U.N. for providing financial services for North Korea's weapons of mass destruction proliferators. The investigation revealed

that Dandong Hongxiang was acting in part as a front for KKBC, to allow KKBC to engage in over $1.3 billion in U.S. dollar transactions. Dandong Hongxiang used over 22 different front companies with offshore bank accounts to help KKBC evade U.S. sanctions after KKBC was designated as an SDN on August 11, 2009. This elaborate network helped North Korea conduct foreign trade using the U.S. financial system without detection for over seven years.

30.     This use of front companies (*i.e.*, Dandong Hongxiang and related companies) to continue to transact in U.S. dollars is consistent with what the Panel of Experts found to be true for North Korea financial institutions. Specifically, the Panel of Experts noted in 2016 that "[t]ransactions originating in foreign banks have been processed through corresponding accounts in the United States and Europe." *See* 2016 Report of the Panel of Experts, at 62. These sanction-violative transactions continue to be processed by front companies, which are "often registered by non-nationals, who also use indirect payment methods and circuitous transactions dissociated from the movement of goods or services to conceal their activity." *Id.* North Korean front companies are instructed to strip all information tying their U.S. dollar transactions to North Korea, in order to prevent the Treasury Department from blocking the transactions. *Id.* at 66.

**III.     IN SPITE OF THE SANCTIONS, THE FOREIGN TRADE BANK, WHICH IS THE CENTRAL NORTH KOREAN BANK FOR FOREIGN CURRENCY TRANSACTIONS, ILLEGALLY TRANSACTS IN U.S. DOLLARS**

**A.     BACKGROUND ON FTB**

31.     U.N. and OFAC sanction designation publications reveal that FTB is responsible for handling foreign currency transactions for North Korea's government ministries and their subordinate trading companies. Reforms undertaken in the early and mid-2000s codified FTB's role and relevance in North Korea's banking industry. In approximately 2000, FTB developed and instituted an inter-bank clearing system in North Korea. After the institution of this system, North Korean banks were generally required to maintain currency clearing accounts at FTB. These

accounts are used to clear transactions among North Korea's commercial banks. This reform, in effect, channeled transactions from North Korea's arms exports and luxury goods imports through FTB.

32.     In the March 2013 designation of FTB, OFAC noted that FTB is a state-owned bank, and "acts as North Korea's primary foreign exchange bank." The designation further noted that North Korea uses FTB to facilitate millions of dollars in transactions on behalf of actors linked to its proliferation network.

B.     FTB HAS LAUNDERED U.S. DOLLAR TRANSACTIONS, IN VIOLATION OF U.S. LAW

33.     FTB continues to act as the umbrella bank for foreign currency transactions in North Korea. In fact, FTB sets the official exchange rate for North Korean currency to foreign currency.

34.     The FinCEN Section 311 action made specific findings as to FTB, that is:

> The following examples are representative of the activities of FTB and its front companies. Between 2008 and 2012, FTB used front companies in multiple countries to make and receive payments equivalent to tens of millions of U.S. dollars. In 2011, an FTB front company was involved with U.S.-designated KKBC and Korea 5 Trading Corporation, a subordinate of U.S. and UN-designated Korea Ryonbong General Corporation, in financial dealings totaling several millions of U.S. dollars. *The same FTB front company processed transactions through U.S. correspondent accounts as recently as April 2014.*

Federal Register, Vol. 81, No. 107 at 35445 (emphasis added).

35.     This FinCEN report alone demonstrates that FTB has illegally laundered "millions of U.S. dollars," in violation of the U.S. sanctions. Moreover, this report shows that even prior to designation, FTB was laundering U.S. dollar transactions on behalf of sanctioned North Korean entities.

36. FTB's integral role in the North Korean financial network is also evidenced by its processing of internal foreign currency transactions, and its stake in other North Korean banks. Specifically, FTB is known to be the parent bank of KKBC and Korea Kumgang bank (another designated bank).

C. CONFIDENTIAL SOURCES HAVE CONFIRMED MINGZHENG'S INVOLVEMENT IN LAUNDERING FUNDS FOR NORTH KOREA

37. Two reliable confidential sources have independently revealed that Mingzheng has laundered U.S. dollar payments on behalf of North Korea entities – in particular, FTB. Mingzheng also bears the hallmarks of a FTB front company. Mingzheng has no website, and gives no purported business purpose in corporate documents. A search of international wires reveals that it makes U.S. dollar payments for products in totally unrelated industries. As discussed below, this is consistent with how North Korea uses front companies to evade sanctions and procure items in U.S. dollars to sustain its proliferation program and economy. Mingzheng was incorporated in Hong Kong and is operated by at least one Chinese national.

38. The first reliable confidential source (CS-1) revealed that Mingzheng made illicit U.S. dollar payments directly for the benefit of the North Korean government between January 2012 and January 2015.

39. The second reliable confidential source (CS-2) confirmed that FTB has used Mingzheng to launder U.S. dollar payments. Specifically, CS-2 provided information tying FTB to Mingzheng and the wiring of the Defendant Funds.

40. CS-2 revealed that Mingzheng acts a front company for a covert Chinese branch of FTB. This branch is operated by a Chinese national who has historically been tied to FTB. This practice is consistent with the findings of the Panel of Experts as to how North Korean financial institutions have been able to evade sanctions, to wit:

Behind these illicit activities is the continued access of the Democratic People's Republic of Korea to the international banking system. Despite strengthened financial sanctions in 2016, the country's networks are adapting by using greater ingenuity in accessing formal banking channels, as well as bulk cash and gold transfers. *Banks of the Democratic People's Republic of Korea maintain correspondent bank accounts and representative offices abroad* and partner with foreign companies in joint ventures. Banks and designated entities of the Democratic People's Republic of Korea make use of broad interwoven networks to undertake procurement and banking activity. *Their ability to conceal financial activity by using foreign nationals and entities* allows them to continue to transact through top global financial centres.

2017 Report of the Panel of Experts, at 1 (emphasis added).

41.     CS-2 further indicated that payment instructions in international wires sent by Mingzheng contained coded reference numbers used by FTB. These coded reference numbers reflect that Mingzheng was making U.S. dollar payments on behalf of FTB, which FTB was otherwise barred from doing.

42.     Additionally, CS-2 identified several Mingzheng payments as being remitted to a Chinese Export and Import Company (Chinese Company 1) that had previous ties to Dandong Hongxiang. According to Chinese Company 1's corporate registry information, it is a Chinese export and import company that services North Korea, among other markets. Records from U.S. correspondent banks and documents obtained in the Dandong Hongxiang investigation revealed that Dandong Hongxiang and its related front companies made U.S. dollar payments to Chinese Company 1 totaling approximately $3.19 million between November 2009 and December 2013.

43.     A review of international wires revealed that Chinese Company 1 was frequently listed as a beneficiary of suspicious payments between 2012 and 2016. Many of these payments contained coded reference numbers used by FTB. CS-2 confirmed that the Mingzheng payments from this timeframe were on behalf of FTB.

44. Records from U.S. correspondent banks further revealed that Mingzheng paid Chinese Company 1 approximately $1.8 million by between March 2013 and September 2014.

## IV. MINGZHENG PREVIOUSLY LINKED TO NORTH KOREAN MONEY LAUNDERING SCHEMES

### A. MINZHENG'S ILLICIT FINANCIAL TRANSACTIONS IN OCTOBER AND NOVEMBER 2015

45. From on or around October 19, 2015, to on or around November 18, 2015, Mingzheng sent or received a total of 20 wire transfers, which transited through the U.S. financial system through the use of correspondent U.S. banks, and represent the Defendant Funds. The Defendant Funds include 13 outgoing wires, totaling $1,349,258.16, in which Mingzheng was listed as the remitter, and seven incoming wires, totaling $553,717.53, in which Mingzheng was listed as the beneficiary. The details of these 20 wires, totaling $1,902,975.69, are provided in the table below. Three different Mingzheng accounts were involved with the transactions identified below including China Merchants Bank ("CMB") account ending in 2808, Bank of Communications ("BOC") account ending in 3100, and Shanghai Pudong Development Bank ("SPDB") account ending in 6150.

**TABLE 1: Illicit Mingzheng Wires on Behalf of FTB that Comprise Defendant Funds**

| # | Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|------|-------------|--------------------|--------------------|
| 1 | 10/19/2015 | $9,932.00 | Mingzheng (SPDB) | Counterparty 1 |
| 2 | 10/19/2015 | $9,742.79 | Mingzheng (BOC) | Counterparty 2 |
| 3 | 10/20/2015 | $162,018.00 | Counterparty 3 | Mingzheng (SPDB) |
| 4 | 10/22/2015 | $96,345.42 | Mingzheng (SPDB) | Counterparty 4 |
| 5 | 10/23/2015 | $9,945.00 | Mingzheng (BOC) | Counterparty 1 |
| 6 | 10/28/2015 | $24,932.00 | Mingzheng (CMB) | Counterparty 1 |

| # | Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|---|---|---|---|
| 7 | 10/29/2015 | $199,982.00 | Mingzheng (CMB) | Counterparty 5 |
| 8 | 10/30/2015 | $79,151.51 | Mingzheng (CMB) | Counterparty 4 |
| 9 | 11/2/2015. | $42,632.00 | Mingzheng (SPDB) | Counterparty 6 |
| 10 | 11/2/2015 | $174,982.00 | Mingzheng (CMB) | Counterparty 7 |
| 11 | 11/4/2015 | $5,326.00 | Mingzheng (CMB) | Counterparty 8 |
| 12 | 11/5/2015 | $205,536.23 | Mingzheng (CMB) | Counterparty 9 |
| 13 | 11/5/2015 | $295,769.21 | Mingzheng (CMB) | Counterparty 10 |
| 14 | 11/6/2015 | $194,982.00 | Mingzheng (CMB) | Counterparty 7 |
| 15 | 11/6/2015 | $140,000.00 | Counterparty 11 | Mingzheng (SPDB) |
| 16 | 11/12/2015 | $45,000.00 | Counterparty 12 | Mingzheng (SPDB) |
| 17 | 11/17/2015 | $57,749.07 | Counterparty 13 | Mingzheng (SPDB) |
| 18 | 11/17/2015 | $100,000.00 | Counterparty 13 | Mingzheng (SPDB) |
| 19 | 11/17/2015 | $41,822.04 | Counterparty 14 | Mingzheng (BOC) |
| 20 | 11/18/2015 | $7,128.42 | Counterparty 14 | Mingzheng (BOC) |

46.     These U.S. dollar payments, which cleared through U.S. correspondent banking accounts, violated U.S. law, because Mingzheng was surreptitiously making them on behalf of FTB, whose designation precluded such transactions.

       B.     MINGZHENG'S FINANCIAL TRANSACTIONS ARE CLOSELY LINKED TO DANDONG HONGXIANG, A CHINESE COMPANY THAT WAS RECENTLY SANCTIONED FOR ITS TIES TO NORTH KOREAN WMD PROLIFERATION

47.     On September 26, 2016, OFAC announced sanctions against Dandong Hongxiang and four of its executives for having ties to the government of North Korea's weapons of mass destruction proliferation efforts. On the same day, the Department of Justice unsealed a criminal

complaint in the District of New Jersey (as referenced in paragraph 29) alleging Dandong Hongxiang and four of its executives conspired to violate U.S. laws by laundering U.S. dollar transactions on behalf of KKBC, a sanctioned North Korean bank.

48.     The criminal complaint identified Luo Chuanxu as one of the Dandong Hongxiang co-conspirators. The complaint indicates that Luo is a Chinese National who established multiple front companies in Hong Kong, Anguilla, and the British Virgin Islands to facilitate payments on behalf of KKBC, a sanctioned North Korean bank. Luo handled these payments as an employee of Dandong Hongxiang, and was working to assist KKBC in violation of U.S. laws. The criminal complaint noted that Deep Wealth was owned or controlled by Dandong Hongxiang, at least as of June 10, 2015.

49.     Additionally, Luo facilitated numerous payments to Mingzheng using Deep Wealth Ltd. ("Deep Wealth"), a Dandong Hongxiang front company established in Anguilla, in the months prior to the transactions related to the Defendant Funds.

50.     Specifically, Luo received confirmation of two large payments to Mingzheng from Deep Wealth in 2015. On July 31, 2015, Luo received confirmation from China Merchants bank showing that Deep Wealth remitted $660,000 to Mingzheng's account ending in 6150. On August 04, 2015, Luo received another confirmation from China Merchants Bank showing that Deep Wealth remitted $900,000 to the same Mingzheng account. These payments are consistent with the North Korean money laundering activities observed between sanctioned North Korean banks via related front companies.

51.     Hong Jinhua, who was charged in the criminal complaint, is the deputy general manager of Dandong Hongxiang. Hong managed U.S. dollar bank accounts on behalf of Dandong Hongxiang and its front companies. Hong was associated with some of the front companies using

her own personal identifying information. One such front company is Nice Field International, Ltd. ("Nice Field"). Nice Field was established in Hong Kong on or about November 12, 2010. Its director is Hong. Nice Field is identified as a Dandong Hongxiang front company in the criminal complaint.

52.     On March 06, 2015, Nice Field wired $199,982.00 to Mingzheng's BOC account ending in 3100.

53.     In addition to the direct payments to Mingzheng from Dandong Hongxiang front companies, other similarities were identified between Mingzheng and Dandong Hongxiang front companies. Notably, Good Field Trading Limited ("Good Field"), Nice Field, and Flying Horse (HK) Ltd. ("Flying Horse"), made/received similar payments to the beneficiaries/remitters of payments made/received by Mingzheng as to the Defendant Funds. A table of Dandong Hongxiang front company payments with the same beneficiaries/remitters from Table 1 is provided below.

**TABLE 2: Dandong Hongxiang front company payments with Mingzheng counterparties**

| # | Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|------|-------------|--------------------|-----------------------|
| 1 | 7/9/2014 | $99,662.00 | Nice Field International Limited | Counterparty 3 |
| 2 | 7/14/2014 | $297,752.00 | Good Field Trading Limited | Counterparty 9 |
| 3 | 11/10/2014 | $199,998.00 | Good Field Trading Limited | Counterparty 5 |
| 4 | 12/5/2014 | $199,342.00 | Good Field Trading Limited | Counterparty 3 |
| 5 | 12/19/2014 | $199,998.00 | Good Field Trading Limited | Counterparty 5 |
| 6 | 12/22/2014 | $99,982.00 | Nice Field International Limited | Counterparty 5 |
| 7 | 12/22/2014 | $164,998.00 | Good Field Trading Limited | Counterparty 5 |
| 8 | 1/5/2015 | $209,982.00 | Nice Field International Limited | Counterparty 5 |
| 9 | 1/27/2015 | $199,995.00 | Flying Horse (HK) Limited | Counterparty 5 |

| #  | Date       | Wire Amount  | Party Sending Wire               | Party Receiving Wire          |
|----|------------|--------------|----------------------------------|-------------------------------|
| 10 | 3/25/2015  | $199,982.00  | Nice Field International Limited | Counterparty 5                |
| 11 | 3/30/2015  | $89,982.00   | Good Field Trading Limited       | Counterparty 7                |
| 12 | 5/22/2015  | $6,726.34    | Good Field Trading Limited       | Counterparty 10               |
| 13 | 6/15/2015  | $39,847.00   | Good Field Trading Limited       | Counterparty 3                |
| 14 | 7/22/2015  | $49,935.00   | Counterparty 12                  | Good Field Trading Limited    |
| 15 | 9/24/2015  | $90,871.00   | Good Field Trading Limited       | Counterparty 4                |
| 16 | 9/28/2015  | $4,138.20    | Good Field Trading Limited       | Counterparty 10               |
| 17 | 10/21/2015 | $43,599.71   | Good Field Trading Limited       | Counterparty 4                |
| 18 | 10/22/2015 | $98,080.00   | Deep Wealth Limited              | Counterparty 9                |
| 19 | 10/22/2015 | $490,146.65  | Good Field Trading Limited       | Counterparty 5                |
| 20 | 12/28/2015 | $6,677.00    | Nice Field International Limited | Counterparty 12               |

54.    A comparison of Table 1 and Table 2 shows that from July 9, 2015, through October 22, 2015, Dandong Hongxiang front companies (including Nice Field, Good Field, Flying Horse and Deep Wealth) had financial transactions with seven of the 14 companies that were included in Mingzheng's transactions comprising the Defendant Funds. Particularly of note, Counterparty 5 received three payments from Dandong Hongxiang front companies from November 10, 2014 through March 25, 2015, each in the amount of $199,982.00. Mingzheng made a similar payment to Counterparty 5 on October 29, 2015, for the amount $199,982.00. These U.S. dollar payments, which cleared through U.S. correspondent banking accounts, violated U.S. law, because Mingzheng was surreptitiously making them on behalf of FTB, whose designation precluded such transactions.

- 19 -

C.  MINGZHENG FACILITATES DPRK PAYMENTS TO CHINESE SUPPLIER
ZTE THROUGH CHINESE COMPANY 2

55.  A search for other financial transactions related to Mingzheng determined that Mingzheng was linked to a series of financial transactions benefiting the Chinese telecommunication company ZTE Corporation ("ZTE"), which pled guilty to U.S sanction violations in March 2017.

56.  According to an investigation led by FBI and the Department of Commerce, ZTE was identified as having a significant trade relationship with the Korea Posts and Telecommunications Company ("KPTC"), a North Korean state owned Telecommunications Company. KPTC utilized several intermediary companies to assist with various aspects of the business relationship with ZTE. As part of a U.S. government inquiry into ZTE's illegal business practices, ZTE allowed an independent auditing company to examine their contract management system and business records. The audit identified at least four Chinese trade companies that were used as the intermediaries for KPTC's business with ZTE. One of the Chinese trade companies identified as facilitating ZTE's North Korean business was Chinese Company 2. Mingzheng wired Chinese Company 2 approximately $2,295,728, while Chinese Company 2 was laundering funds on behalf of the North Korean government to ZTE.

57.  CS-2 confirmed that Mingzheng's SPDB account ending in 6150, one of the known Mingzheng accounts referenced in paragraph 45, was referenced in numerous payment instructions from FTB. These payment instructions included the $96,345.42 Mingzheng payment to Counterparty 4 that is part of the Defendant Funds. CS-2 further indicated that Mingzheng received confirmation of eight additional payments to/from FTB involving Mingzheng's CMB account ending in 2808.

58.     Mingzheng's payments to ZTE further demonstrate Mingzheng's role as a major front company procuring products in U.S. dollars on behalf of North Korean entities. These U.S. dollar payments, which cleared through U.S. correspondent banking accounts, violated U.S. law, because Mingzheng was surreptitiously making them on behalf of FTB, whose designation precluded such transactions.

## V.     SUMMARY OF FACTS GIVING RISE TO FORFEITURE

59.     Sanctions against North Korea make it illegal for North Korean banks, such as FTB, to make payments in U.S. dollars, without an OFAC license.

60.     In sum, the investigation has revealed that Mingzheng is a front company acting on behalf of a covert foreign branch of FTB to launder U.S. dollar transactions, in violation of United States laws.

### COUNT ONE -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

61.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 60 above as if fully set forth herein.

62.     FTB, Mingzheng, and others, known and unknown, acted individually and conspired together to conduct the above identified illegal procurements and payments in violation of IEEPA, specifically 50 U.S.C. § 1705; and the conspiracy statute, 18 U.S.C. § 371.

63.     As such, the Defendant Funds are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to violations of IEEPA and a conspiracy to violate IEEPA.

## COUNT TWO -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(A))

64.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 60 above as if fully set forth herein.

65.     FTB, Mingzheng, and others, known and unknown, acted individually and conspired together to transmit and transfer the Defendant Funds to a place inside the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of IEEPA, in violation of 18 U.S.C. § 1956(a)(2)(A), (h).

66.     As such, the Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(a)(2)(A), (h), or as any property traceable to such property.

\*     \*     \*

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that notice issue on the Defendant

Funds as described above; that due notice be given to all parties to appear and show cause why the

forfeiture should not be decreed; that judgment be entered declaring that the Defendant Funds be

forfeited to the United States of America for disposition according to law; and that the United

States of America be granted such other relief as this Court may deem just and proper, together

with the costs and disbursements of this action.

Dated: June 14, 2017
      Washington, D.C.

                         Respectfully submitted,

                         CHANNING D. PHILLIPS,
                         United States Attorney

By:         /s/
                         Zia M. Faruqui, D.C. Bar No. 494990
                         Deborah Curtis
                         Chris Brown
                         Brian Hudak
                         Assistant United States Attorneys
                         555 Fourth Street, N.W.
                         Washington, D.C. 20530
                         (202) 252-7566 (main line)

                         *Attorneys for the United States of America*

## **VERIFICATION**

I, Benjamin Whitley, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this <u>14th</u> day of June, 2017.

<u>        *Benjamin Whitely*          </u>
Benjamin Whitley
Special Agent
Federal Bureau of Investigation

# EXHIBIT M

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

CYNTHIA WARMBIER, *et al.*,

        Judgment Creditors

    v.

DEMOCRATIC PEOPLE'S REPUBLIC OF
KOREA,

        Judgment Debtor.

**FILED UNDER SEAL**

Case No. 1:21-MC-00021 (LEK/DJS)

## EXPERT DECLARATION OF PROFESSOR SUNG-YOON LEE

    I, Sung-Yoon Lee, of Burlington, Massachusetts, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury as follows:

### Professional and Educational Background

    1.    I am the Kim Koo-Korea Foundation Professor in Korean Studies and Assistant Professor at the Fletcher School of Law and Diplomacy at Tufts University in Medford, Massachusetts, where I teach graduate courses on Korea and U.S.-East Asia relations, with a particular focus on North and South Korean politics and foreign relations. Examples of courses I have recently taught include "North Korean State and Society," "U.S.-East Asia Relations: 1945 to the Present," and "The Politics of the Korean Peninsula: Foreign and Inter-Korean Relations." I am also a Faculty Associate at the U.S.-Japan Program, Weatherhead Center for International Affairs, Harvard University. I have been a professor at the Fletcher School since 1998, as an Adjunct Assistant Professor of International Politics from 1998 to 2005 and 2007 to 2011. I am a former National Asia Research Program Research Fellow at the National Bureau of Asian Research and the Woodrow Wilson International Center for Scholars (2011-2012) and former

1

Associate in Research at the Korea Institute at Harvard University (1998-2015). A copy of my *Curriculum Vitae* is attached hereto as **Exhibit A**.

2.     I earned my Ph.D. in International Relations from the Fletcher School in 1998, and my Master of Arts degree in Law and Diplomacy from the Fletcher School in 1994. I obtained a Bachelor of Arts degree in American and British Literature from the New College in Sarasota, Florida in 1991.

3.     I have frequently spoken before various governmental entities on matters concerning North Korea. On March 5, 2013, I testified as an expert witness before the U.S. House Foreign Affairs Committee on potential U.S. sanctions legislation and financial regulatory measures against North Korea's illicit trade in arms, counterfeit currency, and drugs. I have also testified before the Asia and the Pacific Subcommittee of the U.S. House Foreign Affairs Committee in the following hearings: "Pressuring North Korea: Evaluating Options" held on March 23, 2017, and "North Korea's Diplomatic Gambit: Will History Repeat Itself?" held on April 11, 2018. In all of the above-mentioned congressional hearings, I was joined by my co-expert witnesses who are former and current senior policymakers in U.S. Government: David Asher, former special coordinator for the State Department's North Korea Working Group; Ambassador Joseph DeTrani, Director of the National Counter Proliferation Center and Special Advisor to Director of National Intelligence; Bruce Klingner, former CIA Deputy Division Chief for Korea; Anthony Ruggiero, former State Department and Treasury Department policymaker and former National Security Council Director for North Korea; Professor Victor Cha, former director for Asian affairs at the National Security Council; and Christopher Hill, former U.S. ambassador to South Korea and former Assistant Secretary for East Asian and Pacific Affairs at the U.S. Department of State, and lead U.S. negotiator to the so-called "Six-Party Talks," aimed at

2

resolving the North Korean nuclear crisis (2003-2008). In addition, I also testified in a special conference on May 3, 2018, held at the United Nations (and co-sponsored by the United States, the European Union, Japan, Republic of Korea and Australia), as an expert witness on North Korean human rights.

4.    I have briefed former President Barack Obama in the White House, with four other North Korea experts in attendance, on April 29, 2013. I have also briefed Senator Bob Corker, the chairman of the Senate Committee on Foreign Relations, in his Senate office, on March 5, 2013. I also prepared and delivered a presentation on January 24, 2011 before the U.S. Senate Chiefs of Staff entitled, "Preparing for the Decline and Demise of the Democratic People's Republic of Korea."

5.    I am presently writing a book on Kim Yo Jong, the First Sister of North Korea, to be published by Pan MacMillan on June 23, 2022. I have authored several articles concerning North Korean politics, foreign relations, and human rights issues, including the following:

- "Countering North Korea's Carrot-and-Stick Policy," lead article in William H. Overholt, ed., *North Korea: Peace or War?* (Cambridge: Mossavar-Rahmani Center, Harvard University, 2019), a compilation of articles by leading scholars and practitioners from Korea, China, and the United States.

- "Seoul's Supporting Role in North Korea's Sanctions-Busting Scheme" in *Asia Policy* (13.3, July 2018).

- "Forgotten Borders: Japan's Maritime Operations in the Korean War and Implications for North Korea," in Geofffrey F. Gresh, ed., *Eurasia's Maritime Rise and Global Security: From the Indian Ocean to Pacific Asia and the Arctic* (Palgrave, 2018).

- *Getting Tough on North Korea*, Foreign Affairs (May/June Issue, 2017).

- *North Korea's Next Dare*, Foreign Affairs (Sept. 13, 2015).

- *The Pyongyang Playbook*, Foreign Affairs (Aug. 26, 2010).

I have published over 100 op-eds concerning North Korean foreign relations and human rights issues in numerous publications, including The New York Times, The Washington Post, the

Wall Street Journal, The Los Angeles Times, The Christian Science Monitor, and The Hill. I am also a frequent commentator on North Korean-U.S. relations on major international broadcast networks, such as BBC, CNN, PBS, MSNBC, and CNBC.

6.       I have previously provided an expert declaration in support of the Judgment Creditors' Motion for Default Judgment (Dkt. No. 16) in the matter captioned *Warmbier et al. v. Democratic People's Republic of Korea* (Case No. 18-977) before Chief Judge Beryl A. Howell in the U.S. District Court for the District of Columbia. I did not receive any compensation for my services in the foregoing matter, and I will likewise not receive any compensation for my services in this matter pending before the Court.

## Nature of this Expert Witness Declaration

7.       I have been asked by counsel to Cynthia Warmbier and Frederick Warmbier (the "Judgment Creditors") to submit this declaration and provide my expert opinion with respect to whether a particular entity, Korea Kwangson Banking Corporation ("KKBC"), constitutes an "agency or instrumentality" of the Democratic People's Republic of Korea ("DPRK" or "North Korea").

8.       For purposes of providing this expert declaration, I have been provided with the following definition of "agent or instrumentality" under the Terrorism Risk Insurance Act: "To demonstrate that Defendants are 'agencies or instrumentalities' of a terrorist party under the TRIA, therefore, Plaintiffs must show that each Defendant (1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 135 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

4

## Report

9.     Based upon my review of open source information, positions and statements made by various components of the U.S. Government, and my own academic and professional knowledge, I readily conclude that KKBC not only constitutes an agency or instrumentality of the North Korean state but is an essential state enterprise that facilitates North Korea's manifold sanctions evasion and illicit activities around the world, including, as the latest UN Panel of Experts Report, dated March 4, 2021 ("UN Expert Report"), noted, those "related to maritime sanctions, the importation of luxury goods, illicit labour and the laundering of proceeds related to the theft of virtual assets" that "predominantly target and use financial institutions in China."[1]

### A.     KKBC Was a Means Through Which a Material Function of North Korea Was Accomplished, and KKBC Provided Material Services to, on behalf of, or in Support of North Korea

10.     As noted by the U.S. Congress, KKBC has "been designated by the Secretary of the Treasury and the European Union as having materially contributed to the proliferation of weapons of mass destruction." 22 U.S.C. § 9222(a)(10) (setting forth congressional findings).

11.     On August 11, 2009, the U.S. Department of Treasury "designated Korea Kwangson Banking Corp. (KKBC) under Executive Order (E.O.) 13382 for providing financial services in support of both Tanchon Commercial Bank (Tanchon) and Korea Hyoksin Trading Corporation (Hyoksin), a subordinate of the Korea Ryonbong General Corporation (Ryonbong)."[2] The press release further noted the following:

> Tanchon and Ryonbong, were identified by the President as weapons of mass destruction (WMD) proliferators and listed in the Annex to E.O. 13382 in June 2005, and Hyoksin was designated by Treasury in July 2009 for being owned or controlled by Ryonbong.  All three entities have been designated by the UN

---

[1] *See* Rep. of the S.C., at 52, ¶ 139, U.N. Doc. S/2021/211 (2021), https://undocs.org/S/2021/211.
[2] *See* Press Release, U.S. Dep't of Treasury, Treasury Designates Financial Institution Tied to North Korea's WMD Proliferation (Aug. 11, 2009), https://www.treasury.gov/press-center/press-releases/pages/tg260.aspx

pursuant to UN Security Council Resolution (UNSCR) 1718 for their roles in North Korea's WMD and missile programs.  E.O. 13382 freezes the assets of proliferators of WMD and their supporters and prohibits U.S. persons from engaging in transactions with them, thereby isolating them from the U.S. financial and commercial systems.

"North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey.

Since 2008, Tanchon has been utilizing KKBC to facilitate funds transfers likely amounting to millions of dollars, including transfers involving Korea Mining Development Trading Corporation (KOMID)-related funds from Burma to China in 2009.  KOMID, which has been identified by the President in the Annex to E.O.13382 and designated by the UN pursuant to UNSCR 1718, is North Korea's premier arms dealer and main exporter of goods and equipment related to ballistic missiles and conventional weapons.  Tanchon, the financial arm of KOMID, plays a key role in financing KOMID's sales of ballistic missiles.  Additionally, Hyoksin, which the UN described as being involved in the development of weapons of mass destruction, sought to use KKBC in connection with a purchase of dual-use equipment in 2008.

Due to KKBC's relationship to Tanchon, Hyoksin, and Ryonbong, today's action is consistent with UNSCR 1718's requirement to freeze the funds of and deny financial services to UN-designated entities.  It is also consistent with UNSCR 1874's call to prevent the provision of financial services or any financial assets that could contribute to North Korea's nuclear, ballistic missile, or other WMD-related programs.

12.     Additionally, on March 2, 20216. the United Nations Security Council adopted Resolution 2270, which applied a previous mandatory asset freeze (through Resolution 1718) on several additional entities, including KKBC, for being "engaged in or providing support for, including through other illicit means, DPRK's nuclear-related, other weapons of mass destruction-related and ballistic missile-related programmes . . ."  S.C. Res. 1718, ¶ 8(d) (Oct. 14, 2006); S.C. Res. 2270, ¶ 10 (Mar. 2, 2016).  Shortly after the adoption of Resolution 2270, on March 4, 2016, the Council of the European Union adopted its own Council Decision (CFSP) 2016/319, adding KKBC to the European Union's list of sanctioned North Korean entities.  2016 O.J. (L 60/78) 5.

13.     In addition to the above, based on my own knowledge and familiarity with the methods utilized by North Korea to move funds illicitly through the global financial system in support of the development of weapons programs, I am aware that North Korea continues to access international financial systems through offshore accounts, money-laundering, and the use of shell companies in the advancement of its weapons of mass destruction programs. As the U.N. Expert Report above states, "The illicit revenue generated from sanctions evasion activities and laundered through these networks both directly and indirectly supports the country's weapons of mass destruction and ballistic missile programmes. These networks' obfuscation methods and techniques continued to exploit those Member States with lax or minimal financial oversight, rules and regulations."[3] I firmly believe KKBC is a key node in North Korea's networks of illicit activities.

14.     Accordingly, KKBC is a means through which a material function of North Korea is carried out, to wit, the illicit movement of funds though the global financial system to support the funding of North Korea's weapons programs. Relatedly, KKBC provided material services to, on behalf of, or in support of North Korea in furtherance of these ends.

**B.     KKBC was Owned, Controlled, and Directed by North Korea**

15.     Based on my own knowledge and familiarity with the government and economy of North Korea, I know that financial institutions such as KKBC based in North Korea, a totalitarian state, are, in fact, owned, controlled, and directed by the Government of North Korea. KKBC is a Pyongyang-based financial institution that used its overseas branch in Dandong, China, to facilitate financial transactions related to the North Korean Government's development of weapons of mass

---

[3] Rep. of the S.C., at 51-52, ¶ 138, U.N. Doc. S/2021/211 (2021), https://undocs.org/S/2021/211.

destruction, a task of the highest national priority. Hence, I am readily able to conclude that KKBC is owned, controlled, and directed by the Government of North Korea.

16.     In sum, KKBC functions as an organ of the state of North Korea, and it constitutes an "agent or instrumentality" of North Korea as those terms are used in TRIA.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on *April 2*, 2021, in *Burlington, MA*

Signed: _____
          Sung-Yoon Lee

8

# Exhibit A

# Curriculum Vitae

Name in Full: Sung-Yoon Lee
Address: The Fletcher School, 160 Packard Ave., Medford, MA 02155
Office Tel: 617-627-███; Mobile: 617-417-███
Email: ███████████

- **Kim Koo-Korea Foundation Professor of Korean Studies and Assistant Professor**
  **The Fletcher School of Law and Diplomacy;**
  Associate in Research, Korea Institute, Harvard University, 1998-2016
  Former National Asia Research Program Research Fellow, The National Bureau of Asian Research and the Woodrow Wilson International Center for Scholars
- Visiting Professor, ROK Ministry of Unification, September 14-October 4, 2014
- Visiting Research Fellow, Northeast Asia History Foundation, July-August, 2014
- Adjunct Assistant Professor of International Politics,
  The Fletcher School of Law and Diplomacy, Fall 2007-Novmber 2011.
- Visiting Professor of Korean Studies,
  Sogang University, Seoul, Korea, Summer 2007.
  Visiting Professor, Seoul National University, Summer, 2012-2015
- Kim Koo Research Associate
  Kim Koo Forum on U.S.-Korea Relations.
  Korea Institute, Harvard University, July 2005 to June 2006.
- Adjunct Assistant Professor of International Politics,
  The Fletcher School of Law and Diplomacy, 1998-2005.
  Visiting Assistant Professor of History,
  Tufts University, 2000-2005.
- Associate in Research, The Korea Institute, Harvard University, 1999 to present.
- Adjunct Assistant Professor of Asian Studies and Government,
  Bowdoin College, Brunswick, Maine, Spring 2000.

Education

| | |
|---|---|
| May 1998 | Ph.D., The Fletcher School of Law and Diplomacy, Tufts University |
| May 1994 | M.A. in Law and Diplomacy, The Fletcher School, Tufts University |
| May 1991 | B.A. in American and British Literature, New College, Sarasota, FL |
| June 1990 | Intensive Summer Session in Advanced Chinese, UC Berkeley |
| 1984-1987 | Northfield Mount Hermon School, Massachusetts, *Cum Laude* |
| 1981-1984 | Yoido Secondary School, Seoul, Korea |
| 1980 | Geneva International School, Geneva, Switzerland |
| 1979-1980 | King's College Junior School, Wimbledon, England |
| 1977-1979 | St. Richard's with St. Andrew's Church of England Primary School, Richmond, England |

- Ph.D. Dissertation: "The Antinomy of Divine Right and the Right to Resistance: *Tian Ming*, *Dei Gratia*, and *Vox Populi* in Syngman Rhee's Korea, 1948-1960"
- MALD Thesis: "Technology and Culture"
- Courses recently offered: "North Korean State and Society," "The U.S. and Northeast Asia," "The U.S. and East Asia: 1945 to the Present," "The Politics of the Korean Peninsula: Foreign and Inter-Korean Relations."
- Languages: Korean, English, Mandarin Chinese (intermediate)

Publications

--Monograph draft titled **In Due Course: The Conception of Korean Democracy**, examining the political culture of mass defiance in South Korea, the internal dynamics of the Korean peninsula, and prospects for the unification of the two Koreas (near completion).

--Monograph draft, **The Pyongyang Playbook: North Korea's Revolutionary Unification Policy**, examining North Korea's strategic provocations and peace ploys (in progress).

Articles:

- "Seoul's Supporting Role in Pyongyang's Sanctions-Busting Scheme," *Asia Policy*, Vol. 13., No. 3 (July 2018), 13-19.
- "Forgotten Borders: Japan's Maritime Operations in the Korean War and Implications for North Korea," in Geoffrey f. Gresh, ed., *Eurasia's Maritime Rise and Global Security: From the Indian Ocean to Pacific Asia and the Arctic* (Palgrave, 2018)
- "Getting Tough on North Korea: How to Hit Pyongyang where It Hurts," *Foreign Affairs* 96 (65), May/June 2017 (with Joshua Stanton and Bruce Klingner)
- **"North Korea's Revolutionary Unification Policy,"** *International Journal of Korean Studies*, **Vol. XIX, No. 2 Fall/Winter 2014.**
- "The Seoul-Beijing-Tokyo Triangle: Terra-Centric Nordpolitik vs. Oceanic Realpolitik," Korea Economic Institute of America Press and Palgrave MacMillan (2014).
- "North Korean Exceptionalism and South Korean Conventionalism: Prospects for a Reverse Formulation?" *Asia Policy* **15**, The National Bureau of Asian Research, January 2013.
- "The Boy Who Would Be King," *NBR Expert Brief*, National Bureau of Asia Research, December 28, 2011.
- The Pyongyang Playbook," *Foreign Affairs*, August 26, 2010.
- "Engaging North Korea: The Clouded Legacy of South Korea's Sunshine Policy," *Asian Outlook*, American Enterprise Institute for Public Policy, April 2010.

2

- Sung-Yoon Lee, "The United States Should Make North Korean Human Rights a Priority," in Louise Gerdes, ed., ***Opposing Viewpoints: North Korea and South Korea*** (Farmington Hills, MI: Greenhaven Press, 2007).
- "The Folly of Fabled Sentimentality: South Korea's Unorthodox Courtship of North Korea," **The Woodrow Wilson International Center for Scholars Special Report,** November, 2006.
- "Dependence and Defiance: Historical Dilemmas in U.S.-Korea Relations," ***Korea Policy Review***, The John F. Kennedy School of Government, Harvard University, Summer 2006.
- "The Mythical Nuclear Kingdom of North Korea," ***The Fletcher Forum of World Affairs*** (Summer/Fall 2005), Vol. 29:2.
- "Nuclear Diplomacy vis-à-vis the DPRK: A Dead-End Street," ***The Fletcher Forum of World Affairs*** (Summer/Fall 2003), Vol. 27: 2.
- Commissioned by Center for National Policy to translate the first—since the North Korean nuclear crisis resurfaced in October 2002—secret proposal in writing by North Korea to the United States, **"Requisites for Resolving the Nuclear Issue,"** December 16, 2003 http://www.cnponline.org/Issue%20Briefs/North%20Korea/North%20Korea%20Paper.PDF
- Translation, Kim Hyun Sik, "The Secret History of Kim Jong Il," ***Foreign Policy***, September/October, 2008.
- Translation, Kim Chi-Ha, "My Poetry: Visions from the Darkness of the 1970s," ***Korea Policy Review***, The John F. Kennedy School of Government, Harvard University, Summer 2008.


Select columns and short essays:

1. 'Moon over Pyongyang, Peddles Peace," *The Hill*, September 22, 2018, and 12 other op-eds in 2018.
2. "Why won't the U.S. use its full sanctions power against North Korea?" *Los Angeles Times*, September 8, 2017.
3. "The Way to Make North Korea Back Down," *The New York Times*, September 6, 2017.
4. "Why Do We Appease North Korea?" *The New York Times*, May 17, 2017
5. "How Trump Can Get Tough on North Korea—Making Kim Pay for Belligerence," ***Foreign Affairs***, January 18, 2017.
6. "Make Pyongyang Pay" (with Joshua Stanton), ***Foreign Policy***, February 10, 2016.
7. "How to Get Serious with North Korea" (with Joshua Stanton), **CNN**, January 15, 2016.
8. "Beef Up Sanctions on North Korea" (with Joshua Stanton), ***Wall Street Journal***, January 4, 2016.
9. "Shinzo Abe's Sorry Apology" (co-authored with Zach Przystup), ***Foreign Policy***, May 1, 2015.
10. "A North Korean Con Job" (co-authored with Joshua Stanton), ***New York Times***

3

November 10, 2014.

11. "Japan Alienates Its Friends" (co-authored with Zach Przystup), **Wall Street Journal Asia**, June 26, 2014.

12. "North Korea's Hate Crimes" (co-authored with Joshua Stanton), **CNN.com**, May 10, 2014.

13. "Pyongyang's Hunger Games" (co-authored with Joshua Stanton), **The New York Times**, March 6, 2014.

14. "Abe's Profane Pilgrimage," **The New York Times**, January 6, 2014.

15. "Financial sanctions could force reforms in North Korea" (co-authored with Joshua Stanton), **The Washington Post**, February 20, 2014.

16. "World must awaken to North Korea's camps of horror" (co-authored with Joshua Stanton), **CNN.com**, December 7, 2013.

17. "South Korea's Chomskyite flunkeys," **Asia Times Online**, December 12, 2013.

18. "Rodman just a toy for N. Korea's Kim," **CNN.com**, September 7, 2013.

19. "North Korea is far from suicidal," **CNN.com**, April 4, 2013.

20. "Seoul Mates?" **Foreign Policy**, March 20, 2013.

21. "Hit Kim Jong Eun where it hurts: His wallet" (co-authored with Joshua Stanton) **The Washington Post**, February 12, 2013.

22. "Don't engage Kim Jong Un — bankrupt him" (co-authored with Joshua Stanton), **Foreign Policy**, January 9, 2013.

23. "South Korea's New President Must Challenge the North," **The New York Times**, December 19, 2012.

24. "Why North Korea's Rocket Mattered," **The New York Times**, April 14, 2012, and 40 other opeds.


Book Reviews:

- Brad Glosserman and Scott Snyder, *The Japan-South Korea Identity Clash: East Asian Security and the United States* (New York: Columbia University Press, 2016), in Brill Online.
- Daniel J. Lawler & Erin R. Mahan, eds., *Foreign Relations of the United States, 1969-1976, Vol. XIX, Part 1: Korea, 1969-1972* (Washington, D.C.: United States Government Printing Office, 2010), in H-Diplo Roundtable, H-Net, March (forthcoming).
- Jonathan Pollack, *No Exit: North Korea, Nuclear Weapons and International Security* (Washington, D.C.: Brookings Institution and Routledge, 2011), in *Asia Policy 13*, The National Bureau of Asian Research, January 2012.
- Thomas J. Christensen, *Worse Than A Monolith: Alliance Politics and Problems of Coercive Diplomacy in Asia* (Princeton: Princeton University Press, 2011), in New Global Studies, De Gruyter, December 2011.
- Steven Casey, *Selling the Korean War: Propaganda, Politics, and Public Opinion in the United States, 1950-1953* (Oxford: Oxford University Press, 2008), in H-Diplo Roundtable, H-Net, March 17, 2009.

4

- ▪ Gregg Brazinsky, *Nation Building in South Korea: Koreans, Americans, and the Making of Democracy* (Chapel Hill: The University of North Carolina Press, 2007), in H-Diplo Roundtable, H-Net, August 1, 2008.
- ▪ Son Key-young, *South Korean Engagement Policies and North Korea: Identities, Norms and the Sunshine Policy* (Abingdon, Routledge, 2006), in *International Affairs* (Chatham House, Vol. 82, No. 5, September 2006).

Activities

Frequent commentator on Korean foreign relations and domestic politics: Multiple appearances on BBC, National Public Radio, Public Radio International, CBC, CNN, CN8, ABC, NBC, CBS, FOX TV, PBS News Hour with Jim Lehrer, New England Cable News, Bloomberg News, CGTN, CTV, Voice of America, Radio Free Asia, Radio Free Europe, Voice of Russia, Reuters, Al Jazeera, etc.

Sung-Yoon Lee has lectured and presented papers at dozens of major universities and leading think tanks in the world. He has testified as an expert witness at a U.S. House of Representatives Committee on Foreign Affairs Hearing on North Korea policy, most recently, at a hearing on "North Korea's Diplomatic Gambit: Will History Repeat Itself?" April 11, 2018, and has advised senior officials and elected leaders in the U.S. government, including the President of the United States of America.